**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CONSOLIDATED FOR TRIAL**

FILED by ___ D.C.

MAR 1 2 2018

STEVEN M. LARiMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

COMPULIFE SOFTWARE, INC.

Plaintiff,

v.

BINYOMIN RUTSTEIN
and DAVID RUTSTEIN,

Defendants.

CASE NO:  9:16-CV-80808-JMH

COMPULIFE SOFTWARE INC.,

Plaintiff,

v.

MOSES   NEWMAN,   DAVID   RUTSTEIN,
BINYOMIN RUTSTEIN and AARON LEVY,

Defendants.

CASE NO.:  9:16-cv-81942-JMH

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

These consolidated cases were tried before the Court in a bench trial held from October 3,

2017 to October 6, 2017. (08 DE 186; 187; 189; 190).[1] During that trial, the Court heard the live

testimony of Christopher Bruner, Plaintiff's programmer (Tr. 42 DE 192 at 3-43)[2]; Nancy Miracle,

Plaintiff's expert witness (Tr. 42 DE 192 at 43-66; 42 DE 193 at 1-41); Jeremiah Kuhn, Plaintiff's

chief financial officer and chief operating officer (Tr. 42 DE 193 at 41-94); Brian McSweeney, a

life insurance agent (Tr. 42 DE 194 at 4-56); Robert Barney, Plaintiff's founder and president

(Tr. 42 DE 195 at 15-106; DE 196 at 4-98); Defendant Moses Newman (Tr. 42 DE 197 at 11-

---

[1] Docket entries referring to case number 9:16-CV-80808-JMH will be cited as (08 DE XX). Docket entries referring to case number 9:16-CV-81942-JMH will be cited as (42 DE XX).

[2] The transcript of the bench trial is filed in the 42 case at docket entries 192, 193, 194, 195, 196, 197, and 214. When citing to the trial transcript, the Court denotes it with a "Tr." and cites to the appropriate docket entry and page number – found at the top right of each page in the Court's header – and line number(s). The Court does not utilize the transcript's original page numbers, which continue consecutively through the entire transcript, as those numbers are obscured by the Court's header.

49); and Defendant David Rutstein (Tr. 42 DE 197 at 50-100; DE 214 at 15-87). The Court received deposition designations for Defendant Binyomin Rutstein and watched the video of the designated portions during the trial. (Tr. 42 DE 193 at 95-96; DE 194 at 3-4); (*Deposition Designations,* 08 DE 179 at 1-2, 42 DE 194 at 3); (*Video File on DVD,* 08 DE 200); (*Deposition Transcript.* 08 DE 196-2). The Court also received deposition designations for Anthony Wilson of One Resource Group; the parties read the designated portions out loud during the trial. (*Deposition Designations,* 08 DE 150 at 1-2; DE 151 at 1-2; DE 179 at 3-4); (*Deposition Transcript,* 08 DE 196-1). The Court additionally received deposition designations for Defendant Aaron Levy; the Court reviewed the designated portions in chambers. (Tr. 42 DE 195 at 11; DE 197 at 102); (*Deposition Designations,* 08 DE 150 at 2; DE 179 at 2-3); (*Video File on DVD,* 08 DE 200). The parties also introduced numerous exhibits, which have been filed in the record. (*Exhibit List,* 08 DE 208); (*Plaintiff's Trial Exhibits,* 08 DE 192, 193, 194, 195); (*Defendants' Trial Exhibits,* 08 DE 191, 197, 199).

On January 24, 2018, the Court held an evidentiary hearing on the issues of: (1) whether the Defend Trade Secrets Act is applicable to the conduct at issue in the 08 case; and (2) whether Plaintiff's state law claims in both cases are preempted by the Florida Uniform Trade Secrets Act. (08 DE 209; 217). At the hearing, the Court heard the live testimony of Robert Barney, (H-Tr. 08 DE 221 at 12:20-24),[3] admitted five additional exhibits, (08 DE 218), and received deposition designations for Defendant Moses Newman, (H-Tr. 08 DE 221 at 30:25-31:22). Based upon the testimony, deposition designations, exhibits, stipulations, pleadings, and other proceedings, the Court makes the following findings of fact and conclusions of law.

---

[3] When citing to the transcript of the Evidentiary Hearing held on January 24, 2018, the Court denotes it with a "H-Tr." and cites to the appropriate docket entry and page number – found at the top right of each page in the Court's header – and line number(s).

# I.    FINDINGS OF FACT

## 1.    Compulife

1. Plaintiff, Compulife Software, Inc. ("Compulife"), is a software company founded by Robert Barney ("Barney") in 1982. (Tr. 42 DE 195 at 15:24-18:25).

Compulife Program

1. Compulife is the creator of the Compulife Quotation System, a term life insurance comparison software program that performs life insurance policy comparisons ("Program"). (S.F. 08 DE 177 at ¶ 1, 3).[4]

2. Compulife has invested substantial time, effort, and financial resources creating the Program and promoting the Program in interstate commerce to life insurance agents and brokers. (S.F. 08 DE 177 at ¶ 22).

3. Compulife does not sell insurance. (Tr. 42 DE 195 at 19:23-20:11).

4. Compulife licenses its Program to customers as both a stand-alone version that operates on a personal computer ("PC version") and an internet engine ("Internet Engine version") that runs independently on the customer's server. (S.F. 08 DE 177 at ¶ 2); (Tr. 42 DE 192 at 4:6-15; DE 193 at 44:13-15; DE 195 at 28:13-18).

5. Compulife customers that license the PC Version can purchase an add-on that allows the customer to put an internet-based version of the Program on their website; this add-on is known as the Website Quoter. (Tr. 42 DE 193 at 44:4-15, 71:23-72:7).

6. At one point, the Website Quoter was called Website Quotes. (Tr. 42 DE 193 at 71:25-72:1).

7. The Website Quoter speaks to the compulife.net server. (Tr. 42 DE 193 at 71:25-72:7).

8. The PC and Internet Engine versions of the Program are written in C++ code. (Tr. 42 DE 192

---

[4] The Parties' Stipulated Facts for Trial are cited as "S.F." followed by a citation to its location on the docket.

at 14:2-22, 53:9-16).

9. Compulife obtained a Certificate of Registration from the United States Copyright Office for two versions of this C++ code: the 2001 version – titled the 2001 Main Source Code – and the 2010 version – titled the 2010 Main Source Code. (P.E. 153 a, filed at 08 DE 193-17)[5] (2001 Main Source Code Certificate of Registration); (P.E. 153 c, filed at 08 DE 193-19) (2010 Main Source Code Certificate of Registration).

10. The 2001 Main Source Code was registered effective May 29, 2015, and was assigned Reg. No. TXu 1-962-793. (P.E. 153 a, filed at 08 DE 193-17) (2001 Main Source Code Certificate of Registration).

11. The 2010 Main Source Code was registered effective May 29, 2015, and was assigned Reg. No. TXu 1-962-792. (P.E. 153 c, filed at 08 DE 193-19) (2010 Main Source Code Certificate of Registration).

12. Chris Bruner ("Bruner"), Compulife's programmer, wrote both of the registered versions of the C++ code and did not copy them from anyone else.  (Tr. 42 DE 192 at 5:2-10).

13. Bruner was an employee of Compulife when he wrote both the 2001 Main Source Code and the 2010 Main Source Code. (Tr. DE 192 at 10:10-12).

14. Bruner assigned ownership in the 2001 Main Source Code and the 2010 Main Source Code to Compulife. (Tr. DE 192 at 9:17-23); (P.E. 153 a, filed at 08 DE 193-17; 153 c, filed at 08 DE 193-19).

Transformative Database

15. Compulife has a transformative database ("Transformative Database"), which contains the

---

[5] Plaintiff's exhibits are identified as "P.E." followed by the exhibit number. Defendants' exhibits are identified as "D.E." followed by the exhibit number. When citing to either party's exhibits, the Court identifies the location of that exhibit on the docket.

information used by Compulife's host software[6] to provide information about user quotes. (Tr. 42 DE 192 at 50:11-14).

16. The information input into the Transformative Database is derived, in part, from insurance rate tables provided by insurance companies. (Tr. 42 DE 192 at 33:16-34:2).

17. The rate tables are public information. (Tr. 42 DE 195 at 21:9-10, 23:11).

18. Barney often gets the rate tables from insurance companies in advance of their public release due to the relationships he has developed with these companies. (Tr. 42 DE 195 at 19:5-22, 20:12-15, 23:11-24:3).

19. Barney inputs certain information from the rate tables into the Transformative Database using a program known as the back-office software. (Tr. 42 DE 192 at 7:5-9, 33:16-34:2, 50:15-16).

20. Barney uses his experience in the term life insurance industry to translate the information in the rate tables into the information that is input into the back-office software program. (Tr. 42 DE 195 at 22:9-23:4).

21. Only Barney knows how the information from the rate tables is input into the back-office software program. (Tr. 42 DE 192 at 7:7-12; DE 195 at 21:21-22).

22. The back office software program uses a formula to calculate premiums using the information input by Barney. (Tr. 42 DE 192 at 33:16-34:9, DE 195 at 24:4-12).

23. The back-office software program also builds and maintains the Transformative Database. (Tr. 42 DE 192 at 50:15-16).

24. The back-office software program encrypts the information contained in the Transformative Database to ensure that the data files cannot be easily reverse engineered. (Tr. 42 DE 192 at

---

[6] It appears that the host software is the version of the Internet Engine that is stored on a Compulife server and interacts with the www.term4sale.com website. (Tr. 42 DE 193 at 5:4-6) (discussing Get Commands sent to "host software").

7:7-21; DE 195 at 23:5-8); (S.F. 08 DE 177 at ¶ 12).

25. Bruner created the back-office software program. (Tr. 42 DE 192 at 34:3-4).

26. The back-office software program is used only by Compulife and is not provided to anyone outside of Compulife. (Tr. 42 DE 192 at 7:16-17); (S.F. 08 DE 177 at ¶ 11).

27. The Transformative Database is stored on one of Compulife's servers. (Tr. 42 DE 192 at 8:5-13).

28. End users can access the Transformative Database only though the Compulife website www.term4sale.com. (Tr. 42 DE 192 at 8:5-13).

Data Used by PC and Internet Engine Versions of Program

29. Insurance agents who purchase a licensed copy of the PC version of the Program receive some encrypted data.[7] (Tr. 42 DE 192 at 51:3-6).

30. Insurance agencies can purchase a licensed copy of the Internet Engine, which comes with a database of information. Both the Program and the accompanying database of information[8] are installed on the agencies' server for use by their agents. (Tr. 42 DE 192 at 51:3-9; DE 195 at 28:13-29:4); (P.E. 550 at 5, filed at 08 DE 195-27).

31. Licensees of the Internet Engine version can accept data feeds from other providers that are not Compulife. (Tr. 42 DE 196 at 27:23-28:7).

Serial Numbers and Watermarks

32. Licensed versions of the Program are assigned a serial number. (Tr. 42 DE 192 at 5:20-6:8; 31:18-20; 61:1-2).

33. When a premium request is made using an Internet Engine version, the Program checks the customer's serial number and confirms that that the request is coming from a licensed

---

[7] It is unclear whether this encrypted data is a copy of any portion of the Transformative Database.

[8] It is unclear whether this database is a copy of any portion of the Transformative Database.

customer. (Tr. 42 DE 192 at 5:11-6:8).

34. At some point,[9] Compulife added a watermark system to identify the serial number of the customer requesting the quote. (Tr. 42 DE 192 at 26:8-15).

35. The watermark system identifies the customer requesting the quote by placing a two-letter code that corresponds to the user's serial number within the product name of the quotes returned. (Tr. 42 DE 192 at 26:8-27:15).

36. Quotes obtained through www.term4sale.com display a watermark assigned to the www.term4sale.com website. (Tr. 42 DE 192 at 40:8-12).

Compulife Customers

37. Compulife's licensed customers are typically agents that sell life insurance to the public or distributors of life insurance products that service multiple agents using either the PC or Internet Engine version of the Program. (S.F. 08 DE 177 at ¶ 4); (Tr. 42 DE 192 at 51:3-5).

38. Licensed Internet Engine customers are allowed to remarket access to the Internet Engine to customers that have purchased a license for the PC version of Compulife's Program. (Tr. 42 DE 195 at 28:24-29:6).

39. The public can use the Internet Engine version through Compulife's website, www.term4sale.com. (S.F. 08 DE 177 at ¶ 5); (Tr. 42 DE 192 at 4:18-20; DE 195 at 27:16-22).

Compulife's HTML Code

40. Compulife uses HTML code to provide a user interface to the Internet Engine version of the Program. (Tr. 42 DE 192 at 6:9-11).

41. Through this interface, users input certain information to obtain a list of premiums, which are

---

[9] It is unclear when Compulife added the watermark feature.

also called quotes. (S.F. 08 DE 177 at ¶ 5); (Tr. 42 DE 192 at 4:21-24).

42. The HTML code must contain the correct variables, or parameters, in order for the Internet Engine to produce quotes. (Tr. 42 DE 192 at 6:14-20).

43. Bruner made up the variables himself. (Tr. 42 DE 192 at 21:3-5).

44. The HTML code can be viewed on in any web browser. (Tr. 42 DE 192 at 37:18-25, 55:4-6).

45. Compulife obtained a Certificate of Registration from the United States Copyright Office for two versions of this HTML code: the 2001 version – titled the 2001 HTML Source Code – and the 2010 version – titled the 2010 HTML Source Code. (P.E. 153 b, filed at 08 DE 193-18) (2001 HTML Source Code Certificate of Registration); (P.E. 153 d, filed at 08 DE 193-20) (2010 HTML Source Code Certificate of Registration).

46. The 2001 HTML Source Code was registered effective May 29, 2015, and was assigned Reg. No. TX-8-106-360. (P.E. 153 b, filed at 08 DE 193-18) (2001 HTML Source Code Certificate of Registration).

47. The 2010 HTML Source Code was registered effective May 29, 2015, and was assigned Reg. No. TX-8-106-364. (P.E. 153 d, filed at 08 DE 193-20) (2010 HTML Source Code Certificate of Registration).

48. Bruner wrote both registered versions of the HTML code and did not copy from anyone else. (Tr. 42 DE 192 at 5:2-10).

49. Bruner was an employee of Compulife when he wrote both the 2001 HTML Code and the 2010 HTML code. (Tr. DE 192 at 10:10-12).

50. Bruner assigned ownership in the 2001 HTML Code and 2010 HTML Code to Compulife.

(Tr. DE 192 at 10:13-19[10], 11:17-19); (P.E. 153 b, filed at 08 DE 193-18; 153 d, filed at 08 DE 193-20).

51. Compulife has always had a copyright notice on the www.term4sale.com website. (Tr. DE 195 at 27:12-13).

www.term4sale.com

52. Compulife developed the www.term4sale.com website around 1999. (Tr. DE 195 at 25:12-24).

53. Visitors to www.term4sale.com can input their certain personal information and receive a list of term life insurance quotes. (S.F. 08 DE 177 at ¶ 5); (Tr. 42 DE 192 at 4:21-24).

54. Visitors can request to have their information sent to three insurance agents who can then contact the visitor. (S.F. 08 DE 177 at ¶ 5); (Tr. 42 DE 192 at 4:21-5:1).

55. Agents who receive these referrals pay Compulife for the service. (S.F. 08 DE 177 at ¶ 5).

56. The version of the Internet Engine that interfaces with www.term4sale.com resides on a Compulife server. (Tr. 42 DE 195 at 28:8-12).

Licensing Agreements and Terms of Use

57. After a 30-day trial period, Compulife requires all users to agree to a licensing agreement in order to continue to use the Compulife Program; if the user does not do so the Program stops working.[11] (S.F. 08 DE 177 at ¶ 15); (Tr. 42 DE 193 at 42:18-43:8; DE 195 at 31:1-16).

58. Compulife has at least three versions of its licensing agreement: a Standard License Agreement, a Personal Use License Agreement, and an Internet Engine License Agreement.

---

[10] Although Bruner identified Plaintiff's Exhibit 153 d as the registration certificate for the main source code, the Certificate of Registration fount in Exhibit 153 d reflects that it is for the 2010 HTML Source Code.

[11] It is unclear when Compulife began requiring users to agree to a licensing agreement.

(P.E. 532, 533, 534, 535, 536, 537 filed at 08 DE 195-13, -14, -15, -16, -17, -18) (Current,

P.E. 532, and 2010, P.E. 533, version of the Standard License Agreement; Current, P.E. 534,

and 2010, P.E. 535, version of the Personal Use License Agreement; Current, P.E. 536, and

2015, P.E. 537, version of the Internet Engine License Agreement).

59. These licensing agreements provide that Compulife's software constitutes Compulife's
valuable trade secrets, that the object code constituting the Software and updates of the
Software contains confidential and trade secret material, and that the user will not duplicate
Compulife's software except for back-up purposes. (S.F. 08 DE 177 at ¶ 16); (P.E 532 at §
3(ii)and (iii), filed at 08 DE 195-13); P.E 533 at § 3(ii)and (iii), filed at 08 DE 195-14; P.E
534 at § 3(ii)and (iii), filed at 08 DE 195-15; P.E 535 at § 3(ii)and (iii), filed at 08 DE 195-
16; P.E 536 at § 3(ii)and (iii), filed at 08 DE 195-17; P.E 537 at § 3(ii)and (iii), filed at 08
DE 195-18).

60. These licensing agreements further provide that the user's license for Compulife's software is
not transferable without the written consent of Compulife. (S.F. 08 DE 177 at ¶ 21); (P.E 532
at § 3(v), filed at 08 DE 195-13); P.E 533 at § 3(v), filed at 08 DE 195-14; P.E 534 at § 3(v),
filed at 08 DE 195-15; P.E 535 at § 3(v), filed at 08 DE 195-16; P.E 536 at § 3(viii), filed at
08 DE 195-17; P.E 537 at § 3(viii), filed at 08 DE 195-18).

61. The 2015 version and Current version of the Internet Engine License Agreement provide that
Compulife displays life insurance quotations on the internet through a proprietary system of
template files originally created by Compulife, and that the user will not permit sub-users to
re-format a quotation on another computer. (P.E 536 at § 3(v), filed at 08 DE 195-17; P.E
537 at § 3(v), filed at 08 DE 195-18).

62. The 2015 version and Current version of the Internet Engine License Agreement also provide

that the process of posting variables by an html page involves names of variables and lists of variables which are proprietary to Compulife and subject to Compulife's copyright. (P.E 536 at § 3(vi), filed at 08 DE 195-17; P.E 537 at § 3(vi), filed at 08 DE 195-18).

63. The 2015 version and Current version of the Internet Engine License Agreement further provide that, prior to providing internet web quoting service to sub-users, the customer will contact Compulife by email to confirm that the third party is a licensee of Compulife. (P.E 536 at § 3(iv), filed at 08 DE 195-17; P.E 537 at § 3(iv), filed at 08 DE 195-18).

64. After September 6, 2016, Compulife added a "Terms of Use Agreement" to the www.term4sale.com website. (S.F. 08 DE 177 at ¶ 53).

## 2.   Defendants

David Rutstein

65. David Rutstein ("David") is an individual who currently resides in Jerusalem, Israel, and has resided in Israel since 2004. (S.F. 08 DE 177 at ¶ 35).

66. David is also known as David Gordon, Bob Gordon, and Nate Golden. (S.F. 08 DE 177 at ¶ 35).

67. David was previously licensed by the Florida Department of Financial Services as an insurance agent. (S.F. 08 DE 177 at ¶ 36).

68. At one time David had insurance licenses in 40 different states. (S.F. 08 DE 177 at ¶ 37).

69. Beginning in 2010, insurance regulators began to terminate and/or stop renewing David's insurance licenses. (S.F. 08 DE 177 at ¶ 38).

70. On April 19, 2012, in the Matter of David Brian Rutstein, Case No. 115256-11-AG, a Consent Order was entered revoking the license to sell insurance previously issued to David, and David was immediately and permanently removed and permanently barred from any and all direct or indirect participation in and/or affiliation with, any entity which is licensed or

regulated under the Florida Insurance Code, and any individual or entity which is otherwise involved in the business or transaction of insurance. (S.F. 08 DE 177 at ¶ 39); (P.E. 1, filed at 08 DE 192-1).

<u>Binyomin Rutstein</u>

71. Binyomin Rutstein ("Binyomin") is David Rutstein's son.  (S.F. 08 DE 177 at ¶ 40).

72. Binyomin's resident agent address and place of business is 11618 Briarwood Circle, #1, Boynton Beach, Florida. (S.F. 08 DE 177 at ¶ 42).

73. However, Binyomin does not live or work at 11618 Briarwood Circle, #1, Boynton Beach, Florida. (S.F. 08 DE 177 at ¶ 42).

74. Instead, 11618 Briarwood Circle, #1, Boynton Beach, Florida, is the address of the home of Binyomin's grandmother Arleen Rutstein. (S.F. 08 DE 177 at ¶ 42).

75. Binyomin is a legal resident of Jerusalem, Israel, where he has lived for the past seven years. (S.F. 08 DE 177 at ¶ 44).

76. Binyomin is an insurance agent licensed in 35 different states and appointed as agent by 70 different insurance companies to act as the producer on sales of insurance policies. (S.F. 08 DE 177 at ¶ 41).

77. Binyomin has never sold a life insurance policy. (S.F. 08 DE 177 at ¶ 43).

78. American Web Designers, Ltd. ("AWD") is an Ohio company set up by Binyomin that is licensed as an insurance agency in Florida. (Tr. 42 DE 197 at 62:18-24).

<u>Moses Newman</u>

79. Moses Newman ("Newman") is an individual who currently has temporary residence in the United States. (Tr. 42 DE 197 at 11:20-22).

80. By April of 2016, Newman was doing programming work for www.naaip.org. (Tr. 42 DE

197 at 34:3-35:25).

Aaron Levy

81. Aaron Levy ("Levy") is an individual who resides at 111 Agripas, Apt. 20, Jerusalem, Israel 9451311. (S.F. 08 DE 177 at ¶ 46).

### 3.  www.naaip.org and www.beyondquotes.com

www.naaip.org

82. David became involved in internet sites at least thirteen years ago when he moved to Israel. (Tr. 42 DE 197 at 55:19-21).

83. He has created 30 to 40 insurance-related lead generation websites. (Tr. 42 DE 197 at 56:20-57:4).

84. David and Levy came up with the idea for www.naaip.org. (Tr. 42 DE 197 at 57:13-18).

85. David founded the "National Association of Accredited Insurance Professionals" or "NAAIP" in 2010. (S.F. 08 DE 177 at ¶ 34).

86. David initially claimed that he ceased being involved with NAAIP after April 19, 2012. (S.F. 08 DE 177 at ¶ 60).

87. Before trial, David stipulated that he was involved with NAAIP after April 19, 2012. (S.F. 08 DE 177 at ¶ 72).

88. During trial, David admitted he was not truthful at his deposition when he said he was not involved with NAAIP after April 19, 2012. (Tr. 42 DE 197 at 50:7-14; 214 at 16:19-17:11).

89. During trial, David admitted that he sent and received emails from the david@naaip.org email account. (Tr. 42 DE 214 at 26:25-27:17).

90. Binyomin initially claimed that he was never involved in NAAIP, but later admitted that he authorized Aaron Levy and Moses Newman to use his insurance licenses in connection with the operation and marketing of NAAIP to insurance agents. (S.F. 08 DE 177 at ¶ 59).

91. NAAIP is not a real entity, charity, not-for-profit, or trade association, and is not incorporated anywhere. (S.F. 08 DE 177 at ¶ 24).

92. NAAIP does not issue credentials or accreditation. (S.F. 08 DE 177 at ¶ 24).

93. The concept of www.naaip.org is to provide an automated process for giving free websites to insurance agents using a simple website template. (S.F. 08 DE 177 at ¶ 25); (Tr. 42 DE 197 at 57:19-58:8).

94. The key benefit offered by a free www.naaip.org website is access to NAAIP's "Life Insurance Quote Engine." (S.F. 08 DE 177 at ¶ 26).

95. Visitors to one of these free www.naaip.org websites can enter certain basic personal information and the Life Insurance Quote Engine will return a list of quotes for term life insurance policies. (S.F. 08 DE 177 at ¶ 27).

www.beyondquotes.com

96. In 2008, David purchased the www.beyondquotes.com website for $5,000 from a non-party. (Tr. 42 DE 197 at 57:5-12); (P.E. 166 at 50-51, filed at 08 DE 193-26).

97. David used www.beyondquotes.com to generate insurance leads. (Tr. 42 DE 197 at 59:22-25).

98. The www.beyondquotes.com website also operates a "Life Insurance Quote Engine" that allows internet visitors to www.beyondquotes.com to enter certain basic personal information and obtain a list of quotes for term life insurance policies. (S.F. 08 DE 177 at ¶ 29).

99. If a visitor to www.beyondquotes.com wishes to purchase one of the policies, that visitor becomes a "lead" that www.beyondquotes.com sells to insurance agents who are customers of www.beyondquotes.com. (S.F. 08 DE 177 at ¶ 30).

### 4.    VAM DB and Brian McSweeney

100.    VAM DB is an insurance customer relationship manager software program owned by

MSCC Corporation ("MSCC"). (S.F. 08 DE 177 at ¶ 62); (Tr. 42 DE 194 at 11:17-12:2); (P.E. 157, filed at 08 DE 193-21).

101.   Michael Steinhardt ("Steinhardt") is the owner and founder of MSCC. (S.F. 08 DE 177 at ¶ 64); (P.E. 157, filed at 08 DE 193-21).

102.   MSCC is a Compulife customer that has a license to the Internet Engine version of the Compulife Program. (S.F. 08 DE 177 at ¶ 63).

103.   Brian McSweeney ("McSweeney") is a life insurance agent. (Tr. 42 DE 194 at 4:19-20).

104.   McSweeney is currently employed by MBM Life Quotes, LLC ("MBM"). (Tr. 42 DE 194 at 4:13-17).

105.   McSweeney is the sole owner of MBM. (Tr. 42 DE 194 at 23:20-21).

106.   MBM[12] is a former Compulife customer. (Tr. 42 DE 194 at 5:6-7; 24:2-9).

107.   MBM is also a VAM DB customer. (Tr. 42 DE 194 at 11:19-21).

108.   As a Compulife customer, MBM licensed the PC Version of the Program with a Quoter Add-On. (Tr. 42 DE 193 at 70:4-6).

109.   On August 15, 2011, MBM entered into a lead agreement with AWD ("Lead Agreement"). AWD was represented by David Rutstein for purposes of the Lead Agreement. (Tr. 42 DE 194 at 5:16-22); (P.E. 28, filed at 08 DE 192-12).

110.   Pursuant to the Lead Agreement, www.beyondquotes.com provided MBM with leads for the sale of insurance policies. (Tr. 42 DE 194 at 6:4-9, 7:12-17).

111.   For every sale made pursuant to one of these leads, MBM paid AWD a lead generation

---

[12] It is unclear whether McSweeney as an individual or MBM as an entity was technically the Compulife customer. *Compare* (Tr. 42 DE 194 at 5:6-7, 24:2-13) (McSweeney, answering questions regarding whether he is or was a Compulife customer) *with* (Tr. 42 DE 193 at 70:4-6) (Kuhn, testifying about MBM's Compulife account). For purposes of clarity and consistency, the Court refers to MBM as the Compulife customer.

fee. (Tr. 42 DE 194 at 6:4-9).

112.   About ninety days after entering into the Lead Agreement, McSweeney asked Steinhardt to integrate leads from www.beyondquotes.com into MBM's VAM DB account. (Tr. 42 DE 194 at 13:21-25; 26:9-15).

113.   These leads were integrated into MBM's database using VAM DB's Compulife account. (Tr. 42 DE 194 at 14:6-17).

114.   David also partnered with Eric Savage, who was a licensed Compulife customer. (Tr. 42 DE 193 at 91:12-14; DE 196 at 62:15-18; DE 197 at 60:4-6).

115.   On March 23, 2011, Eric Savage sent an email to service@compulife.com. Savage noted that he may be using a different domain name and website soon and asked whether he needed to "buy compulife" for his second website or whether, instead, he could use the "same engine" for both. (D.E. 2, filed at 08 DE 191-2).

116.   Jeremiah Kuhn ("Kuhn"), Plaintiff's chief financial officer and chief operating officer, responded to that email the same day, stating that per his conversation with Savage, Savage's web designer could put the Website Quoter on any website that Savage owned. (D.E. 2, filed at 08 DE 191-2).

117.   On August 17, 2011, David Rutstein, using the email address bob@naaip.org, sent an email to McSweeney and service@compulife.com. The email stated that David had an account with Compulife through Eric Savage and asked that Compulife make adjustments to the quote engine on www.beyondquotes.com. The email also stated that David worked with McSweeney and asked Compulife how to adjust the system by which clients put in their information and received life insurance quotes. David stated that his site would be separate from McSweeney's so that David could track the leads, but stated that "they will be going to

[McSweeney] anyways." (D.E. 1, filed at 08 DE 191-1).

118.    Kuhn responded to this email the next day and stated that "for both Eric [Savage] and Brian [McSweeney]'s Website Quotes, I have sent you a separate email with an attachment that has the code for that option." In the separate email, Kuhn sent the Website Quoter to the bob@naaip.org email address. (D.E. 3, filed at 08 DE 191-3) (8/18/11 response from Kuhn to David); (D.E. 4, filed at 08 DE 191-4) (separate email referenced in 8/18/11 response from Kuhn); (Tr. 42 DE 193 at 73:8-13).[13]

119.    Kuhn believed that the August 17, 2011 email was from a web designer that was associated with McSweeney. (Tr. 42 DE 193 at 90:7-10).

120.    Kuhn also thought www.beyondquotes.com belonged to Eric Savage. (Tr. 42 DE 193 at 91:24-92:2).

121.    Kuhn would not have provided the Website Quoter for use on www.beyondquotes.com if he had known that www.beyondquotes.com was not owned by either Savage or McSweeney. (Tr. 42 DE 193 at 92:6-9).

122.    On April 8, 2015, Barney was made aware of the www.naaip.org website by one of Compulife's customers. (Tr. 42 DE 195 at 31:17-25).

123.    Barney visited the www.naaip.org website and ran a life insurance quote. (Tr. 42 DE 195 at 32:1-2).

124.    Barney recognized the company and product names in the quote obtained from www.naaip.org as the ones created for the Compulife Program. (Tr. 42 DE 195 at 32:1-12).

125.    Barney viewed the source code of the www.naaip.org agent's website, but was unable to

---

[13] Although Defense Counsel referenced Defense Exhibit 5 in discussing this email, it is clear that she was referencing Defense Exhibit 4 as that Exhibit is the email between Kuhn and bob@naaip.org which sent the Website Quoter.

determine what internet engine and server the website was calling. (Tr. 42 DE 195 at 32:12-23).

126.    Barney then called the toll free number on the www.naaip.org home page and spoke to David, who identified himself as David Gordon. (Tr. 42 DE 195 at 38:18-39:1).

127.    From April 8, 2015, through at least April 13, 2015, Barney repeatedly contacted David to assert that David was using Compulife's products without permission and demand that David either stop using the products or purchase a license. (Tr. 42 DE 195 at 38:22-44:12); (P.E. 17, filed at 08 DE 192-8; 129, filed at 08 DE 193-9; 236, filed at 08 DE 194-12).

128.    Upon discovering a link between www.beyondquotes.com and www.naaip.org and receiving an email from www.beyondquotes.com that evidenced a link to McSweeney, Barney called McSweeney to inquire about the use of Compulife's Website Quoter on those two websites. (Tr. 42 DE 195 at 45:2-15).

129.    McSweeney did not have any information, but pointed Barney to Steinhardt. (Tr. 42 DE 195 at 45:13-15).

130.    On April 10, 2015, Barney contacted Steinhardt, who discovered that the access was coming through MBM's VAM DB user account. (Tr. 42 DE 194 at 17:4-13; DE 195 at 45:16-21, 56:15-23); (P.E. 157, filed at 08 DE 193-21).

131.    Steinhardt took down the link on the VAM DB server between MBM and www.naaip.org by disabling MBM's VAM DB account. (Tr. 42 DE 194 at 17:4-13; DE 195 at 56:15-23; DE 214 at 29:7-10); (P.E. 157, filed at 08 DE 193-21).

132.    After Steinhardt disabled the account, www.naaip.org and www.beyondquotes.com stopped producing life insurance quotes. (Tr. 42 DE 195 at 56:15-23).

133.    Barney informed McSweeney that NAAIP had obtained access to the Compulife Website

Quoter through the VAM DB account that was associated with MBM. (Tr. 42 DE 194 at 16:6-25).

134.   McSweeney never gave authorization to David or AWD to access to the Website Quoter. (Tr. 42 DE 194 at 17:1-3).

HTML Code on www.naaip.org

135.   Plaintiff's 2010 HTML Source code is contained in Plaintiff's Exhibit 542. (filed at 08 DE 195-20).

136.   The code contained in this exhibit is the code that was deposited with the copyright office in order to obtain the Registration for the 2010 HTML Source code. (Tr. 42 DE 192 at 12:20-24).

137.   Plaintiff's expert, Nancy Miracle, compared the 2010 HTML Source code to the source code on one of the www.naaip.org agent websites. (Tr. 42 DE 192 at 56:24-57:14).

138.   Miracle testified about her comparison of the two codes and, specifically, about the comparison – found on Slide 9 of Miracle's demonstrative slide show – of a small excerpt of the 2010 HTML Source Code with an excerpt from the code on the www.naaip.org agent website.[14] (P.E. 550 at 9, filed at 08 DE 195-27).

139.   When asked whether the code from the www.naaip.org agent's website was a copy of portions of Plaintiff's HTML code, Miracle answered "yes, of course," noting that the "parameters have to be exact." (Tr. 42 DE 192 at 59:10-12).

140.   Barney also testified about the source code on the www.naaip.org agent website. Barney

---

[14] Slide 9 identifies the comparison code from the www.naaip.org agent's website as Exhibit 426. (P.E. 550 at p. 9, filed at 08 DE 195-27). Plaintiff did not admit an exhibit 426; neither did Defendants. (08 DE 208) (Exhibit List). Instead, the excerpt that appears in Slide 9 also appears in Plaintiff's Exhibit 149, which is the source code found on www.naaip.org website of agent "TMattteson77." *Compare* (P.E. 550 at p. 9, filed at 08 DE 195-27) (Slide 9) *with* (P.E. 149 at p. 15-16, filed at 08 DE 193-14). For purposes of its analysis, this Court assumes that Miracle compared Plaintiff's 2010 HTML Source Code, found in Plaintiff's Exhibit 542, with the code found in Plaintiff's Exhibit 149.

stated that while some of the information in the www.naaip.org source code was "not [his] stuff," he identified line 508 of that code as code used by Compulife. He also testified that the www.naaip.org source code used number, as opposed to letter, codes to identify states and that Compulife also uses these number codes in its code. Finally, Barney testified that the www.naaip.org source code distinguished between personal and business policies for the state of New York, which is something still contained in Compulife's codes even though such a distinction is no longer used in New York. (Tr. 42 DE 195 at 36:7-38:17).

### 5.    Get Commands

141.    Between September 1, 2016 and September 6, 2016, a total of 871,055 requests were made to the www.term4sale.com website[15] from the IP address 5.29.63.18, which is owned by ISP[16] called Hot-Net Internet Services, Ltd, that is located in Israel. (S.F. 08 DE 177 at ¶ 65); (Tr. 42 DE 192 at 18:3-19:6; 62:16-25).

142.    Plaintiff's Exhibit 200 is a log file of the www.term4sale.com server that lists the 997,386 hits on the www.term4sale.com server that occurred between September 1 and September 6 of 2016. 126,331 of these hits came from users of the www.term4sale.com website and not from the Israeli IP address. (Tr. 42 DE 192 at 17:5-17; 21:11-20); (P.E. 200, filed at 08 DE 194-5 through -8).

143.    The requests from the Israeli IP address used a "Get Command," also known as a "Get

---

[15] Although parties stipulated that the requests were made to the www.term4sale.com website, there is conflicting testimony as to whether the requests were made to the website or, instead, to the server that speaks to the website. *See, e.g.,* (Tr. 42 DE 192 at 16:2-7; 17:5-17) (Bruner, testifying that a Get Command is a request to a server and discussing requests made to server that are logged in Plaintiff's Exhibit 200); (Tr. 42 DE 193 at 7:9-8:3) (Miracle, discussing hits on server); (Tr. 42 DE 192 at 9:19-21) (Miracle, referring to her analysis of the "attack" on the Compulife website); (Tr. 42 DE 193 at 24:15-25:14) (Miracle, stating that a get command has "nothing to do with the website; it has to do with the host"). It is further unclear whether the server that speaks to the www.term4sale.com website is the server on which the Transformative Database is stored.

[16] Although unclear from the record, ISP likely refers to an internet service provider.

Code" or "Get Request." (Tr. 42 DE 192 at 15:16-23; 16:2-4).

144.    The requests from users of the www.term4sale.com website used a "Post" request. (Tr. 42 DE 193 at 8:4-8).

145.    The requests from the Israeli IP address were sent at a rate of several requests per second, indicating that they were sent using an automated process. (Tr. 42 DE 192 at 62:16-18; DE 193 at 7:7-21).

146.    For each Get Command, the www.term4sale.com server returned life insurance quotes for the parameters – such as zip code and birth month – that were contained in the Get Command. (Tr. 42 DE 193 at 4:8-7:24).

147.    The Get Commands from the Israeli IP address requested quotes for only two zip codes: 10458 (a New York zip code) and 33433 (a Florida zip code). (Tr. 42 DE 192 at 23:6-24:1; DE 193 at 8:13-22).

148.    Newman received a data file in CSV format from woman named Natal who lives in Israel. (Tr. 42 DE 197 at 42:24-43:3).

149.    At some point, Newman observed Natal obtain the information contained in the CSV data files by using a computer to send automated requests. (Tr. 42 DE 197 at 43:4-11).

150.    The information from these CSV files was integrated into the database that provides quote information to the www.naaip.org websites. (Tr. 42 DE 197 at 43:12-16).

151.    The database for the www.naaip.org websites contains data for only two zip codes: one in Florida and one in New York. (Tr. 42 DE 197 at 44:12-17).

152.    Bruner compared the Compulife HTML code[17] to the Get Commands sent from the Israeli IP address and discovered that the parameters in the Get Commands were the same as

_____

[17] It is unclear whether Bruner's comparison was to the 2001 or 2010 version of the HTML Source Code.

those in Compulife's HTML code. (Tr. 42 DE 192 at 16:8-14, 20:22-21:10).

**6.    Defendants' Admissions Regarding Permission and Authority from Compulife**

153.    The Defendants are not and have never been authorized users of the Compulife Software.[18] (S.F. 08 DE 177 at ¶ 69).

154.    The Defendants have never had permission or authority to copy, use, display, make available, distribute or make derivative works of the Compulife Software. (S.F. 08 DE 177 at ¶ 67, 70, 71).

155.    The Defendants were never authorized by Compulife to use or access the Compulife Internet Engine. (S.F. 08 DE 177 at ¶ 66, 68).

156.    Compulife never gave Defendants permission to access Compulife's database of insurance information, or copy, distribute or make derivative works of Compulife's HTML code. (S.F. 08 DE 177 at ¶ 68).

## II.    CONCLUSIONS OF LAW

The Court finds, and both parties agree, that this Court has subject matter jurisdiction over these consolidated cases pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), and 1367. (42 DE 159-2).

---

[18] The stipulated facts regarding these admissions are based on Defendants' admissions to allegations in Plaintiff's Complaints in the 08 and 42 cases. In the 08 Complaint, the term "Compulife Software" is defined to mean "the Compulife Quotation System [ ], a life insurance comparison software program." (08 DE 8 at ¶ 7). The 08 Complaint further alleges that Compulife has registered the Compulife Software with the Copyright Office and lists the Registrations for the 2001 and 2010 Main Source Codes and the 2001 and 2010 HTML Source Codes. (08 DE 8 at ¶ 10). The 42 Complaint states that the term "Compulife Software" means "Compulife's software and database that are the subject of the [Registrations for the 2001 and 2010 Main Source Codes and the 2001 and 2010 HTML Source Codes]." (42 DE 24 at ¶ 13). However, the Registrations for the Main Source Code and HTML Source Code reflect that the subject material was "computer program" for the Main Source Codes and "text, HTML code," for the HTML Source Codes. (P.E. 153 a, filed at 08 DE 193-17) (2001 Main Source Code Certificate of Registration); (P.E. 153 c, filed at 08 DE 193-19) (2010 Main Source Code Certificate of Registration); (P.E. 153 b, filed at 08 DE 193-18) (2001 HTML Source Code Certificate of Registration); (P.E. 153 d, filed at 08 DE 193-20) (2010 HTML Source Code Certificate of Registration). No database was included in the copyright subject material. Defendants' admissions are limited to the meaning of the term "Compulife Software" as used in the 08 and 42 Complaints.

In the 08 case, Plaintiff's allegations center on the Life Insurance Quote Engine on both www.naaip.org and www.beyondquotes.com. Plaintiff asserts that the Life Insurance Quote Engine is an unauthorized copy of Plaintiff's Website Quoter. The Amended Complaint in case number 16-CV-80808 asserts the following claims against Defendants David Rutstein and Binyomin Rutstein: Count I: Direct Copyright Infringement (17 U.S.C. § 501); Count II: Contributory Copyright Infringement (17 U.S.C. § 501); Count III: Federal Unfair Competition (15 U.S.C. § 1125(a)); Count IV: Federal Theft of Trade Secrets (18 U.S.C. § 1836(b)); Count V: Florida Theft of Trade Secrets (Chapter 688, Florida Statutes); Count VII: Unfair Competition (Florida Common Law); Count VIII: Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.204). (08 DE 8). Plaintiff voluntarily dismissed Count VI, which alleged a violation of the Florida Computer Abuse and Data Recovery Act (Fla. Stat. § 688.803), before trial.

In the 42 case, Plaintiff's alleges that in September of 2016, Defendants David Rutstein, Binyomin Rutstein, Aaron Levy, and Moses Newman caused over 800,000 quotes to be generated by www.term4sale.com with get commands and then stored the quotes in a database used by the quote engine on www.naaip.org and www.beyondquotes.com. The Verified Complaint in case number 16-CV-81942 asserts the following claims against all Defendants: Count I: Violation of the Economic Espionage Act of 1996 as Amended by the Federal Defend Trade Secrets Act of 2016[19] (18 U.S.C. § 1836(b)); Count II: Direct Copyright Infringement (17 U.S.C. § 501); Count III: Contributory Copyright Infringement (17 U.S.C. § 501); Count IV: Federal Unfair Competition (15 U.S.C. § 1125(a)); Count V: Florida Theft of Trade Secrets (Chapter 688, Florida Statutes); Count VI: Violation of the Florida Computer Abuse and Data Recovery Act (Fla. Stat. § 688.803); Count VII: Unfair Competition (Florida Common Law). (42

---

[19] This Count is brought under the same statute as Count IV in the 08 case. It is unclear why Plaintiff titled these counts differently.

DE 24).

<u>Weight Assigned to Miracle's Expert Report and Trial Testimony</u>

As an initial matter, the Court addresses the weight assigned to the legal conclusions contained within the expert report and trial testimony of Plaintiff's expert, Nancy Miracle. "[A]n expert witness may not testify as to h[er] opinion regarding ultimate legal conclusions," *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009) (citing *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir.1990)), and "courts must remain vigilant against the admission of legal conclusions." *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977).[20] However, a court's gatekeeping role is relaxed when the case is tried by bench trial. *See Chick-Fil-A, Inc. v. CFT Dev., LLC*, No. 5:07-CV-501-OC-10GRJ, 2009 WL 1754058, at *2 (M.D. Fla. June 18, 2009) (Where a "case is set for a bench trial, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.") (quotation omitted). Nonetheless, when testimony containing opinions regarding legal conclusions is admitted those opinions are "entitled to no deference." *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) (testimony from plaintiff and his patent attorney, regarding proper construction of patent claim, "amount[ed] to no more than legal opinion" and was entitled to no deference; court noted that "as to these types of opinions, the court has complete discretion to adopt the expert legal opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it").

The Court deemed Miracle "an expert on matters relating to computer software programming and the other computer-related matters" at issue in this case. (Tr. 42 DE 192 at

---

[20] All decisions of the former Fifth Circuit handed down prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

46:12-19). Miracle is not an attorney. (Tr. 42 DE 193 at 16:16-17). Miracle's expert report and

trial testimony[21] included numerous opinions on legal conclusions. *See, e.g.*, (Tr. 42 DE 192 at

49:15-25) (opinion that compilation of information contained in Plaintiff's database is a trade

secret); (Tr. 42 DE 193 at 13:20-14:23) (opinion that the use of the Get Commands constituted a

violation of the Florida Computer Abuse and Data Recovery Act); (*Expert Report*, 08 DE 72 at

19) (opinion that Defendants infringed on Plaintiff's copyrights). Miracle testified that in

reaching these opinions, she used case law and legal principles provided by Plaintiff's counsel.

(Tr. 42 DE 193 at 16:12-17:15). The legal principles provided by Plaintiff's counsel are

incorporated in Miracle's expert report. (Tr. 42 DE 193 at 17:7-11). Because Miracle is not

competent to offer opinions containing legal conclusions, the Court exercises its discretion to not

consider such opinions, as it indicated during trial. (Tr. 42 DE 193 at 20:19-21:22).

### A.   DIRECT COPYRIGHT INFRINGEMENT
(Count I in 08 case; Count II in 42 case)

"To establish a claim of copyright infringement, [Plaintiff] must prove '(1) ownership of

a valid copyright, and (2) copying of constituent elements of the work that are original.'"

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (quoting *Feist Publications,*

*Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

<u>*Feist*'s First Prong</u>

"To satisfy *Feist* 's first prong, plaintiff must prove that the work *as a whole* is original

and that the plaintiff complied with applicable statutory formalities." *MiTek Holdings, Inc. v.*

*Arce Eng'g Co.*, 89 F.3d 1548, 1553–54 (11th Cir. 1996) (emphasis added) (quotation omitted).

"Original, as the term is used in copyright, means only that the work was independently created

---

[21] Defense counsel failed to object to the majority of Miracle's testimony containing opinions on legal conclusions. However, defense counsel did raise an objection on that basis towards the end of Miracle's direct examination, which the Court sustained. (Tr. 42 DE 193 at 12:19-13:5).

by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist,* 499 U.S. at 345 (citing 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 2.01[A], [B] (1990)) [hereinafter NIMMER 1990]. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* (quoting NIMMER 1990 at § 1.08 [C] [1]).

"In any judicial proceedings the certificate of a registration made *before or within five years after first publication of the work* shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. § 410(c) (emphasis added), including the originality of the author, *see* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.11[B][1][a] (Matthew Bender, rev. ed., 2017) [hereinafter NIMMER] ("Because originality of the author is a necessary condition to validity of the copyright, it follows that a certificate of registration, properly obtained within the prescribed five-year period, constitutes *prima facie* evidence of the author's originality.") (footnotes omitted). However, "[t]he evidentiary weight to be accorded the certificate of a registration *made thereafter* shall be within the discretion of the court." 17 U.S.C. § 410(c) (emphasis added). "[T]he court, in its discretion, may accord such later filings presumptive validity." NIMMER at § 12.11[A][1]. "Upon receipt of some evidence for plaintiff's ownership, courts typically extend the presumption." *Id.* "[T]he burden [then] shifts to the defendant to demonstrate why the claim of copyright is invalid." *Bateman,* 79 F.3d at 1541. "At this juncture, it is incumbent upon a putative infringer to establish that the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that the *portion of* the copyrighted work actually taken is unworthy of copyright protection." *Id.* (emphasis added). Here, "the task is to distinguish between protectable

expression and unprotectable 'methods of operation,' 'processes,' and the like." *Id.* n.21 (quoting 17 U.S.C. § 102(b)).

In both the 08 and the 42 case, Plaintiff claims that Defendants infringed on its 2010 HTML Source Code. (P.P. 08 DE 204 at 25-26).[22] Plaintiff obtained a Certificate of Registration ("Registration") for the work titled "2010 HTML Source Code" with an effective date of May 29, 2015. (P.E. 153 d, filed at 08 DE 193-20). Plaintiff acknowledges it is not automatically entitled to the presumption of validity as its Registration was made more than five years after initial publication. (P.P. 08 DE 204 at 25); (P.E. 153 d, filed at 08 DE 193-20) (listing date of first publication as January 31, 2010). Thus, the "evidentiary weight to be accorded the certificate of [ ] registration" is "within the discretion of th[is] [C]ourt." *See* 17 U.S.C. § 410(c).

The fact that Plaintiff missed the five-year window by less than one year weighs in favor of extending the presumption of validity. *See Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 227 (S.D.N.Y. 1988) (five-year requirement was added because "the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate"). *Cf. Brown v. Latin Am. Music Co.*, 498 F.3d 18, 24–25 (1st Cir. 2007) (approving of district court's decision to afford copyright registration "little or no weight" where decision was based, in part, on fact that twenty years had passed between first publication and registration). Further, Plaintiff presented evidence of its ownership in the copyright. Bruner testified that he wrote the code for Plaintiff as an employee of Plaintiff. (Tr. 42 DE 192 at 31:13-17). *See* 17 U.S.C. § 201(b) ("Works Made for Hire.--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and,

---

[22] Plaintiff's Proposed Findings of Fact and Conclusions of Law are cited as P.P followed by a citation to its location on the docket. The Court refers to the page numbers found at the top of each page in the Court's header.

unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). Moreover, Bruner testified that he assigned ownership in the copyright for the 2010 HTML Source Code to Plaintiff, (Tr. 42 DE 192 at 10:10-20),[23] and the Registration reflects that the transfer was by written agreement, (P.E. 153 d, filed at 08 DE 193-20). *See* 17 U.S.C. § 201(d)(1) ("ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law"); § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."). Defendants do not dispute that Bruner authored the 2010 HTML Source Code or that Plaintiff owns the copyright in that code.

The Court finds that Plaintiff's Registration for the 2010 HTML Source Code is entitled to a presumption of validity. *See Lifetime Homes, Inc. v. Residential Dev. Corp.*, 510 F. Supp. 2d 794, 800–01 (M.D. Fla. 2007) (finding that plaintiff, who obtained certificate of registration more than 5 years after first publication, established ownership of a valid copyright where defendants failed to point to any evidence indicating that the registration was not valid or that plaintiff did not own the copyright). The Registration thus "constitutes *prima facie* evidence of the author's originality."[24] *See* NIMMER § 12.11[B][1][a].

Thus, "the burden shifts to [ ] defendant[s] to demonstrate why the claim of copyright is

---

[23] Although Bruner identified Plaintiff's Exhibit 153 d as the registration certificate for the main source code, the Certificate of Registration found in Exhibit 153 d reflects that it is for the 2010 HTML Source Code.

[24] Even without this presumption, Plaintiff established the originality of the 2010 HTML Source Code *as a whole*. Bruner testified that he wrote the 2010 HTML Source Code and did not copy it from anyone else. (Tr. 42 DE 192 at 5:2-10). Miracle testified that the 2010 HTML Source Code contained numerous creative elements, including the values used to denote the term of the policy and those used to limit the number of results returned. (Tr. 42 DE 192 at 54:13-56:21). *See Feist,* 499 U.S. at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.").

invalid" by "prov[ing] that the *portion of* the copyrighted work actually taken is unworthy of copyright protection." *Bateman,* 79 F.3d at 1541. Defendants assert that because "the variables used to input into the quote engine and the names and products created are based upon life insurance industry standards," Plaintiff "has not met the first element of originality for its copyright claims." (D.P. 08 DE 203 at 9).[25] It is unclear whether Defendants claim that Plaintiff copied these portions of the code or whether, instead, Defendants assert that these portions are not entitled to copyright protection because they are "methods of operation, processes, [or] the like." *Bateman,* 79 F.3d at1541 n.21 (quotations omitted). *See Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, 716 F. Supp. 2d 428, 435 (E.D. Va. 2010) ("The burden on the defendant to rebut the presumption varies depending on the issue bearing on the validity of the copyright. Where, for example, the issue is whether the copyrighted article is original, the presumption will not be overcome unless the defendant offers proof that the plaintiff's product was copied from other works or similarly probative evidence as to originality. On the other hand, where the issue is whether particular articles with certain undisputed characteristics are copyrightable, the defendant need not introduce evidence but instead must show that the Copyright Office erroneously applied the copyright laws in registering plaintiff's articles.") (quotations and citations omitted).

Defendants' assertion, made without reference to any factual or legal support, is insufficient to rebut the presumption. *See, e.g., Fodere v. Lorenzo*, No. 09-CV23120, 2011 WL 465468, at *3 (S.D. Fla. Feb. 4, 2011) ("Defendants misunderstand the nature of the evidence required to rebut the presumption of validity. A defendant must come forward with some

---

[25] Defendants' Proposed Findings of Fact and Conclusions of Law are cited as D.P followed by a citation to its location on the docket. The Court refers to the page numbers found at the top of each page in the Court's header.

evidence or proof to dispute that the copyrighted work was not copyrightable in the first instance . . . . Here, [d]efendants have not alleged that the [ ] photograph is not eligible for copyright protection. They have alleged only that the registration of the copyright in [a certain plaintiff's name] was improper, without explaining how it was improper or citing any law to support that position."), *aff'd*, 441 F. App'x 666 (11th Cir. 2011); *Blazon, Inc. v. DeLuxe Game Corp.*, 268 F. Supp. 416, 421 (S.D.N.Y. 1965) ("Mere denial by the defendant, unsupported by evidence, is not sufficient to overcome the prima facie presumption of plaintiff's originality. And proof that plaintiff copied from prior works should involve the same elements as are required to establish copying by the defendant, i.e., access and similarity.") (quotations and citations omitted). Plaintiff has satisfied the first *Feist* prong.

<u>*Feist*'s Second Prong</u>

Under *Feist's* second prong, Plaintiff must prove "'copying of constituent elements of the work that are original.'" *Bateman,* 79 F.3d at 1541 (quoting *Feist,* 499 U.S. at 361). "This [ ] involves two separate inquiries: 1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and 2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *MiTek,* 89 F.3d at 1554 (quotation omitted).

"As a factual matter, a proof of copying may be shown either by direct evidence, or, in the absence of direct evidence, it may be inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *Id.* However, "[e]ven if the court finds that the putative infringer copied portions of the copyright owner's program, that is not the end of the inquiry." *Id.* "Copyright infringement occurs only if one copies *protected elements* of a

copyrighted work; in other words, the portion of the copyrighted work that is copied must satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl. 8." *Id.* (quotation omitted). "As the Court in *Feist* noted, 'the mere fact that a work is copyrighted does not mean that every element of the work may be protected.'" *Id.* (quoting *Feist,* 499 U.S. at 348). "Significantly, the Copyright Act expressly states that: 'In no case does copyright protection for an original work of authorship extend to any *idea, procedure, process, system, method of operation, concept, principle, or discovery,* regardless of the form in which it is described, explained, illustrated, or embodied in such work.'" *Id.* (emphasis supplied by court) (quoting 17 U.S.C. § 102(b)). "Thus, in order for a plaintiff to prevail on a claim of copyright infringement, the court must find not only that the portion of the work copied is original and thus protectable but also that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." *Id.* (quotation omitted).

"Two works are substantially similar if an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Palmer v. Braun*, 287 F.3d 1325, 1330 (11th Cir. 2002) (quotation omitted). "Both literal and nonliteral similarities can warrant a finding of substantial similarity." *Id.* "Literal similarity is the verbatim copying of a copyrighted work." *Id.* "In many cases, an allegedly infringing work will evince 'fragmented literal similarity.'" *Id.* (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A][2] (2001)) [hereinafter Nimmer 2001]. "In other words, the work may copy only a small part of the copyrighted work but do so word-for-word." *Id.* "If this fragmented copy is important to the copyrighted work, and of sufficient quantity, then it may support a finding of substantial similarity." *Id.* "Nonliteral similarity is more difficult to define." *Id.* "A work may be deemed substantially similar to another work when it evinces what Nimmer calls

'comprehensive nonliteral similarity.'" *Id.* (citing NIMMER 2001 AT § 13.03[A][1]). "This comprehensive nonliteral similarity is evident where 'the fundamental essence or structure of one work is duplicated in another.'" *Id.* (quoting NIMMER 2001 AT § 13.03[A][1]).

Although Plaintiff presented evidence that Defendants copied the parameters from its 2010 HTML Source Code, Plaintiff has failed to prove that "th[e] elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *See MiTek,* 89 F.3d at 1554 (quotation omitted). The 2010 HTML Source Code fills just over nine pages; each of the initial nine pages is filled with between twenty-five (page 1) and fifty-six (page 5) lines of text. (P.E. 542, filed at 08 DE 195-20). Plaintiff made no attempt to identify the protectable elements of the 2010 HTML Source Code. Moreover, Plaintiff failed to provide any basis on which to conclude that the copied portions of the 2010 HTML Source Code, assuming they are protectable, are "important to the [2010 HTML Source Code], and of sufficient quantity" or duplicate "the fundamental essence or structure" of the 2010 HTML Source Code. *See Palmer,* 287 F.3d at 1330. Plaintiff does not acknowledge the *Altai* test, which "is critical to the determination of substantial similarity between the allegedly copyrighted code and the offending use and thus also to the determination of infringement."[26]

---

[26] It is possible that the *Altai* test does not apply to the 2010 HTML Source Code because it is HTML code instead of a source code or computer program. Although the title of the work indicates that it is an "HTML Source Code," it is unclear whether an HTML code can also be considered a source code or computer program. *Compare The Compendium of U.S. Copyright Office Practices* § 721.10(A) (3d ed. 2017) (revised Sept. 29 2017) [hereinafter *Compendium*] ("HTML is not a computer program or source code."), *with Schultz v. Lost Nation Booster Club,* No. 3:13-CV-68-RAW, 2014 WL 10038777, at *1 (S.D. Iowa Oct. 14, 2014) (stating that "[b]y definition HTML code is a 'computer program'") (citing 17 U.S.C. § 101, which defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result"). Indeed, while the copyright application reflects that Plaintiff sought protection for "text, computer program" - as evidenced in the "author created", "material excluded from this claim," and "new material included in claim" fields, (P.E. 153 d at 3, filed at 08 DE 193-20) - the Certificate of Registration shows that these fields were changed to state "text, HTML code," (P.E. 153 d at 1, filed at 08 DE 193-20). The *Compendium* further notes that while copyright protection for a computer program generally extends to the screen displays generated by that program, this rule does not apply to HTML "unless the applicant submits a copy of the website

*See Indyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp. 2d 1278, 1285 (M.D. Fla. 2012), *aff'd,* 513
F. App'x 858 (11th Cir. 2013).

In summarily asserting that the 2010 HTML Source Code is substantially similar to the
HTML source code found on the www.naaip.org agent's website, Plaintiff relies on Miracle's
comparison of the two codes. (P.P. 08 DE 204 at 26). When asked whether the code from the
www.naaip.org agent's website was a copy of portions of Plaintiff's HTML code, Miracle
answered "yes, of course" and stated that the "parameters have to be exact." (Tr. 42 DE 192 at
59:10-12). Miracle's demonstrative slide show includes a comparison of an excerpt of about 20
lines of text from each of the codes. (P.E. 550 at p. 9, filed at 08 DE 195-27).[27] While the
comparison reveals the exact copying of two parameters – each of which constitutes a portion of
one line of text – the two excerpts are not identical. (P.E. 550 at p. 9, filed at 08 DE 195-27). *See*
*TracFone Wireless, Inc. v. Technopark Co.*, 281 F.R.D. 683, 688 (S.D. Fla. 2012) ("[W]hen the
defendant has engaged in literal or verbatim copying of all of the protected source code, there is
sufficient evidence to authorize a finding of infringement."). And Plaintiff provided no basis on
which to evaluate what quantity of the HTML code from the www.naaip.org agent's website,
which spans twenty-five pages, is copied from Plaintiff's 2010 HTML code, which spans just
over nine pages. *See MiTek, Holdings, Inc. v. Arce Eng'g Co.*, 864 F. Supp. 1568, 1575 (S.D. Fla.
1994), *aff'd,* 89 F.3d 1548 (11th Cir. 1996) (plaintiff conceded that literal elements of two codes

---

content and expressly asserts a claim in that material." *See Compendium* § 721.10(A). It is unclear
whether these distinctions render the *Altai* test inapplicable in this instance. *See Bateman*, 79 F.3d at 1545
(assessing application of *Altai* test to computer *program*; noting that "[i]t is undeniable that the *Altai* court
formulated its test to address nonliteral copying of computer *code*") (emphasis added). However, even if
this test does not apply, Plaintiff's claim still fails as it did not identify the protectable portions of its 2010
HTML Source Code or show that Defendants' allegedly infringing code was substantially similar.

[27] As previously noted, *supra* note 14, although Slide 9 of Miracle's slide show cites to Exhibit 426 for
the code found on www.naaip.org website of agent "TMattteson77," it appears that the correct exhibit is
Plaintiff's Exhibit 149.

were not substantially similar where plaintiff's expert testified that only two percent of the literal elements were substantially similar). Plaintiff likewise provided no basis on which to evaluate the importance of the copied parameters to the 2010 HTML Source Code as a whole. *See Peter Letterese And Assocs., Inc. v. World Inst. Of Scientology Enterprises*, 533 F.3d 1287, 1307 (11th Cir. 2008) ("The extent of copying must be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole.").

Likewise, while Bruner testified that the parameters in the Get Commands matched the parameters in the HTML code, (Tr. 42 DE 192 at 16:8-14, 20:22-21:10), Plaintiff failed to provide any basis on which to evaluate the quantity of the 2010 HTML Source Code that was copied by the Get Commands or the importance of the copied parameters to the 2010 HTML Source Code as a whole. "The burden is on the copyright owner to demonstrate the significance of the copied features, and, in this case, [Plaintiff] has failed to meet that burden." *MiTek*, 89 F.3d at1560.

### B.   CONTRIBUTORY COPYRIGHT INFRINGEMENT
(Count II in 08 case; Count III in 42 case)

Because Plaintiff did not prove direct copyright infringement, its contributory copyright infringement claims fail. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) ("Contributory infringement necessarily must follow a finding of direct or primary infringement.").

### C.   MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT AND FLORIDA UNIFORM TRADE SECRETS ACT
(Defend Trade Secrets Act: Count IV in 08 case; Count I in 42 case)
(Florida Uniform Trade Secrets Act: Count V in 08 case; Count V in 42 case)

Plaintiff claims that Defendants violated the Federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA") in both the 08 and 42 cases.

1. Effective Date of the DTSA

"On May 11, 2016, the Defend Trade Secrets Act, Publ. L. 114-53, 130 Stat. 376, conferred on U.S. district courts subject matter jurisdiction over civil actions pertaining to the theft of trade secrets used in interstate or foreign commerce."[28] *M.C. Dean, Inc. v. City of Miami Beach, Florida*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) (citing 18 U.S.C. § 1836(c)). Generally, "[t]he statute only applies to conduct occurring on or after its effective date, May 11, 2016." *Yager v. Vignieri*, No. 16CV9367(DLC), 2017 WL 4574487, at *3 (S.D.N.Y. Oct. 12, 2017). But "while this may be the case under an 'acquisition' theory of liability, under a 'disclosure' theory of liability a DTSA claim is actionable when the disclosure or use continued to occur after the effective date." *God's Little Gift, Inc. v. Airgas, Inc.*, No. 317CV00004FDWDSC, 2017 WL 4366751, at *2 (W.D.N.C. Oct. 2, 2017).

In the 08 case, Plaintiff alleges that Rutstein's unauthorized access to its Transformative Database through MBM's VAM DB account constituted misappropriation. (P.P. 08 DE 204 at 32-34). It is undisputed that Defendants' access through MBM's VAM DB account was terminated in April of 2015. (Tr. 42 DE 195 at 45:2-21; DE 197 at 69:12-21). However, Plaintiff alleges that Defendants continued to use the acquired information after May 11, 2016. Plaintiff can prevail on its DTSA claim in the 08 case only if it can prove this continuing use. *See Airgas*, 2017 WL 4366751 at *2.

2. Merits of DTSA and FUTSA Claims

"To prevail on [its] claim for misappropriation of trade secrets, Plaintiff[ ] must demonstrate that (1) Plaintiff[ ] possessed a trade secret; and (2) Plaintiff['s] trade secret

---

[28] The parties stipulated to the fact that Plaintiff promoted the Program in interstate commerce. (S.F. 08 DE 177 at ¶ 22).

information was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Heralds of Gospel Found., Inc. v. Varela*, No. 17-22281-CIV, 2017 WL 3868421, at *4 (S.D. Fla. June 23, 2017) (quotation omitted) (evaluating misappropriation claims brought under DTSA and FUTSA).

*Trade Secret*

"The DTSA[29] and FUTSA[30] similarly define[ ] a 'trade secret' as (1) any type of information, (2) that derives economic value from being secret, and (3) that is kept secret." *Id.* "'Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection.'" *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-CV-9-FTM-29CM, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) (quoting *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).

Plaintiff asserts that its Transformative Database constitutes a trade secret. Both the DTSA and FUTSA provide that compilations may constitute trade secrets. *See* 18 U.S.C. § 1839(3) ("'trade secret' means all forms and types of . . .  information, including . . . compilations"); Fla. Stat. § 688.002(4) ("'Trade secret' means information, including a . . . compilation"). Although the rate tables from which Barney pulls the information that he inputs

---

[29] *See* 18 U.S.C. § 1839(3) ("'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information").

[30] *See* Fla. Stat. § 688.002(4) ("'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").

into the Transformative Database are publicly attainable, Barney uses his decades of experience in the industry to obtain the rate tables in advance of their public release, distill the information, and develop the formula for how that information is used to calculate premiums. (Tr. 42 DE 195 at 19:5-22, 20:12-15, 22:9-23:4, 23:11-24:3). And while Defendants made much of the fact that the rate tables are publicly available, Defendants presented no evidence of their ability to replicate Plaintiff's Transformative Database using only the rate tables. Indeed, the Transformative Database cannot be replicated using only the publicly-available rate tables as the distillation method and the calculation formula are not known to anyone other than Barney and Bruner. (Tr. 42 DE 192 at 34:3-4; DE 195 at 21:21-22). Moreover, Plaintiff maintains the secrecy of the Transformative Database through various security features, including encryption of the data. (Tr. 42 DE 192 at 7:7-21; DE 195 at 23:5-8); (S.F. 08 DE 177 at ¶ 12). Plaintiff's Transformative Database constitutes a trade secret. *See Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. Dist. Ct. App. 1982) (customer lists were trade secrets where they were a distillation of a larger list that "reflect[ed] considerable effort, knowledge, time, and expense on the part of the plaintiff"); *Compass iTech, LLC v. eVestment All., LLC*, No. 9:14-CV-81241-KAM, 2017 WL 5153210, at *4 (S.D. Fla. Aug. 11, 2017) (rejecting assertion by allegedly misappropriating party that database was not a trade secret because it "could have compiled the data from public sources" where there was insufficient evidence of its ability to do so; noting that allegedly misappropriating party could not "show that it had any capability to compile this vast amount of data on its own").

However, in the 42 case Plaintiff asserts misappropriation based on the 871,055 "accesses" to the www.term4sale.com website[31] from September 1 to September 6 of 2016. (P.P.

---

[31] As previously noted, *supra* note 15, it is not clear whether Get Commands spoke to the server serving www.term4sale.com or the website itself.

08 DE 204 at 34). Although not entirely clear, it appears that Plaintiff seeks to assert misappropriation based on the acquisition of term life insurance quotes via the Get Commands. Plaintiff acknowledges that any individual can visit www.term4sale.com to obtain a quote and that, prior to September 7, 2016, there was no restriction on how an individual could use a quote obtained from www.term4sale.com. (S.F. 08 DE 177 at ¶ 5, 53); (Tr. 42 DE 192 at 4:18-20, 32:16-33:5). Likewise, any member of the public can visit the website of a Compulife customer to obtain a quote and there is no restriction on how an individual uses such a quote. (Tr. 42 DE 192 at 40:22-41:6). These quotes do not constitute trade secrets. *See Primo,* 2017 WL 1502714 at *11 ("Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection."). Thus, Plaintiff's FUTSA and DTSA claims in the 42 case, alleging misappropriation of these quotes, necessarily fail. *See Heralds,* 2017 WL 3868421 at *4 (to prevail on claim for misappropriation of trade secrets plaintiff must demonstrate both that plaintiff possessed a trade secret and that plaintiff's trade secret was misappropriated). *Cf. Physicians Interactive v. Lathian Sys.*, No. CA-03-1193-A, 2003 U.S. Dist. LEXIS 22868, at *25 (E.D. Va. Dec. 5, 2003) (stating that there was "no doubt that the use of a computer software robot to hack into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret" where the information obtained was not available to the public).

*Misappropriation*

"Liability under either [the DTSA or FUTSA] requires an act of misappropriation." *M.C. Dean,* 199 F. Supp. 3d at 1353. Both the DTSA and FUTSA contemplate three possible theories of misappropriation: (1) acquisition; (2) disclosure; (3) or use. *See Yager,* 2017 WL 4574487 at *3 ("The DTSA provides a remedy for the owner of a trade secret that is 'misappropriated.' 'Misappropriation' is defined to mean either 'acquisition of a trade secret . . .' or

'disclosure or use of a trade secret . . . .'") (citing 18 U.S.C. § 1839(5)); *Equitrac Corp. v. Delaney*, No. 09-60629-CIV, 2009 WL 10667046, at *7 (S.D. Fla. Aug. 31, 2009) (stating, in evaluating FUTSA claim, that "[m]isappropriation can be broken down into misappropriation by improper acquisition or misappropriation by unauthorized disclosure or use") (quotation omitted). Plaintiff alleges misappropriation through both use and acquisition of its Transformative Database.[32]

Use

Plaintiff alleges that Defendants used its Transformative Database without consent although Defendants knew or had reason to know that their knowledge of the Transformative Database was either – (1) "acquired under circumstances giving rise to a duty to" or (2) "derived from a person who owed a duty to" – maintain the secrecy of the trade secret or limit the use of the trade secret. (P.S.P. 08 DE 222 at 10).[33] *See* 18 U.S.C. § 1839(5)(B)(ii)(II) and (III) ("(5) the term 'misappropriation' means-- . . . (B) disclosure or use of a trade secret of another without express or implied consent by a person who-- . . . (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-- . . . (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret"); Fla. Stat. § 688.002(2)(b)2.b and c ("'Misappropriation' means: . . . (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: . . . 2. At the time of disclosure or

---

[32] Although Plaintiff specified its theories of liability for only its FUSTA claims, this Court assumes that Plaintiff asserts liability under the same theories for its DTSA claims.

[33] Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law are cited as P.S.P followed by a citation to its location on the docket. The Court refers to the page numbers found at the top of each page in the Court's header.

use, knew or had reason to know that her or his knowledge of the trade secret was: . . . b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use").

Plaintiff asserts that "the circumstances of Defendants' acquisition of Compulife's database gave rise to a duty in [Plaintiff's] licensing agreements with McSweeney to maintain the secrecy of the [Transformative Database]." This assertion combines the alternately alleged bases of use of a trade secret acquired under circumstances giving rise to a duty, pursuant to 18 U.S.C. § 1839(5)(B)(ii)(II) and Fla. Stat. § 688.002(2)(b)2.b, and use of a trade secret that was derived from or through a person who owed such a duty, pursuant to 18 U.S.C. § 1839(5)(B)(ii)(III) and Fla. Stat. § 688.002(2)(b)2.c. Plaintiff does not specify on whom the duty was allegedly imposed. However, Plaintiff identifies no source of any such duty on Defendants. *Cf. All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012) (noting, in evaluating trade secret misappropriation claim, that "the fact that *an employee* did not sign a non-disclosure or confidentiality agreement is not dispositive" because "[t]he law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was acquired by the employee in the course of his employment") (emphasis added) (quotation omitted); *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 856-59 (11th Cir. 2017) (evaluating language in applicable defense regulations to determine whether non-party, which released allegedly trade secret manuals to defendant, owed plaintiff a duty to keep the manuals secret or limit their use; determining that the inquiry was "intensely factual, technical, and legal in nature" and remanding to district court to address the issue in the first instance; also

evaluating whether former employee of plaintiff owed plaintiff the same duty regarding emails, finding that former employee, whose employment agreement contained a confidentiality provision, owed such a duty to plaintiff). As for any duty allegedly imposed on McSweeney pursuant to his licensing agreements with Compulife, Plaintiff fails to identify these licensing agreements or the language within the agreements that does so. Plaintiffs point to Plaintiff's Exhibit 537, which is a blank "Internet Engine License Agreement" dated July 31, 2015. (P.E. 537, filed at 08 D.E. 195-18). However, Plaintiff makes no effort to establish that McSweeney was subject to this agreement.[34] Plaintiff has failed to prove the existence of the duty critical to its claims of trade secret misappropriation through use pursuant to 18 U.S.C. § 1839(5)(B)(ii)(II) and (II) and Fla. Stat. § 688.002(2)(b)2.b and c. Because Plaintiff was required to prove use occurring after May 11, 2016 in order to prevail on its DTSA claim in the 08 case, this claim fails.

The Court further notes that the evidence Plaintiff offered to prove continuing use after the DTSA's effective date falls short of doing so. In the Evidentiary Hearing held on January 24, 2018, Plaintiff introduced five exhibits. One of those exhibits, Plaintiff's Exhibit 288, was a printout of life insurance quotes from the www.term4sale.com website from June 11, 2015. (P.E. 288, filed at 08 DE 218-2). The other four exhibits were printouts of life insurance quotes from the www.naaip.org website from June 19, 2015, (P.E. 291 and 292, filed at 08 DE 218-3 and -4),

---

[34] During his testimony, McSweeney acknowledged that he agreed to "Compulife's licensing agreement" when he became a customer of Compulife. (Tr. 42 DE 194 at 5:6-10)  It is not clear when McSweeney (on behalf of himself or MBM) became a customer and agreed to any licensing agreement(s). However, it appears to have been well before 2015 and, in any case, before July of 2015. (Tr. 42 DE 194 at 17:14-18:20) (discussing email from McSweeney to Barney, dated April 10, 2015, in which McSweeney discusses Rutstein's access to MBM's Compulife Website Quoter). Although Plaintiff introduced 2010 versions of its other two license agreements (the standard and personal use agreements) and introduced testimony regarding the similarity between the earlier and current versions of those agreements, Plaintiff did not introduce an earlier version of the internet engine license agreement, which Kuhn stated "was something different" from the standard license agreement. (Tr. 42 DE 193 at 45:9-48:16).

DE 218-5), and June 6, 2016, (P.E. 1S, filed at 08 DE 218-1). When presented with Plaintiff's Exhibits 291, 292, and 309, Barney compared each of them to Plaintiff's Exhibit 288, noting that the Company Names, Product Names, and Health Categories in the two exhibits were the same. (H-Tr. 08 DE 221 at 14:21-17:24).

When presented with the only exhibit dated after May 11, 2016, Plaintiff's Exhibit 1S, Barney testified only that it "show[ed] that [Defendants] were continuing to use information taken from my software." (H-Tr. 08 DE 221 at 26:10-12). Barney did not provide the basis for his conclusion. The Court infers that Barney was again referring to the considerable similarities[35] between the Company Names, Product Names, and Health Categories in Exhibits 288 and 1S. However, Barney acknowledged that these Company Names, Product Names, and Health Categories are all available on www.term4sale.com, which is a public website. (H-Tr. 08 DE 221 at 27:15-18). Moreover, a comparison of the quotes in Exhibit 288 to those in Exhibits 1S reveals substantial differences in both the annual and monthly quotes. For example, while Exhibit 288 states that the United of Omaha Life Insurance Company's "Term Life Answers 20" product for the "Preferred Plus Non-Tobacco" category would be $477.50 annually and $41.78 monthly, Exhibit 1S quotes the same policy at $617 annually and $54 monthly. And although Plaintiff's Supplemental Findings of Fact and Conclusions of Law assert that Barney testified to seeing Plaintiff's watermarks in the quotes from www.naaip.org, this was not the case. (P.S.P. 08 DE 222 at 2-3). Barney did not mention the watermark feature and a review of all five exhibits

---

[35] There are some differences between the two quotes as it relates to these three categories. Despite the fact that the www.term4sale.com example (Plaintiff's Exhibit 288) contains fifty quotes in comparison to the twenty-eight quotes included in the www.naaip.org example (Plaintiff's Exhibit 1S) two of the companies listed in Exhibit 1S do not appear at all in Exhibit 288 – Security Mutual Life Insurance Co of NY and Motorists Life Insurance Company. There are additionally a few minor differences in the product names. For example, while the product name for American National Insurance Company in Exhibit 288 is "ANICO Signature Term 20," the product name for the same company in Exhibit 1S is "Signature Term 20."

shows an absence of the watermark feature.[36] Exhibit 1S and the testimony presented in relation fail to establish continuing use of any information acquired through MBM's VAM DB account. *See also* (Tr. 42 DE 195 at 57:14-25) (Barney, testifying that about two or three weeks after the middle of May (of 2015) Barney "saw [his] stuff showing up on their website again," but was and remains "bamboozled" as to where the information was coming from).

Acquisition

     Liability for acquisition occurs when the acquirer "knows or has reason to know that the trade secret was acquired by improper means." *See* 18 U.S.C. § 1839(5)(A) ("the term 'misappropriation' means-- (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"); Fla. Stat. § 688.002(2)(a) ("'Misappropriation' means: (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"). Both the DTSA and FUTSA define improper means to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Fla. Stat. § 688.002(1). However, the DTSA excludes "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6)(B).

     Plaintiff asserts that David "obtained access" to the Transformative Database "through an integration with Brian McSweeney's VAM DB account" and that "Defendants used this access to put a quote engine on [www.]naaip.org." (P.S.P. 08 DE 222 at 9). It appears that Plaintiff equates access with acquisition. However, Plaintiff provides no legal basis for doing so. *See DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848–49 (11th Cir. 2016) (finding that

---

[36] *Compare* (P.E. 1S, 288, 291, 292 and 309, filed at 08 DE 218-1, -2, -3, -4, and -5) (lists of quotes without watermark feature) *with* (P.E. 550 at 13) (example of watermark in quote).

district court did not err in concluding that complaint, which alleged facts sufficient to show that defendant had "obtained" alleged trade secrets, did not sufficiently allege that defendant had misappropriated that information through disclosure or use, further concluding that complaint failed to allege facts that constituted acquisition of allegedly trade secret information). Moreover, it is unclear what data source www.naaip.org was linked to. Plaintiff's allegation of access to the Transformative Database – stored on one of Plaintiff's servers – is at odds with the testimony of Barney that www.naaip.org was communicating with the VAM DB database[37] and not a Compulife server. (Tr. 42 DE 196 at 25:8-19). *See also* (Tr. 42 DE 193 at 81:2-8) (Kuhn, when asked whether www.naaip.org users spoke to the trade secret data compilation on Compulife's server, stating that www.naaip.org users never called Compulife's server). This lack of clarity is likely due to the fact that, as Plaintiff's counsel candidly acknowledged, Plaintiff "still [does not] know exactly how the misappropriation through acquisition occurred . . . ." (H-Tr. 08 DE 221 at 23:23-25). Plaintiff has failed to meet its burden of proving that Defendants acquired its trade secret, the Transformative Database, through improper means. *Cf. VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1355–56, 60-62 (S.D. Fla. 2012) (plaintiff established substantial likelihood of success on the merits of misappropriation through acquisition claim where computer forensic investigator's investigation of defendant's work-issued laptop and cell phone showed that defendant had copied multiple files containing plaintiff's confidential information onto a USB device and sent emails containing plaintiff's confidential information to email

---

[37] As an Internet Engine customer, VAM DB received a database from Compulife that VAM DB installed on its server. (Tr. 42 DE 192 at 50:21-51:9) (discussing P.E. 550 at 5, filed at 08 DE 195-27). However, it is unclear how this database compares to the Transformative Database on Plaintiff's server. Moreover, it is unclear what steps are taken to maintain the secrecy of this data. *See* (Tr. 42 DE 196 at 27:23-28:7) (Barney, testifying that licensees of Internet Engine can accept data feeds from other providers and that users of VAM DB "hypothetically" have access to data from both Compulife and other providers).

addresses not affiliated with plaintiff-company).

### D.     UNFAIR COMPETITION IN VIOLATION OF THE LANHAM ACT AND FLORIDA COMMON LAW

(Lanham Act: Count III in 08 case; Count IV in 42 case)
(Florida Common Law: Count VII in 08 case; Count VII in 42 case)

Plaintiff claims that Defendants violated the Section 1125(a) of the Lanham Act and Florida's common law prohibition on unfair competition in both the 08 and 42 cases. Plaintiff presents the same argument in support of all of its unfair competition claims. (P.P. 08 DE 204 at 37-39).

1.   Lanham Act Unfair Competition

"Section 1125(a) [  ]  creates  two  distinct  bases  of  liability:  false  association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Black Diamond Land Mgmt. LLC v. Twin Pines Coal Inc.*, 707 F. App'x 576, 579 (11th Cir. 2017). Neither of Complaint specifies which type of Lanham Act claim Plaintiff purports to bring. (08 DE 8 at 9-10); (42 DE 24 at 17). However, the sole legal citation Plaintiff provides in support of its Lanham Act claim reveals that Plaintiff asserts a false advertising claim. (P.P. 08 DE 204 at 37-38).

"To succeed on a false advertising claim under [  ] the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004). "The first element of the Lanham Act test requires that the plaintiff show that the statements at issue were either (1) commercial claims that are literally false as a factual matter or (2) claims

that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* at 1261 (quotation omitted). "The classification of an advertisement as literally false or true but misleading affects [plaintiff's] burden with respect to the element of consumer deception." *Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298, 1318–19 (11th Cir. 2010). "If the court deems an advertisement to be literally false, then the movant is not required to present evidence of consumer deception." *Id.* at 1319. "If, on the other hand, the court deems the advertisement to be true but misleading, then the movant is required to present evidence of deception." *Id.*

Plaintiff does not explicitly identify which advertisements form the basis of its unfair competition claims. (P.P. 08 DE 204 at 37-38). *See, e.g., Schutz Container Sys., Inc. v. Mauser Corp.*, No. 1:09-CV-3609-RWS, 2012 WL 1073153, at *6 (N.D. Ga. Mar. 28, 2012) (party bringing Lanham Act false advertising claim identified five statements it asserted were actionable under the Lanham Act). However, in combing through the record citations Plaintiff provides in support of its unfair competition claims, this Court found discussion of one statement made in an email from David Gordon to about 400 Compulife customers. *See* (P.P. 08 DE 204 at 38-39) (citing to Tr. 42 DE 195 at 77:5-11). Mr. Barney testified that in this email David Gordon warned these customers to beware of a security flaw, telling them that their back office[38] was not password protected. (Tr. 42 DE 195 at 77:5-11) (discussing P.E. 273, filed at 08 DE 194-20). The email also included a link to the www.naaip.org website and indicated that the email recipient could go to that website and get term life quote engines and websites for free. (Tr. 42

---

[38] An agent's back office, often called a control panel, is a place the agent can go to customize their settings. (Tr. 42 DE 195 at 79:8-17).

DE 195 at 77:5-11).[39]

These statements were not literally false. Barney acknowledged that the lack of password protection on the back office "was a weakness," (Tr. 42 DE 195 at 79:7-12), which he quickly fixed after this email was sent, (Tr. 42 DE 195 at 80:1-10). And there is no dispute that visitors to the www.naaip.org and beyondquotes.com websites could obtain free websites with access to a life term quote engine. Thus, the success of Plaintiff's unfair competition claim depends on it being able to show the statements are literally true but misleading. "A plaintiff attempting to establish . . . that an advertisement is literally true but misleading, must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence. Consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive." *See Hickson,* 357 F.3d at 1261 (quotation and citation omitted). Plaintiff does not point to any evidence of deception and "the Court is not under any obligation to search the record to find evidence supporting Plaintiff's position." *Keaton v. Cobb Cty.*, 545 F. Supp. 2d 1275, 1309 (N.D. Ga. 2008), *aff'd* No. 08-11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009). Thus, even assuming that the email in question constitutes "commercial advertising or promotion,"[40] Plaintiff has failed to prove its Lanham Act false advertising claims.

The Court reaches this conclusion without reaching the remaining elements of a Lanham

---

[39] Although Plaintiff cited this portion of the transcript for the proposition that "Defendants have compared NAAIP and BeyondQuotes.com to Compulife, called Compulife inferior, and attempted to get Compulife users to switch to NAAIP and BeyondQuotes.com," the testimony reveals no comparisons or allegations of inferiority.

[40] *See Schutz Container Sys.*, 2012 WL 1073153 at *7 n.6 ("[A] claimant has the threshold burden of showing that the allegedly false or misleading statements were made in 'commercial advertising or promotion.'") (quoting 15 U.S.C. § 1125(a)(1)(B)); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (detailing test for determining whether something is "commercial advertising or promotion").

Act false advertising claim. However, the Court notes that Plaintiff likewise failed to point to any evidence showing that the alleged deception "had a material effect on purchasing decisions." *See Hickson*, 357 F.3d at 1260. Plaintiff must establish materiality regardless of whether the advertisement is literally false or instead literally true but misleading. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250-51 (11th Cir. 2002). "In order to establish materiality, the plaintiff must demonstrate that the defendant's deception is likely to influence the purchasing decision." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (quotation omitted). "The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (quotation omitted). Even assuming that the statements in the emails from David Gordon were false or misleading, Plaintiff points to no evidence regarding the effect these statements had on purchasing decisions.

2.  Florida Common Law Unfair Competition

For the same reasons Plaintiff's Lanham Act claims fail, its Florida Common Law Unfair Competition claims also fail. *See Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1296 (11th Cir. 2012) ("The success of [plaintiff's] state unfair competition . . . claim[ ] is tied to the federal Lanham Act claims for infringement and false advertising.").

E.          **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
(Count VIII in 08 case)

To the extent that Plaintiff's Florida Deceptive and Unfair Trade Practice ("FDUTPA") claim mirrors its failed Lanham Act claims, those claims fail. *See Sovereign Military*, 702 F.3d at 1296 ("The success of [plaintiff's] . . . FDUTPA claims is tied to the federal Lanham Act claims

for infringement and false advertising."); *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1323 (11th Cir.2011) ("The legal standards we apply to [the FDUPTA] claim are the same as those we have applied under section 43(a) of the Lanham Act.") (quotation omitted). Indeed, in Plaintiff's proposed findings of fact and conclusions of law, it asks the Court to find a violation of FDUPTA "for the same reasons the Court determined that the defendant's acts constituted unfair competition and false advertising." (P.P. 08 DE 204 at 40).

However, Plaintiff appears to assert three additional bases for its FDUTPA claim that are not premised on false advertising: (1) "offering a free competing product containing Compulife's trade secrets"; (2) the scraping attack on www.term4sale.com; and (3) "offering life insurance quotes for all states using only the data for New York or Florida," which is "unquestionably deceptive to the public." (P.P. 08 DE 204 at 40). To the extent Plaintiff seeks to prove a FDUTPA claim based on misappropriation of Plaintiff's trade secrets, this claim is preempted by Plaintiff's FUTSA claim. *See Supercase Enter. Co. v. Marware, Inc.*, No. 14-CV-61158-CIV, 2015 WL 11622424, at *8 (S.D. Fla. Oct. 26, 2015) ("[FUTSA] displaces all 'conflicting tort, restitutory, and other [Florida law] providing civil remedies for misappropriation of a trade secret.'") (quoting Fla. Stat. § 688.008(1)). As for the scraping attack – which refers to the use of Get Commands – that conduct is at issue only in the 42 case; Plaintiff did not bring a FDUTPA claim in that case. As to Plaintiff's last basis, even assuming that Plaintiff has proven deception of customers, it fails to prove (or even allege) the latter two elements of injury and causation. *See NACM Tampa, Inc. v. Sunray Notices, Inc.*, No. 8:15-CV-1776-T-33TGW, 2017 WL 2209970, at *7 (M.D. Fla. Feb. 8, 2017), *report and recommendation adopted sub nom. NACM Tampa, Inc. v. Mensh*, No. 8:15-CV-1776-T-33TGW, 2017 WL 711243 (M.D. Fla. Feb. 23, 2017) ("In order to prove a FDUTPA violation, the plaintiffs must establish: (1) a deceptive act or unfair

practice; (2) causation; and (3) actual damages."); *SMS Audio, LLC v. Belson*, No. 9:16-CV-81308, 2017 WL 1533941, at *4 (S.D. Fla. Mar. 9, 2017) (Plaintiff "must prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim.") (emphasis in original) (quoting *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015)). Plaintiff offers no evidence of injury or detriment to customers.

### F.   FLORIDA COMPUTER ABUSE AND DATA RECOVERY ACT
#### (Count VI in 42 case)

The Computer Abuse and Data Recovery Act ("CADRA") imposes civil liability on any "person who knowingly and with intent to cause harm or loss: (1) Obtains information from a protected computer without authorization and, as a result, causes harm or loss; (2) Causes the transmission of a program, code, or command to a protected computer without authorization and, as a result of the transmission, causes harm or loss; or (3) Traffics in any technological access barrier through which access to a protected computer may be obtained without authorization." Fla. Stat. § 668.803(1)-(3). Plaintiff does not specify under which of these theories it seeks to establish liability. However, while Plaintiff does not mention any transmission or trafficking in technological access barriers, Plaintiff does refer to the information obtained via the Get Commands in September of 2016. (P.P. 08 DE 204 at 37). Thus, the Court proceeds under the assumption that Plaintiff seeks to impose liability pursuant to Fla. Stat. § 668.803(1). A "protected computer" is "a computer that is used in connection with the operation of a business and stores information, programs, or code in connection with the operation of the business in which the stored information, programs, or code can be accessed only by employing a technological access barrier." Fla. Stat. § 668.802(6). A "[t]echnological access barrier" is "a

password, security code, token, key fob, access device, or similar measure." Fla. Stat. § 668.802(7).

Plaintiff asserts that the September 2016 use of Get Commands constitutes a CADRA violation because these commands obtained information through an unauthorized access to Plaintiff's Transformative Database. However, Plaintiff fails to address several key issues with this assertion. First, Plaintiff fails to address how the Defendants are subject to CADRA liability for the use of the Get Commands when there is no evidence that any Defendant sent the Get Commands at issue. Instead, Plaintiff asserts, (P.P. 08 DE 204 at 30), and the evidence points to the fact that it was a woman named Natal who sent the Get Commands. Plaintiff asserts that Defendants "paid for, received, and used [ ] the information obtained" from the Get Commands and that "these acts are sufficient to provide a violation of CADRA by the Defendants." However, Plaintiff provides no legal support for its conclusion that these allegations, even if true, subject the four Defendants in this case to CADRA liability and it is not apparent from the face of the CADRA statute. *See* Fla. Stat. §§ 668.803(1) (imposing liability on "[a] person who knowingly and with intent to cause harm or loss [ ] [o]btains information from a protected computer without authorization and, as a result, causes harm or loss"); 668.802(9) (defining "without authorization" to mean "access to a protected computer by a person who . . .") (emphasis added).

Second, the evidence in this case does not show that the Get Commands accessed the Transformative Database. Indeed, it is not clear to this Court what exactly the Get Commands interfaced with, but it appears to have been the server that interfaces with www.term4sale.com. *See, e.g.,* (Tr. 42 DE 192 at 16:2-7; 17:5-17) (Bruner, testifying that a Get Command is a request to a server and discussing requests made to term4sale.com server that are logged in Plaintiff's

Exhibit 200); (Tr. 42 DE 193 at 7:9-8:3) (Miracle, discussing hits on server); (Tr. 42 DE 193 at 9:19-21) (Miracle, referring to her analysis of the "attack" on the Compulife website); (Tr. 42 DE 193 at 24:15-18) (Miracle, stating that a get command has "nothing to do with the website; it has to do with the host"); (P.P. 08 DE 204 at 37) (referring to "attack" on www.term4sale.com website in asserting CADRA liability). It is further unclear whether the server that speaks to the www.term4sale.com website is the server on which the Transformative Database is stored.

Third, Plaintiff makes no effort to establish that the computer that responded to the Get Commands was accessible only by employing a technological access barrier. In fact, any person can obtain a quote by visiting www.term4sale.com. Indeed, the log of hits on the server included both the Get Commands and the Post requests coming from www.term4sale.com, which indicates that the accesses by the Get Commands were no different that the access available to any member of the general public. (Tr. 42 DE 192 at 17:5-17; 21:11-20); (P.E. 200, filed at 08 DE 194-5 through -8). Plaintiff has failed to prove that Defendants violated CADRA.

## G.   PERMANENT INJUNCTIVE RELIEF

Plaintiff states only that "Compulife is entitled to entry of a permanent injunction against defendants." (P.P. 08 DE 204 at 50) Plaintiff has not met its burden of proving entitlement to permanent injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by

a permanent injunction.").

### III.    FINAL CONCLUSIONS

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED AND ADJUDGED** that Final Judgment shall enter in favor of Defendants David Rutstein and Binyomin Rutstein as to all Counts in the 08 case and in favor of Defendants Moses Newman, Aaron Levy, David Rutstein, and Binyomin Rutstein as to all Counts in the 42 case. In accordance with Federal Rule of Civil Procedure 58, a separate Final Judgment will be entered consistent with the Court's Findings of Fact and Conclusions of Law.

**DONE AND ORDERED** in Chambers on this ⟨⟩th day of March, 2018, at West Palm Beach in the Southern District of Florida.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record