**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| COMPULIFE SOFTWARE, INC., ) | |
| ) | |
|      Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 9:16-CV-80808-BER |
| ) | |
| BINYOMIN RUTSTEIN, a/ka BEN RUTSTEIN,) | |
| DAVID RUTSTEIN, et al., ) | |
| ) | |
|      Defendants. ) | |
| ) | |
| COMPULIFE SOFTWARE, INC., ) | |
| ) | |
|      Plaintiff, ) | |
| ) | CASE NO. 9:16-CV-81942-BER |
| vs. ) | |
| ) | |
| MOSES   NEWMAN,   DAVID   RUTSTEIN,) | |
| BINYOMIN RUTSTEIN and AARON LEVY, ) | |
| ) | |
|      Defendants. ) | |
| ) | |

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW**

These consolidated cases were tried by the Court beginning on November 16, 2020. Based upon the testimony, exhibits, pleadings, and other proceedings, the Court makes the following findings of fact and conclusions of law.

**I. Court's Findings of Fact in Addition to Stipulated Facts**

On November 10, 2021, the Parties filed Stipulated Facts for Trial. (D.E. 286-1[1]). The Court makes the following additional findings of fact:

---

[1] The same documents was filed at D.E. 296-1 in the '942 case.

Case Nos.: 16-cv-80808
16-cv-81942

1. Compulife Software, Inc. ("Compulife") develops and markets life insurance comparison and quotation software.  (Trial Transcript ("Tr.") Volume ("Vol.") 1, 39:4-6).

2. Robert Barney is the President of Compulife.  (Tr. Vol. 1, 39:2-3).

3. Mr. Barney is also the President of Compulife Software Inc. located in Canada ("Compulife Canada").  (*Id.*; Tr. Vol. 3, 65:9-11).

4. Compulife offers a PC version of its software to its customers.  (Tr. Vol. 1, 49:8-10).

5. Compulife also offers an internet verison of its software which a customer may place on its own server, including Compulife's database, and may manipulate the HTML files to produce its own variation of quoting.  (Tr. Vol. 1, 49:21-50:2, 53:12-21).

6. Compulife customers using the internet version may resell or re-market services as long as the recipient is also a customer of the PC Version of Compulife.  (Tr. Vol. 1, 55:7-13).

7. Compulife does not require the users of the internet version to disclose on their individual websites that the quotes are being generated by Compulife's software.  (Tr. Vol. 2, 31:12-32:3).

8. Compulife also offers a web quoter to its customers which allows the customer to place a web quoter on the its own website that accesses Compulife's database through Compulife's own server.  (Tr. Vol. 1, 54:1-7).

9. Compulife does not require its customers to advise what website the web quoter will be placed on or verify who owns the website at which the web quoter may be placed.  (Tr. Vol. 2, 50:24-51:5; Tr. Vol. 3, 76:9-13).

10. Chris Bruner is an employee of Compulife Canada.  (Tr. Vol. 2, 175:3-4, 176:2-5).

Case Nos.: 16-cv-80808
16-cv-81942

11.    Mr. Bruner created Compulife's 2010 HTML source code as the user interface to communicate with Compulife's internet engine.  (Plaintiff's Exhibit ("PE") 542; Tr. Vol. 2, 121:9-17).

12.    Compulife believes that 282 of the 347 lines of its 2010 HTML source code is protectable.  (Tr. Vol. 3, 146:4-147:13).

13.    The variables used in the 2010 HTML source code were based on standard insurance industry inputs including date of birth, face amount, type of insurance, gender, smoking information and health profile.  (Tr. Vol. 2, 27:8-16, 28:7-11, 28:18-25).

14.    Mr. Bruner used a pre-existing "library" from a prior source code he did not write for the organization of the states in the 2010 HTML source code.  (Tr. Vol. 2, 147:6-11, 182:13-183:4).

15.    The states are organized alphabetically which is very common in computer programming. (PE 542; Tr. Vol. 4, 68:14-19).

16.    The inclusion of "District of Columbia" along with the list of states in Compulife's 2010 HTML source code is common to the insurance industry.  (Tr. Vol. 4, 51:3-6).

17.    The birth months are organized within Compulife's 2010 HTML source code in consecutive order and assigned numbers in accordance with each consecutive number. (PE 542; Tr. Vol. 3, 8:20-9:4; Tr. Vol. 4, 67:25-68:13).

18.    The dates of each month within Compulife's 2010 HTML source code are organized in the order the dates appear in a calendar. (PE 542; Tr. Vol. 4, 68:20-69:3).

3

Case Nos.: 16-cv-80808
16-cv-81942

19.     The years within Compulife's 2010 HTML source code are organized consecutively from oldest to newest.  (PE 542; Tr. Vol. 4, 69:4-11).

20.     Radio buttons, such as those used in the 2010 HTML source code to chose "male" or "female" and "smoker" or "non-smoker," are common in web page programming. (PE 542; Tr. Vol. 3, 10:15-17).

21.     The different rates for "New York Personal" and "New York Business" that appear in Compulife's source code were used prior to 1990 in the insurance industry but are now obsolete. (PE 542; Tr. Vol. 2, 29:11-17, 30:4-15).

22.     Camel case is a common style used in programming whereby each word is capitalized. (Tr. Vol. 2, 139:23-140:2, 148:12-13, 184:19-20).

23.     A portion of the 2010 HTML source code contained standard computer code to create a table with a drop down menu. (PE 542; Tr. Vol. 3, 5:8-18, 6:9-23, 8:15-19, 10:9-13; Tr. Vol. 4, 47:2-11, 69:12-17, 69:23-70:14).

24.     Compulife's 2010 HTML source code did not contain a copyright notice.  (PE 542; Tr. Vol. 3, 15:21-16:3).

25.     Nancy Miracle only compared one naaip.org website, naaip.org/tmatteson77, to Compulife's 2010 HTML source code and did not perform any independent review of the other existing naaip.org websites in preparing her Expert Report.  (Tr. Vol. 4, 74:13-24; PE 173).

26.     Ms. Miracle has no knowledge as to how many of naaip.org's user websites contained any portion of Compulife's 2010 HTML source code besides the handful of websites provided to her by Mr. Barney to review.  (Tr. Vol. 4, 74:25-75:8).

Case Nos.: 16-cv-80808
16-cv-81942

27.     In fact, at least one HTML source code from a naaip.org website, naaip.org/adamcarrey, that was reviewed by Ms. Miracle organized the sates alphabetically without assigning a number as done in the Compulife 2010 HTML source code.  (Defendants' Exhibit ("DE") 113; PE 542; Tr. Vol. 4, 88:18-21, 89:3-8).

28.     Compulife, as part of its business practice, does not require removal of the source code on the websites of its former licensees once the data feed from Compulife's server is terminated.  (Tr. Vol. 2, 36:16-19).

29.     Compulife also maintains a database of rate information.  (Tr. Vol. 1, 45:3-9).

30.     Compulife uses the information contained in the rate books and rate charts published by roughly 100 of the over 1,000 insurance companies in the United States to compile its database.  (Tr. Vol. 1, 42:11-13; Tr. Vol. 2, 5:1-6).

31.     The rate books and rate charts provided by the insurance companies is public information and may be provided to Compulife's competitors.  (Tr. Vol. 1, 42:8-10; Tr. Vol. 2, 5:15-17; DE 64).

32.     Mr. Barney takes the information Compulife receives from the insurance companies' rate books and rate charts and inputs the rate information into Compulife's database.  (Tr. Vol. 1, 44:12-18).

33.     The rate information includes the various variables to be considered in calculating an insurance premium quote including gender, tobacco use, health risk and face amount.  (Tr. Vol. 2, 13:17-14:1; DE 64).

Case Nos.: 16-cv-80808
16-cv-81942

34.     The rate information placed into Compulife's database is the raw data used to calculate the life insurance premium quote shown to the consumer.  (Tr. Vol. 1, 45:21-46:5, 46:20-23, 47:5-13).

35.     As a result, Compulife's database only contains the raw data and not the actual insurance quotes generated therefrom.  (Tr. Vol. 3, 14:12-19).

36.     Compulife's software takes data from the database and inputs the data into a mathematical formula to generate a quote.  (Tr. Vol. 3, 14:12-19; Tr. Vol. 4, 90:3-14).

37.     Compulife's goal is to replicate insurance premium quotes as close as possible to the quotes a consumer would get directly from an insurance company, including the product name. (Tr. Vol. 2, 29:1-6).

38.     Compulife does not guarantee the accuracy of the quotes generated from its software. (Tr. Vol. 2, 15:1-4).

39.     Compulife's insurance premium quotes generated from its database may differ slightly from its competitors by pennies, if at all, and includes the insurance companies' own proprietary product names.  (Tr. Vol. 2, 8:2-11, 19:15-21:18, 25:24-25: Tr. Vol. 4, 66:18-24; DE 117; DE 118).

40.     Mr. Barney, Mr. Bruner and Jeremiah Kuhn, Compulife's Chief Financial Officer, have access to Compulife's database.  (Tr. Vol. 1, 44:19-45:2; Tr. Vol. 2, 24:20-25:4, 25:8-10; Tr. Vol. 3, 34:7-9).

41.     Term4Sale, Inc. is a wholly owned subsidiary of Compulife.  (Tr. Vol. 2, 25:16-19; 26:7-10; Tr. Vol. 3, 65:6-8, 65:13-15).

6

Case Nos.: 16-cv-80808
16-cv-81942

42.     Term4Sale, Inc. operates term4sale.com which uses Compulife's internet version to offer to generate quotes for the public users and displays along with the quotes a list of local insurance agents that are customers of Compulife.  (Tr. Vol. 1, 50:14-51:2; Vol. 2, 119:16-19; Vol. 3, 65:6-8).

43.     Compulife does not verify whether term4sale.com users are licensees. (Tr. Vol. 2, 43:2-5).

44.     Prior to September of 2016, term4sale.com contained no restrictions limiting a public user's subsequent use of a quote or how many quotes a user could generate from Compulife's database of raw data. (Tr. Vol. 2, 40:21-41:1; Tr. Vol. 3, 15:1-4, 16:16-25, 97:22-98:17).

45.     Unlike the life insurance quote engine contained in Compulife's software, term4sale.com asks the user for his or her zip code instead of state and then translates the zip code into the state and uses the state in the formula to generate the insurance premium quote.  (Tr. Vol. 1, 52:7-12; Tr. Vol. 3, 8:1-14).

46.     Compulife's customers may pay for listings by zip code to appear on term4sale.com along with the quotes generated by a user.  (Tr. Vol. 1, 37:24-38:17).

47.     Term4sale.com generates between $125,000.00 to $150,000.00 a year from the listings.  (Tr., 38:18-22).

48.     Eric Savage was a Compulife customer from at least 2012 who used beyondquotes.com in connection with his account with Compulife and who paid for zip code listings through 2017, while this case was pending.  (DE 65; Tr. Vol. 2, 39:3-34, 40:10-16, 53:10-12).

Case Nos.: 16-cv-80808
16-cv-81942

49.     In February of 2012, the e-mail address davidrutstein@gmail.com was included in Eric Savage's back office control panel with Compulife.  (Tr. Vol. 2, 53:13-54:6; DE 7).

50.     MBM Life Quotes, Inc. had a personal use license with Compulife in 2011.  (2017 Trial Transcript ("2017 Tr."), 138:14-16; Tr. Vol. 3, 72:16-73:3).

46.     David Rutstein owned beyondquotes.com in 2011.  (Tr. Vol. 4, 179:17-19).

51.     In August of 2011, beyondquotes.com was number one on Google.  (2017 Tr., 176:23-177:2; Tr. Vol. 4, 178:23-179:2, 179:25-180:3).

52.     In August of 2011, after reviewing beyondquotes.com's performance within search engines, MBM Life Quotes, Inc. decided to enter into a business relationship with David Rutstein whereby beyondquotes.com would send its leads to MBM Life Quotes, Inc.  (Tr. Vol. 189:20-190:8).

53.     American Web Designers, Inc. ("AWD") is an Ohio company which was opened by Binyomin Rutstein.  (Tr. Vol. 4, 177:14-20).

54.     David Rutstein used AWD to enter into a written agreement with MBM Life Quotes, Inc. on August 15, 2011 to send leads from beyondquotes.com to MBM Life Quotes, Inc.  (2017 Tr., 169:18-22, 170:1-9, 171:12-23; Tr. Vol. 4, 180:4-13; PE 28).

55.     MBM Life Quotes, Inc. did not require that AWD or David Rutstein be a licensed insurance agent to enter into the subject agreement.  (2017 Tr., 197:21-25; Tr. Vol. 4, 178:7-10).

56.     MSCC Corporation ("MSCC") was a reseller of Compulife's software for roughly 20 years.  (Deposition of Michael Steinherdt ("Steinhardt"), 9:8-13, 38:11-19).

8

Case Nos.: 16-cv-80808
16-cv-81942

57.     As part of its business, MSCC offered a customer relation management ("CRM") service to customers of Compulife whereby the Compulife customers would have access to Compulife's software through the internet version of Compulife's software housed on MSCC's server.  (Steinhardt, 7:3-10; 9:14-21; 10:12-25).

58.     MSCC housed the internet version of Compulife's software, including the database, on MSCC's server without a licensing agreement or any other written contractual agreement with Compulife until May of 2015 and without paying Compulife.  (Tr. Vol. 2, 44:3-45:2, 46:3-23; Steinhardt, 14:8-11, 37:19-22, 37:23-38:7, 38:20-23).

59.     At the same time MBM Life Quotes, Inc. contracted with AWD, MBM Life Quotes, Inc. was using MSCC's CRM. (2017 Tr., 175:19-176:4; Steinhardt, 8:1-4).

60.     Brian McSweeney of MBM Life Quotes, Inc. instructed MSCC to put a web quoter on beyondquotes.com.  (2017 Tr., 193:21-194:2; Steinhardt, 33:14-20).

61.     MBM Life Quotes, Inc. already had Compulife's web quoter on its website, mbmlifequotes.com, however, Mr. McSweeney testified that mbmlifequotes.com generated no leads for MBM Life Quotes, Inc. d.  (2017 Tr., 192:24-193:7).

62.     MSCC provided its HTML source code for the web quoter to be used on beyondquotes.com which incorporated Compulife's field names and values, but the rest was written by MSCC.  (Steinhardt, 13:4-10, 48:12-49:1).

63.     MSCC knew that MBM Life Quotes, Inc. had an existing website at mbmlifequotes.com when Mr. McSweeney asked for the web quoter on beyondquotes.com to be connected to MSCC's server.  (Steinhardt, 53:8-15).

9

Case Nos.: 16-cv-80808
16-cv-81942

64.     MSCC never verified who owned beyondquotes.com.  (Steinhardt, 37:11-13).

65.     Mr. McSweeney never advised Compulife that neither he nor MBM Life Quotes, Inc. owned beyondquotes.com.  (2017 Tr., 196:13-16).

66.     Compulife was, however, advised by David Rutstein via email that Compulife's web quoter was being used on beyondquotes.com to send leads to MBM Life Quotes, Inc. and that beyondquotes.com was owned by David Rutstein, not Eric Savage or MBM Life Quotes, Inc.  (DE 1; Tr. Vol. 3, 78:18-23; Tr. Vol. 4, 183:3-5).

67.     MBM Life Quotes, Inc. received leads from beyondquotes.com from September of 2011 through December of 2012 and paid AWD $75,819.00 for the leads. (PE 30; 2017 Tr. 198:3-199:2, 213:6-10).

68.     David Rutstein communicated with Mr. Steinhardt at MSCC to connect the web quoter on beyondquotes.com to MSCC. (Tr. Vol. 4, 184:24-185:3, 185:7-9, 186:3-7).

69.     David Rutstein was never advised by Mr. McSweeney nor Mr. Steinhardt that he needed to be a licensed user of Compulife's software to connect beyondquotes.com to MSCC.  (Tr. Vol. 4, 15-18).

70.     David Rutstein had a conversation with Mr. Steinhardt about incorporating the web quoter on naaip.org.  (Tr. Vol. 4, 187:6-11, 188:22-189:2).

71.     Moses Newman recalls participating in a telephone conference which included naaip.org programmers and a representative from MSCC about incorporating the web quoter to naaip.org websites.  (Tr. Vol. 5, 49:24-50:23).

72.     Naaip.org is not a direct competitor of Compulife.    (Tr. Vol. 3, 43:11-19).

Case Nos.: 16-cv-80808
16-cv-81942

73.     David Rutstein believed that the software and database connected to the naaip.org websites belonged to MSCC.  (Tr. Vol. 4, 151:10-23, 186:11-14, Tr. Vol. 5, 4:18-20).

74.     In 2014, AWD entered into an affiliation agreement with One Resource Group, Inc. ("ORG").  (PE 42, Tr. Vol. 4, 136:1-5).

75.     Pursuant to the affiliation agreement, AWD would receive a referral fee for anyone who used ORG's insurance brokerage services through the link on naaip.org whether or not the user also had a naaip.org website. (PE 42; DE 88; Tr. Vol. 5, 17-19).

76.     ORG required AWD to have a licensed insurance agent.  (Deposition of Anthony Wilson, 71:14-22).

77.     From 2014 through the present, ORG paid AWD $108,406.87 for referrals in connection with the naaip.org e-contracting link.  (PE 43; DE 88; Tr. Vol. 1, 148:6-9, Tr. Vol. 4, 191:3-7).

78.     The naaip.org websites with life insurance web quoters were connected to MSCC. (Steinhardt, 19:9-18).

79.     MBM Life Quotes, Inc. had a website with naaip.org and e-contracted through naaip.org with ORG while MBM Life Quotes, Inc. was also a Compulife customer.  (2017 Tr., 202:7-11, 203:5-12, 205:21-206:4).

80.     As of April 10, 2015, quoters on naaip.org websites were no longer able to access MSCC's database.  (Tr. Vol. 1, 87:4-5; Tr. Vol., 3, 95:23-96:2; Tr. Vol. 5, 9:5-10; Steinhardt, 18:7-14, 19:9-18).

Case Nos.: 16-cv-80808
16-cv-81942

81.     In February of 2017, Compulife terminated its business relationship with MBM Life

Quotes, Inc.  (2017 Tr., 188:5-9).

82.     Mr. Barney requested an affidavit from Michael Steinhardt concerning NAAIP.org's

access through MSCC.  (PE 157; Tr. Vol. 2, 65:16-18).

83.     Michael Steinhardt stated in his affidavit that MSCC was a licensed user of

Compulife's software even though MSCC had no license with Compulife until after the connection

was discovered.  (PE 157; Steinhardt, 16:19-17:9, 17:11-23).

84.     In May of 2015, Mr. Barney directed Compulife's attorney to mail cease and desist

letters to roughly 420 naaip.org website users that included Michael Steinhardt's Affidavit and a

settlement offer of which 12 recipients accepted the settlement offer and paid Compulife. (Tr. Vol.

2, 69:11-70:2; PE 265).

85.     Prior to 2016, Compulife's programmer, Mr. Bruner, was aware that scraping of

term4sale.com could happen but was never asked by Mr. Barney to protect term4sale.com from

scraping.  (Tr. Vol. 2, 177:13-21).

86.     Prior to 2016, term4sale.com had no process in place by which to restrict the use of

"get" commands to generate insurance premium quotes.  (Tr. Vol. 2, 177:22-178:3; Tr. Vol. 4,

93:11-14).

87.     Compulife estimates that the scraping incident caused 870,000 requests to be made

at term4sale.com over a 4 day period and that each scrape usually generates 50 quotes, resulting is

43.5 million quotes.  (Tr. Vol. 2, 161:25-162:3; Tr. Vol. 4, 9:8-12).

88.     After the scraping incident, a degrade system was put on term4sale.com to slow down the results in the event of any attempt to scrape. (Tr. Vol. 2, 181:1-11; Tr. Vol. 3, 17:1-17 ).

89.     Compulife has not incurred any additional programming costs in connection with any work performed to investigate naaip.org and the "get" commands or to add security measures to Compulife's software and database.  (Tr. Vol. 2, 105:22-106:5).

90.     Mr. Bruner was not paid in addition to his salary for any security measures implemented as a result of the scraping incident.  (Tr. Vol. 2, 176:11-14; Tr. Vol. 3, 100:13-101:11).

91.     Mr. Bruner was unable to determine who generated the "get" requests from the IP address.  (Tr. Vol. 2, 179:18-20).

92.     However, Mr. Bruner agrees that none of the Defendants ever had access to Compulife's database beyond calling the quote engine through a public interface through term4sale.com. (Tr. Vol. 3, 14:20-25).

93.     Following the scraping incident, Compulife added a user agreement and/or terms of use to term4sale.com to restrict the use of insurance generated quotes but the terms are required to be read prior to obtaining a quote.  (Tr. Vol. 2, 41:7-21).

94.     Compulife offers a 30 day trial and upon completion of a tutorial, offers a 4 month free subscription.  (Tr. Vol. 2, 35:11-36:4, 35:4-9, 40:14-41:16).

95.     The user executes a licensing agreement but is not required to renew the license at the end of the free 4 month subscription. (Tr. Vol. 2, 36:5-7; Tr. Vol. 3, 35:13-17).

96.     Each license is for a period of 1 year. (Tr. Vol 3, 41:10-11).

Case Nos.: 16-cv-80808
16-cv-81942

97.     Should a user of a free 4 month subscription decline to renew the license, Compulife does not require that the user remove the 2010 HTML source code from the user's website.  (Tr. Vol. 3, 91:14-20).

98.     Compulife found 66 licensees between 2013 and 2017 that were also users of naaip.org and had cancelled a license with Compulife.  (Tr. Vol. 3, 59:12-60:22, 61:18-23; PE 447).

99.     In addition, there were customers of Compulife that were also customers of naaip.org at the same time. (Tr. Vol 3, 87:23-88:4).

100.    Compulife gave each of these 66 licensees a 4 to 6 month free trial and if the licensee failed to pay the invoice for the full year, the license was cancelled. (Tr. Vol. 3, 85:10-18).

101.    Of the 66 licensees identified by Compulife, only the 26 licenses that extended beyond a full year could actually be paying customers of Compulife for the license.  (Tr. Vol. 3, 90:15-91:1; PE 447).

102.    Of the 66 licensees, Compulife could not determine whether the licensees were members of naaip.org before executing a license agreement with Compulife or how long after cancelling the license, the licensee may have joined naaip.org.  (Tr. Vol. 3, 86:6-11, 91:2-7).

103.    Compulife has more competitors that have entered the market in the last 5 years that may have contributed to any loss of Compulife's customers. (Tr. Vol. 3, 93:24-94:19).

104.    Compulife's competitors include I Pipeline, Ninja Quoter, WinFlex and IXM Tech. (Tr. Vol. 3, 43:4-10, 93:24-94:19).

105.    Compulife admittedly does not know how many naaip.org website users had a web quoter placed on the user's naaip.org website.  (Tr. Vol. 3, 94:24-95:1, 95:19-22).

14

Case Nos.: 16-cv-80808
16-cv-81942

106.    Binyomin Rutstein never had any involvement with the operation of naaip.org. (Deposition of Binyomin Rutstein ("B. Rutstein"), 43:16-43:25; Tr. Vol. 4, 194:3-5; Tr. Vol. 5, 59:7-60:4, 60:11-13).

107.    Binyomin Rutstein also has had no involvement with BeyondQuotes.com after 2009. (B. Rutstein, 120:3-5).

108.    Mr. Newman began programming for naaip.org in April of 2016.  (Tr. Vol. 5, 50:16-51:3).

109.    At the time that Mr. Newman began working on naaip.org, the insurance quotes generated from the website quoters on naaip.org user websites were being pulled from a database of quotes housed on naaip.org.  (Tr. Vol. 5, 52:24-53:22).

110.    Mr. Newman received a CSV file from a woman named Matal containing roughly 3.5 million life insurance quotes that Mr. Newman then inputted into naaip.org's database of life insurance quotes.  (Tr. Vol. 4, 115:25-116:21, 117:16-118, 21).

111.    Mr. Newman never asked Matal to scrape Compulife for data.  (Tr. Vol. 4, 115:22-25).

## II. Court's Conclusions of Law

The '808 Case and the '942 Case were consolidated for trial. The parties stipulated that the Court has subject matter jurisdiction, personal jurisdiction over the parties and that venue is proper in this district. (D.E. 159, 159-2). The Amended Complaint in the '808 Case alleges the following causes of action against David Rutstein and Binyomin Rutstein: Count I: Direct Copyright Infringement (17 U.S.C. § 501); Count II: Contributory Copyright Infringement (17 U.S.C. § 501);

15

Count III: Federal Unfair Competition (15 U.S.C. § 1125(a)); Count IV: Federal Theft of Trade Secrets (18 U.S.C. § 1836(b)); Count V: Florida Theft of Trade Secrets (Chapter 688, Florida Statutes); Count VII: Unfair Competition (Florida Common Law); Count VIII: Florida Deceptive and Unfair Trade Practices Act (Section 501.204, Florida Statutes). Count III was dismissed at trial and Counts VII and VIII were tried and affirmed on appeal.  The appellate court remanded Counts I, II, IV and V for additional findings of fact.

The Verified Complaint in the '942 Case alleges the following causes of action against all Defendants: Count I: Violation of the Economic Espionage Act of 1996 as Amended by the Federal Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b)); Count II: Direct Copyright Infringement; Count III: Contributory Copyright Infringement (17 U.S.C. § 501); Count IV: Federal Unfair Competition (15 U.S.C. § 1125(a)); Count V: Florida Theft of Trade Secrets (Chapter 688, Florida Statutes); Count VII: Violation of the Florida Computer Abuse and Data Recovery Act (Section 688.803, Florida Statutes); Count VII: Unfair Competition (Florida Common Law).  Count IV was dismissed at trial and Counts VII and VIII were tried and affirmed on appeal.  The appellate court remanded Counts I, II, IV and V for additional findings of fact.

## A. Direct Copyright Infringement

### 1. Legal Standards

In order to prove that Compulife has a valid copyright, Compulife has the burden to demonstrate that its 2010 HTML source code is original and owned by Compulife. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-1233 (11th Cir. 2010). To satisfy the first element, ownership of the copyright, "a plaintiff must prove that the work is original and that the plaintiff

16

Case Nos.: 16-cv-80808
16-cv-81942

complied with applicable statutory formalities." *Id.* at 1233 (citation omitted). In judicial proceedings, "the certificate of a registration made before or within five years after publication of the work shall constitute prima facie evidence of the copyright and of the facts stated in the certificate. 17 U.S.C. § 410(c). However, if the work was created more than five (5) years before Compulife obtained the copyrights, Compulife does not have a presumption of validity. 17 U.S.C. §410(c). *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010). Without the presumption of validity, the burden is on Compulife to demonstrate the originality of the worked claimed entitled to copyright protection. *Id*. at 7.

If Compulife is able to establish its right to claim a copyright to its 2010 HTML source code, the second element of copyright infringement is demonstrating that Defendants copied "constituent elements of the work that are original" without authority. *Latimer*, 601 F.3d at 1232-33. This Court must find that "the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." *MiTek Holdings, Inc.*, 89 F.3d 1548, 1544 (11th Cir. 1996) (citing *Lotus Development Corp. v. Borland Intern., Inc.*, 49 F.3d 807, 813 (1st Cir. 1994)). However, if the amount of material copied is so small as to be *de minimis*, this Court may find that it will not justify a finding of substantial similarity." *Id.* at 1560. The burden is on Compulife to demonstrate the significance of the copied features to the overall work. *Id.* If Compulife's work is not original or is unworthy of copyright protection, Defendants have a defense to the claim of copyright infringement. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996).

In determining whether a copyright of an individual work has been infringed, courts must

Case Nos.: 16-cv-80808
16-cv-81942

first separate the protectable elements of the work from the non-protectable elements. *Bateman*, 79

F.3d at 1544.  Copyright law does not protect the following elements of Compulife's 2010 HTML

source code and these must be filtered out:

> a.  elements that are only an idea;
>
> b.  elements dictated solely by logic and efficiency;
>
> c.  elements dictated by hardware or software, computer-industry programming, and practices; or
>
> d.  elements taken from the public domain.

*Id.*  Further, "[w]here there are so few ways of expressing an idea, the idea and its expression of it

are said to merge, resulting in no copyright protection." *Oravec v. Sunny Isles Luxury Ventures,*

*LLC*, 469 F.Supp.2d 1148, 1164 (S.D. Fla. 2006).

A copyright owner "is entitled to recover the actual damages suffered by him or her as a

result of the infringement, and any profits of the infringer that are attributable to the infringement

and are not taken into account in computing the actual damages."  17 U.S.C. §504(b).  To

demonstrate the infringer's profits, "the plaintiff must show a causal relationship between the

infringement and profits and present proof of the infringer's gross revenue." *Pronman v. Styles*, 676

Fed.Appx. 846, 848 (11th Cir. 2017).  To prove actual damages, the plaintiff "must 'demonstrate a

'causal connection' between the defendant's infringement and an injury to the market value of the

plaintiff's copyrighted work at the time of infringement.'" *Id.* (citing *Montgomery v. Noga*, 168 F.3d

1282, 1294 (11th Cir. 1999).  If the plaintiff "establishes with reasonable probability the existence

of a causal connection between the infringement and a loss of revenue, the burden properly shifts

to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper Row, Publishers Inc v. Nation Enterprises*, 471 U.S. 539, 567 (1985).

## 2. Court's Conclusions as to the '808 Case

Compulife's Certificates of Registration were not filed within the first five (5) years of creation and therefore Compulife could not rely on the presumption of validity at trial. In that regard, Compulife presented evidence that Mr. Bruner, Compulife's programmer, wrote the 2010 HTML source code, which is the user interface to Compulife's database, based upon the variable terms received from Mr. Barney. Mr. Barney testified that the variable terms needed to calculate life insurance premiums, such as sex, amount, health, age and location, are generally standard for the life insurance industry. Mr. Barney also testified that Compulife's goal is to closely replicate the quotes generated by the insurance companies themselves which inherently requires that the inputs into the quoter are dictated by the insurance industry. Additionally, the portion of the HTML source code that references Compulife's product names are based upon the information received by the insurance companies and are readily ascertainable. The Court finds that the variables used to input into the web quoter and the names and products created are based upon life insurance industry standards and that there are very few ways to create a form to collect the necessary information to generate a quote. Accordingly, Compulife has not met the first element of originality for its copyright claims.

Even so, the Court finds that 338 of the 347 lines of Compulife's 2010 HTML source code are not entitled to copyright protection. First, Ms. Miracle testified that she considered only 281

19

lines of the 2010 HTML source code to be entitled to copyright protection.  Second, a menu, itself, is an idea, a concept for how to display options to generate a quote, which is not protected.  Third, the alphabetization of the states, as well as the chronological order of the birth months, birthdays and birth years and ascending order of the policy amounts are "dictated solely by logic and efficiency" and therefore, unprotectable.  Mr. Bruner also testified that he did not create the "states" portion used in the 2010 HTML source code and as such, it was not his original work.  Fourth, the computer language to create the website quoter such as "tr" for table rows and other language identified by Mr. Bruner and Ms. Miracle are dictated by "computer-industry programming, and practices" and are unprotectable.

Finally, items such as the variables needed to calculate insurance premiums and use of the common name for those variables are "elements taken from the public domain" and again, unprotectable.  Those variables include "State," "Birth Month," "Birthday," "Birth Year," "Sex" and "Face Amount."  Even the capitalization of the first letter of each variable, a style called camel case, is very commonly used in computer programming as testified by Mr. Bruner and Ms. Miracle.  After filtering out the lines of unprotected code, the Court finds that the remaining 9 lines of code that also appear in naaip.org/tmatteson77 are *de minimis* and does not amount to infringement.

### a. BeyondQuotes.com

Notwithstanding the foregoing, the evidence demonstrates that Compulife gave the source code to be used on beyondquotes.com as a lead generator for MBM Life Quotes, Inc. without restriction or the requirement of a separate licensing agreement.  Compulife had both actual and constructive knowledge that David Rutstein, who was not a licensee of Compulife's software,

owned beyondquotes.com. Mr. Kuhn testified that he received an e-mail from David Rutstein explicitly advising that David Rutstein owned beyondquotes.com and would be sending leads to Compulife's customer, MBM Life Quotes, Inc. and after reviewing the e-mail, sent the 2010 HTML source code to David Rutstein.  Mr. Kuhn testified that he sent the web quoter because he believed that David Rutstein was just MBM Life Quotes, Inc.'s programmer, but the e-mail, itself, clearly states that David Rutstein owned beyondquotes.com and was using beyondquotes.com to send leads to MBM Life Quotes, Inc.  Compulife also made no effort to verify the owner of beyondquotes, even though its own internal records demonstrated that beyondquotes.com had already been associated with another licensee, Eric Savage.  Mr. Barney and Mr. Kuhn testified that Compulife rarely, if ever, verified the owner of the domain names to which the web quoter with the 2010 HTML source code was sent.

The evidence also shows that the web quoter's connection to Compulife was short-lived as Mr. McSweeney of MBM Life Quotes, Inc. quickly asked, and MSCC complied, to put MSCC's web quoter on beyondquotes.com. MSCC provided its version of source code to allow beyondquotes.com to communicate with MSCC's version of Compulife's database.  At the time the connection was made, MSCC had no licensing agreement or other written contract restricting its distribution of the 2010 HTML source code.

There was also no evidence presented that Binyomin Rutstein had any involvement with the operation of beyondquotes.com during the period beyondquotes.com was used by MBM Life Quotes, Inc. David Rutstein testified that he used Binyomin Rutstein's corporation to contract with

Case Nos.: 16-cv-80808
16-cv-81942

beyondquotes.com but that Binyomin Rutstein had nothing to do with the business relationship. Binyomin Rutstein also testified that he had no involvement with beyondquotes.com.

### b. Naaip.org

David Rutstein and Mr. Newman testified that MSCC was involved in conversations concerning integrating the web quoter with naaip.org. David Rutstein also testified that no one at MSCC asked him if he was a licensee of Compulife. Mr. Steinhardt testified that he sent MSCC's version of the 2010 HTML source code to David Rutstein, source code given to MSCC by Compulife without a licensing agreement. When Mr. Barney discovered the connection between MSCC and naaip.org, he caused MSCC to shut off the data feed as of April 10, 2015. From that date forward, the MSCC's HTML source code containing Compulife's variables was rendered useless. It is notable that Compulife allows its former web quoter licensees to continue to display the web quoter on their website even after their license has terminated because the 2010 HTML source code is of no value if not connected to Compulife's database.

Mr. Barney testified that in April of 2015, he located 447 naaip.org user websites that were using the web quoter. Yet, Ms. Miracle only compared the code from one website, naaip.org/matteson77, in reaching her conclusion that the alleged copyright was infringed by **all** of the naaip.org websites. Ms. Miracle reviewed at least 8 other naaip.org websites and was unable to find another website with the same parameters as naaip.org/matteson77. The Court finds that Compulife failed to establish that the naaip.org websites infringed its copyright.

The Court also finds that Binyomin Rutstein was not involved and had no knowledge concerning the integration of the HTML source code on naaip.org. David Rutstein testified that he

used AWD to contract with MBM Life Quotes, Inc. and at that time, MBM Life Quotes, Inc. did not require that AWD hold any insurance licenses. It was not until AWD, through David Rutstein, contracted with ORG, was AWD required to have an insurance agent and insurance license at which point Binyomin Rutstein's license was used. However, Binyomin Rutstein testified that he believed that naaip.org was an insurance agent recruiting website and that he had no involvement with the creation of the website or the web quoter.  Mr. Barney as well as Mr. Newman further testified that they never dealt with Binyomin Rutstein concerning naaip.org.

### 2. Court's Conclusions as to the '942 Case

In the '942 case, Compulife demonstrated that term4sale.com was hit with "get" commands that were sent to "scrape" Compulife's term4Sale.com website for insurance quotes without Compulife's permission. Compulife argues that in order to scrape the data, Defendants had to use Compulife's 2010 HTML source code to communicate with Compulife's database. However, Compulife presented no evidence that the scraping came from any IP address associated with Defendants and all Defendants have denied that they were the source of the scraping or requested the scrape of Compulife. The Court finds that Compulife has failed to demonstrate that these Defendants directly infringed any Compulife's copyright with reference to the "scraping incident."

### 3.  Damages

Compulife first claims it is entitled to damages of $75,819.00 paid to David Rutstein for the leads generated by beyondquotes.com from September of 2011 through December of 2012. However, Compulife has failed to show a "causal relationship between the infringement and profits" with respect to beyondquotes.com. Mr. McSweeney testified that MBM Life Quotes, Inc. entered

into the August 11, 2011 agreement with AWD because of how well beyondquotes.com was performing on search engines, not because of the web quoter.  In fact, the web quoter was added *after* MBM Life Quotes, Inc. and AWD entered into the agreement.  In addition, Compulife allowed MBM Life Quotes, Inc. to place its web quoter on beyondquotes.com, which Compulife knew, or should have known, belonged to a third party and was being used by MBM Life Quotes, Inc. to obtain leads.  Lastly, MBM Life Quotes, Inc. contracted with and paid AWD, not David Rutstein and Binyomin Rutstein.  Therefore, the Court finds that Compulife failed to demonstrate its entitlement to an award of damages against David Rutstein and Binyomin Rutstein for the monies paid by MBM Life Quote, Inc. to AWD.

Compulife next claims entitlement to the $108,406.87 paid by ORG to AWD since 2014. The Court again finds that Compulife failed to demonstrate a "causal relationship between the infringement and profits."  Naaip.org offered free websites to insurance agents and allowed them to e-contract through naaip.org.  Compulife presented no evidence, only pure speculation, that the availability of the web quoter, itself, and not the free website was the cause of the e-contracting through naaip.org.  There were customers of Compulife that were also customers of naaip.org at the same time, such as MBM Life Quotes, Inc., further demonstrating that the free website and e-contracting option were the main draw of naaip.org, not the web quoter.   Further, the evidence shows that the payments were made to AWD and not any Defendants.  The evidence also shows that as of April 10, 2015, the web quoter being used on naaip.org websites were no longer receiving quotes through MSCC and as such, any profits thereafter would not be connected to any alleged infringement.  There were also users of the e-contracting option on naaip.org who did not have a

Case Nos.: 16-cv-80808
16-cv-81942

naaip.org website.  As a result, the Court finds that Compulife failed to demonstrate its entitlement to the $108,406.87 paid to AWD by ORG.

Compulife also seeks damages of $43,462.00 as lost revenue for the 66 customers its claims to have lost to naaip.org.  Mr. Kuhn admitted, however, that of the 66 customers that were both users of naaip.org and Compulife, a large portion were never paying licensees of Compulife.  Mr. Kuhn also did not know when the customer stopped using Compulife's software or when the customer became a user of naaip.org.  Mr. Kuhn admitted that the damages associated with these 66 customers were speculative at best.  There was also no evidence presented that the portion of paying Compulife customers included in the 66 would have continued to use Compulife through the present day.  The Court finds that Compulife failed to present any evidence that there was a casual connection between naaip.org's web quoter and Compulife's loss of any of the 66 customers.

Lastly, Compulife claims it is entitled to obtain personal use license fees from all members of naaip.org from 2013 through the present of $10,428,976.00.  First, the evidence presented was that after April 10, 2015, the 2010 HTML source code was no longer effective for the naaip.org website users that may have had a web quoter.  Second, Compulife has failed to demonstrate a reasonable probability that those same naaip.org users would have purchased Compulife's product or that all of the users had web quoter on their websites to justify the lost revenue.  Third, Compulife testified that new competitors came into the market in 2015 that negatively impacted Compulife's sales, especially because the decrease in sales was marginal at best.  Accordingly, the Court finds that the evidence does not support Compulife's claim of an entitlement to lost revenue.

Case Nos.: 16-cv-80808
16-cv-81942

**B. Contributory Copyright Infringement**

**1. Legal Standards**

The Copyright Act does not specifically provide for contributory copyright infringement, however, it is a well-established principle derived from common law. *MetroGoldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-31 (2005). "Contributory copyright infringement refers to the intentional inducement, causation or material contribution to another's infringing conduct." *BUC Intern. Corp. v. International Yacht Council*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007) (citation omitted). As a result, in order to find Defendants liable for contributory copyright infringement, Plaintiff has the burden to demonstrate that Defendants' intentionally caused infringing activity by naaip.org users. *Id*.

**2. Court's Conclusions**

No evidence was presented that David Rutstein knew prior to April 10, 2015 that the web quoter connected to MSCC that was being used on beyondquotes.com and the naaip.org websites could have been infringing on Compulife's unregistered copyright. David Rutstein believed he was freely given the web quoter by Compulife and by MSCC. As a result, David Rutstein was not shown to act with any intent to cause naaip.org users to infringe on Compulife's copyright of the HTML source code. Further, no evidence was presented that Binyomin Rutstein or Moses Newman were involved with the integration of the web quoter onto naaip.org and its users' websites. As a result, the Court finds that Compulife has failed to demonstrate that these Defendants are liable for contributory copyright infringement.

Case Nos.: 16-cv-80808
16-cv-81942

### C. Misappropriation of Trade Secrets

### 1. Legal Standards

Compulife argues that Defendants violated The Defend Trade Secrets Act (DTSA), 18

U.S.C. § 1836, et seq., and the Florida Uniform Trade Secrets Act (FUTSA). Fla. Stat. § 688.001,

et seq. The DTSA defines a trade secret as information that "derives independent economic value,

actual or potential, from not being generally known to, and not being readily ascertainable through

proper means by, another person who can obtain economic value from the disclosure or use of the

information" and that the owner of the information has taken reasonable steps to maintain its

secrecy. 18 U.S.C. § 1839(3). The FUTSA defines a trade secret as "information, including a

formula, pattern, compilation, program, device, method, technique, or process that (a) Derives

independent economic value, actual or potential, from not being generally known to, and not being

readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy." Fla. Stat. § 688.002.

"Information that is commonly known in the industry and not unique to the allegedly injured

party is not confidential and is not entitled to protection." *Autonation, Inc. v. O'Brien*, 347 F.Supp.2d

1299, 1304 (S.D. Fla. 2004) (citing *Anich Indus., Inc. v. Raney*, 751 So.2d 767, 771 (Fla. 5th DCA

2000)).  Information intentionally publicized on a website without restriction as to the use cannot

derive economic value from not being generally unknown.  *EarthCam, Inc. v. OxBlue Corp.*, 703

F. App'x 803, 806 (11th Cir. 2017) (affirming district court's finding that scraping of public

information on a website is not misappropriation).  Further, efforts to ensure confidentiality are a

necessity to assure the trade secrets are protected. *See XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F.Supp.3d 1245, 1258 (S.D. Fla. 2016); *NPA Assocs., LLC v. Lakeside Portfolio Mgmt, LLC*, No. 13-23930 (S.D Fla. 2014); *Hennegan Co. v. Carlos Arriola & Grafika Grp., LLC*, 855 F.Supp.2d 1354 (S.D. Fla. 2012).  Failure to require a reseller of computer program to sign a confidentiality agreement has been found insufficient to maintain secrecy of a trade secret. *Warehouse Solutions, Inc. v. Integrated Logistics*, LLC, 610 F. App'x 881, 885 (11th Cir. 2015). Failure to include a term of use agreement on a website has also been found to demonstrate a lack of reasonable efforts to protect the use of content of that website. *IT Strategies Group, Inc. v. Allday Consulting Group, LLC*, 975 F.Supp.2d 1269, 1283 (S.D. Fla. 2013) (finding plaintiff's failure to clearly display user agreement fatal to plaintiff's reliance on the terms therein); *Cvent, Inc. V. Eventbrite, Inc.*, 739 F.Supp.2d 927, 937-938 (E.D.Va. 2010) (finding that plaintiff's database was not protected in "any meaningful fashion" by the terms of use on its website where same were not displayed in a reasonable manner); *Ef Cultural Travel Bv v. Zefer Corp.*, 318 F.3d 58, 63 (1st Cir. 2003) (considering plaintiff's failure to include "an explicit statement on the website restricting access" when determining that defendant's scraping "bot" did not exceed authorized access to plaintiff's publicly available website).  Failure of an overt expectation and obligation of confidentiality will prohibit proof of an "implied" confidential relationship.  *Bateman*, 79 F.3d at 1550 ("We are wary of any trade secret claim predicated on the existence of an "implied" confidential relationship."); *see also Warehouse*, 610 F. App'x at 885 (finding verbal instruction of confidentiality without requiring a written confidentiality agreement not reasonable to preserve secrecy of program).

28

In a trade secret action under both the DTSA and FUTSA, not only does a plaintiff have the burden to demonstrate that (1) it possessed a "trade secret" as defined above, but also that (2) the secret was misappropriated. *M.C. Dean, Inc. v. City of Miami Beach*, 199 F.Supp.3d 1349 (S.D. Fla. 2016) (citing *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)). "Misappropriation' generally means that the secret was acquired by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it." *Advantor Sys. Corp. v. DRS Technical Servs., Inc.*, 678 F.App'x 839, 853 (11th Cir. 2017). Misappropriation may occur by "improper means," defined "to include "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means," by breach of duty to maintain secrecy or by continuing to use a trade secret upon discovery of acquisition by accident or mistake.  Fla. Stat. §688.002(2) a, b, c. Scraping with a "bot" of public information on a website that has no restrictions as to the use of that information is not "improper mean." *EarthCam, Inc.*, 703 F. App'x at 806; *Ef Cultural Travel Bv*, 318 F.3d at 63.

Both DTSA and FUTSA provide that damages for violations thereunder may include actual damages caused by misappropriation and any unjust enrichment caused by the misappropriation or, in the alternative, a reasonable royalty for the unauthorized use or disclosure.  18 U.S.C. §1836(b)(3)(B); Fla. Stat. §688.00(1).  A movant must prove damages under FUTSA.  *Alphamed Pharmaceuticals v. Arriva Pharmaceuticals*, 432 F.Supp.2d 1319, 1337 (S.D. Fla. 2006).  "Lost profits must be proven with reasonable certainty and be a natural consequence of the wrong." *XTec, Inc.*, 183 F.Supp.3d at 1260.  Damages must be shown with "a reasonable degree of certainty, rather

29

Case Nos.: 16-cv-80808
16-cv-81942

than by means of speculation and conjecture." *Alphamed Pharmaceuticals*, 432 F.Supp.2d at 1339

(citing *Cibran Enterprises, Inc. v. BP Products N. Am., Inc.*, 365 F.Supp.2d 1241, 1254 n. 2 (S.D.

Fla. 2005)).

### 2. Court's Conclusions as to the '808 Case

Compulife has failed to demonstrate that its Compulife's database of raw data supplied by

various insurance companies is a trade secret.  First, as testified to by Mr. Barney, Compulife

receives data in the form of rate tables and instructions on how to calculate premiums from various

insurance companies that are also provided to Compulife's competitors. The information and

product names for the various life insurance are also freely available to the public and the product

names are proprietary to the various insurance companies.  Second, Compulife failed to make

reasonable efforts to protect its database.  Compulife allowed MSCC to house Compulife's database

without any licensing agreement restricting its use.  There was no evidence presented that Compulife

overtly and explicitly made its expectation known that MSCC was obligated to maintain the

confidentiality of Compulife's internet version housed on MSCC's server.

The evidence presented further shows that David Rutstein was freely given access to the

Compulife's database to generate the quotes by MSCC who, at the time, had no licensing agreement

with Compulife and therefore no duty to maintain the secrecy of the Compulife's database.  Mr.

Steinhardt, the owner of MSCC, testified that he did not require David Rutstein to enter into any

contract to maintain the secrecy of the Compulife's database nor did he verify whether David

Rutstein had any agreement with Compulife to access the Compulife's database.  The evidence

shows that Compulife, itself, provided David Rutstein with a website quoter and link to its

30

Case Nos.: 16-cv-80808
16-cv-81942

Compulife's database even though David Rutstein advised that he owned the website on which it was being placed, not Compulife's customer, MBM LifeQuites, Inc. Both Mr. Kuhn and Mr. Barney, admitted that neither verified the owner of the website, nor was verifying ownership done in the ordinary course of Compulife's business.

Compulife has also failed to demonstrate any misappropriation of Compulife's database by David Rutstein and/or Binyomin Rutstein in violation of DTSA and FUTSA. Compulife failed to present any evidence that David Rutstein and/or Binyomin Rutstein ever had access to or acquired the actual Compulife's database. The evidence showed that they only ever had access to the quotes generated by the Compulife's database on MSCC's server and that the quotes, themselves, were not actually housed within the database. In fact, that the same quotes generated by the Compulife's database were freely available to the public on term4sale.com without any use restriction until September of 2016. Therefore, the quotes, themselves, were not entitled to trade secret protection.

### 3. Court's Conclusions as to the '942 Case

Compulife also argues that all Defendants misappropriated its trade secrets from the scrape of term4sale.com between September 1, 2016 and September 5, 2016. However, the evidence presented was that Defendants only obtained, through Matal, the quotes generated by the Compulife's database and no portion of Compulife's database, itself. Compulife presented no evidence that the scraping came from any IP address associated with Defendants and all Defendants have denied that they were the source of the scraping or requested the scrape of Compulife.

The quotes generated were also freely available to the public on term4sale.com with no restriction of the use of the public quotes at the time of the scrape. The quotes, again, were not

Case Nos.: 16-cv-80808
16-cv-81942

actually within Compulife's database but only generated therefrom.  Compulife also continues to allow its own customers to display quotes on their own websites through a web quoter without also requiring that the customers include any terms on their websites restricting the use of the quotes.

In addition, both Mr. Bruner and Ms. Miracle testified to the long-standing practice of scraping.  Mr. Bruner admitted that even while knowing scraping was a possibility, he never discussed with Mr. Barney, nor did Mr. Barney request, any safeguards from scraping such as including a limitation of use on term4sale.com.  Scraping information publicly displayed on a website that contains no restriction is quite distinguishable from espionage, which is considered an improper purpose, such as sending a drone over a competitor to take pictures of the competitor's plant and processes.  Scraping of a website which contains no restrictions or prohibitions does not involve "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means."  Therefore, even if the quotes were considered trade secrets, again, Compulife failed to reasonably protect same from being used.

Lastly, the volume of quotes scraped does not represent any portion of Compulife's database because none of the quotes are actually housed in Compulife's database, only the raw data is contained therein.  Accordingly, all that was scraped were unprotected quotes not maintained in any database by Compulife.  Notwithstanding, Compulife failed to demonstrate how many quotes were actually generated from the Compulife's database based upon the requests sent during the scrape. As quotes were only generated from 2 out of 56 states or territories, assuming all other variables are equal, that represents only 3.5% of quotes that could possibly be generated by Compulife's

Case Nos.: 16-cv-80808
16-cv-81942

database.[2]  In addition, Mr. Newman testified that he received only 3.5 million quotes and not 43.5 million as was suggested by Compulife, who, admittedly, does not actually know how many quotes were generated.  This is a relatively small number in light of the numerous combinations of variables that are available to make requests to generate quotes from the raw data in Compulife's database.

The Court finds that Compulife's failure to restrict the use of its quotes prior to September 5, 2016 is fatal to its cause of action for trade secret misappropriation under DTSA and FUTSA. The Court also finds that the quotes taken were neither housed on Compulife's database nor significant to be deemed acquisition of Compulife's trade secret in light of the magnitude of quotes that may be generated from the raw data in Compulife's database.

### 4. Damages

Compulife again seeks damages for lost revenue, claiming it is entitled to $43,462.00 for the 66 customers its claims to have lost to naaip.org as well as personal use license fees of at $10,428,976.00 from all members of naaip.org from 2013 through the present.  As explained above, Mr. Kuhn admitted that the damages associated with these 66 customers were speculative at best. Compulife also failed to provide anything more than conjecture that the users of naaip.org would have purchased licenses from Compulife but for naaip.org's offer of free website quoters that Compulife argues contained its trade secrets.  Compulife also admitted that new competitors entered the market which may have resulted in the marginal decline of sales.

---

[2]  In reality, the amount of quotes that may be generated from the web quoter is in the trillions when all combinations of the various variables are taken into account.

33

Case Nos.: 16-cv-80808
16-cv-81942

Compulife also seeks an award against Defendants for being unjustly enriched as a result of the payments received by AWD from MBM Life Quotes, Inc.  Again, Compulife has failed to demonstrate that Defendants received those payments directly.  As also explained above, the payments totaling $75,819.00 from MBM Life Quotes, Inc. were for the leads generated by David Rutstein's high performing website before the web quoter was added.  The payments totaling roughly $108,406.87 from ORG to AWD were for commissions as a result of the e-contracting provision at the top of naaip.org.  Compulife presented nothing more than conjecture that the use of the e-contracting was a direct result of naaip.org's offer of a web quoter as opposed to a free website and e-contracting capabilities.

### C. Injunctive Relief

### 1. Legal Standard

"To obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017).

### 2. Court's Conclusion

Compulife has again failed to demonstrate any irreparable harm or inadequate remedies that would warrant the issuance of a permanent injunction.

### D. Judgment

The Court will issue a separate judgment in favor of Defendants consistent with these findings of fact and conclusions of law.

Case Nos.: 16-cv-80808
16-cv-81942

**SO ORDERED**

THIS _____ DAY OF _____, 2021.

_____
Bruce E. Reinhart
United States Magistrate Judge

DATED this 19ᵗʰ day of January, 2021.

Respectfully submitted,
By: s/ Allison L. Friedman
ALLISON L. FRIEDMAN, ESQ.
Fla. Bar No.: 0055336
ALLISON L. FRIEDMAN, P.A.
20533 Biscayne Blvd., Suite 4-435
Aventura, Florida 33180
(305) 905-2679 (Telephone)
(305) 692-9387 (Facsimile)
Ralfriedman@hotmail.com
*Counsel for Defendants*

Case Nos.: 16-cv-80808
16-cv-81942

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021, I have electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: s/ Allison L. Friedman
ALLISON L. FRIEDMAN, ESQ.
Fla. Bar No.: 0055336
ALLISON L. FRIEDMAN, P.A.
20533 Biscayne Blvd., Suite 4-435
Aventura, Florida 33180
(305) 905-2679 (Telephone)
(305) 692-9387 (Facsimile)
Ralfriedman@hotmail.com