## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| COMPULIFE SOFTWARE, INC.<br><br>Plaintiff,<br><br>v.<br><br>BINYOMIN RUTSTEIN a/k/a BEN RUTSTEIN, DAVID RUTSTEIN a/k/a DAVID GORDON a/k/a BOB GORDON a/k/a NATE GOLDEN and JOHN DOES 1 TO 10,<br><br>Defendants. | CASE NO:  9:16-CV-80808-RLR-REINHART |
| COMPULIFE SOFTWARE INC.,<br><br>Plaintiff,<br><br>v.<br><br>MOSES NEWMAN, DAVID RUTSTEIN, BINYOMIN RUTSTEIN AND AARON LEVY,<br><br>Defendants. | CASE NO.:  9:16-cv-81942-RLR-REINHART |

## CONSOLIDATED FOR TRIAL

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## SUBMITTED AFTER TRIAL

**SRIPLAW**
California ◆ Georgia ◆ Florida ◆ Tennessee ◆ New York

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ........................................................................................... 1

II.    FINDINGS OF FACT ................................................................................................. 3

    A.   Cast of Characters ......................................................................................... 3

        1.   Compulife ........................................................................................ 3

        2.   Defendants ...................................................................................... 10

        3.   National Association of Accredited Insurance Professionals (NAAIP) and BeyondQuotes.com ....................................................................... 14

        4.   Other Third Parties ....................................................................... 16

    B.   '08 Case Facts ............................................................................................. 17

    C.   '42 Case Facts ............................................................................................. 25

    D.   Damages and Continuing Harm to Compulife ......................................... 28

III.   CONCLUSIONS OF LAW ....................................................................................... 31

    A.   Compulife's Claims ................................................................................... 31

    B.   Jurisdiction and Venue ............................................................................. 32

    C.   Eleventh Circuit Appeal and the Application of the Law of the Case Doctrine on Retrial ........................................................................................................ 32

    D.   Copyright Infringement ............................................................................ 33

        1.   Legal Standards ............................................................................ 33

        2.   Conclusions of Law in the '08 Case ........................................... 36

        3.   Conclusions of Law in the '42 Case ........................................... 39

    E.   Contributory Infringement ....................................................................... 42

        1.   Court's Conclusions .................................................................... 42

    F.   Compulife's Misappropriation of Trade Secrets Claims Under the DTSA and FUTSA43

        1.   Legal Standards ............................................................................ 43

        2.   Conclusions of Law in the '08 Case ........................................... 44

        3.   Conclusions of Law in the '42 Case ........................................... 47

    G.   Defendants' Affirmative Defenses ............................................................ 51

        1.   Independent Creation .................................................................... 51

        2.   Innocent Infringement .................................................................. 51

        3.   Unclean Hands .............................................................................. 52

IV.   DAMAGES AND INJUNCTIVE RELIEF .............................................................. 52

    A.   Copyright Infringement ............................................................................ 52

1.     Legal Standards ............................................................. 52

2.     Court's Conclusions ....................................................... 54

B.   Trade Secret Misappropriation ............................................. 56

1.     Legal Standards ............................................................. 56

2.     Court's Conclusions ....................................................... 57

C.   Pre-Judgment Interest ..................................................... 59

D.   Permanent Injunction ..................................................... 60

E.   Judgment for Money Damages ............................................. 62

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

# I.     PROCEDURAL HISTORY

This case was first tried on consent before Magistrate Judge James M. Hopkins (now retired) in a bench trial held from October 3, 2017 to October 6, 2017.[1] ('08 ECF 186, 187, 189, 190). Thereafter, an evidentiary hearing was held on January 24, 2018 on the issues of: (1) whether the Defend Trade Secrets Act is applicable to the conduct at issue in the 08 case; and (2) whether Plaintiff's state law claims in both cases are preempted by the Florida Uniform Trade Secrets Act. ('08 ECF 209, 217).

On March 12, 2018, Magistrate Judge Hopkins issued his findings of fact and conclusions of law. *Compulife Software, Inc. v. Rutstein*, No. 9:16-CV-80808-JMH, 2018 WL 11033483 (S.D. Fla. Mar. 12, 2018). Compulife appealed to the Eleventh Circuit Court of Appeals. ('42 ECF 248).

On June 18, 2020, the Eleventh Circuit affirmed in part, reversed in part, vacated and remanded for a new trial. ('42 ECF 268). *Compulife Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020).

---

[1] In the first trial, the Court heard the live testimony of Christopher Bruner ('42 ECF 192 at 3-43); Nancy Miracle ('42 ECF 192 at 43-66, '42 ECF 193 at 1-41); Jeremiah Kuhn ('42 ECF 193 at 41-94); Brian McSweeney ('42 ECF 194 at 4-56); Robert Barney ('42 ECF 195 at 15-106, '42 ECF 196 at 4-98); Defendant Moses Newman ('42 ECF 197 at 11-49); and Defendant David Rutstein ('42 ECF 197 at 50-100, '42 ECF 214 at 15-87). The Court received deposition designations for Defendant Binyomin Rutstein and watched the video of the designated portions during the trial. ('42 ECF 193 at 95-96; '42 ECF 194 at 3-4); (Deposition Designations, '08 ECF 179 at 1-2, '42 ECF 194 at 3); (Video File on DVD, '08 ECF 200); (Deposition Transcript '08 ECF 196-2). The Court also received deposition designations for Anthony Wilson of One Resource Group; the parties read the designated portions out loud during the trial. (Deposition Designations, '08 ECF 150 at 1-2; '08 ECF 151 at 1-2; '08 ECF 179 at 3-4); (Deposition Transcript, '08 ECF 196-1). The Court additionally received deposition designations for Defendant Aaron Levy; the Court reviewed the designated portions in chambers. ('42 ECF 195 at 11; '42 ECF 197 at 102); (Deposition Designations, '08 ECF 150 at 2; '08 ECF 179 at 2-3); (Video File on DVD, '08 ECF 200). The parties also introduced numerous exhibits, which have been filed in the record. (Exhibit List, '08 ECF 208); (Plaintiff's Trial Exhibits, '08 ECF 192, 193, 194, 195); (Defendants' Trial Exhibits, '08 ECF 191, 197, 199).

At the January 24, 2018 hearing the Court heard the live testimony of Robert Barney, ('08 ECF 221 at 12:20-24), admitted five additional exhibits, ('08 ECF 218), and received deposition designations for Defendant Moses Newman, ('08 ECF 221 at 30:25-31:22).

On remand, the parties again consented to proceed before a U.S. Magistrate Judge. ('42 ECF 277). The parties filed their pre-trial stipulation on October 21, 2020. ('42 ECF 290).

On November 16-20, 2020, this court held a new trial via remote video conference. The Court received live testimony of Robert Barney, founder and president of Compulife (Vol. 1, pp. 35-149, Vol. 2, pp. 1-118); Chris Bruner, Compulife's programmer (Vol. 2, pp. 118-187, Vol. 3, pp. 1-30); Jeremiah Kuhn, Compulife's chief financial officer and chief operating officer (Vol. 3, pp. 30-118); Nancy Miracle, Compulife's expert witness (Vol. 3, pp. 118-148, Vol. 4, pp. 1-109); Moses Newman, a defendant (Vol. 4, pp. 109-122, Vol. 5, pp. 46-68); and David Rutstein, a defendant (Vol. 4, pp. 122-202, Vol. 5, pp. 4-41). Defendants Binyomin Rutstein and Aaron Levy did not attend the trial. In lieu of live testimony, and with the parties' agreement, the Court received the transcript of the testimony of Brian McSweeney, a former Compulife customer, from the first trial. (PX 269). The court received deposition testimony of Michael Steinhardt of MSCC (PX 566), Anthony Wilson of One Resource Group (ECF 565), defendant Binyomin Rutstein (ECF 564), and defendant Aaron Levy (ECF 563).

The parties introduced numerous exhibits.[2] (ECF 307).

Based upon the testimony, deposition designations, exhibits, stipulations, pleadings, other proceedings, and the evidence presented, the court makes the following findings of fact and conclusions of law.

---

[2] Plaintiff's exhibits are referred to as "PX" and defendants' exhibits are referred to as "DX".

## II.      FINDINGS OF FACT

### A. Cast of Characters

#### 1. Compulife

1.      Compulife develops and markets life insurance comparison and quotation software. (Vol. 1, 39:5-6). Compulife strives to provide accurate quotes as close as possible to those an insurance company would provide. (Vol. 2, 29:4).

2.      **Robert Barney** founded the company in 1982 and is its president. (Vol. 2, 16:5). **Chris Bruner** is Compulife's programmer. (Vol 2, 119:5-7). **Jeremiah Kuhn** is in charge of customer and technical support and is Compulife's chief financial officer. (Vol. 3, 34:8-9, 72:13-15).

3.      Compulife sells a PC version of its software and an internet engine version. (Vol. 1, 44:9-11).  The Compulife PC version is sold with a click-through licensing agreement. (Vol. 2, 45:15-18; Vol. 3, 35:10-17). To license the Compulife internet engine version you also must license the PC version; you cannot license the Compulife internet quote engine without also licensing the PC version of the software. (Vol. 2, 45:15-24).

4.      Compulife offers initial thirty-day trials of its PC software to insurance agents. (Vol. 2, 35:16-21; Vol. 3, 40:14-41:16). After the thirty-day trial, potential customers who complete a tutorial can get a four-month free trial subscription with the "web-quote" option. (Vol. 2, 36:1-4; Vol. 3, 35:4-12, 41:19-42:17). The Compulife web-quote option allows a customer to put Compulife's HTML code on the customer's website and offer website visitors insurance quotes there. (Vol. 2, 36:3-4; Vol. 3, 36:12-17). Four-month trial customers sign a Compulife licensing agreement. (Vol. 2, 36:7). Compulife's experience has been that more four-month free trials translate into more sales of licenses for Compulife's software. (Vol. 3, 41:19-42:17).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

5.      Compulife also operates the website Term4Sale.com that uses the company's
Internet engine software operated on Compulife's server. (Vol. 1, 50:11-15, 52:6, 53:11; Vol. 2,
119:25). Term4Sale.com is a way for consumers to get quotes for life insurance and to find
Compulife software customers in their area, who are life insurance agents, from where they can
buy life insurance. (Vol. 1, 50:16-20).

6.      Compulife's software relies on a proprietary database of insurance rates from life
insurance companies that Barney created.[3] (Vol. 1, 41:10; Vol. 2, 122:18-123:3). There is a
difference between insurance rates and insurance quotes: rates are one of the "raw materials"
used in developing an insurance premium for a policy; rates are never given to a consumer,
rather rates are used to calculate the premium which is given to a consumer to tell them how
much the insurance will cost. (Vol. 1, 45:25-46:5). Many life insurance companies publish rate
books and rate charts. (Vol. 1, 41:12-13). For life insurance companies that do not publish their
rates, Compulife has relationships with these companies to obtain their rate information. (Vol. 1,
41:16-42:1). Most life insurance companies provide Compulife with rate information in a timely
manner. (Vol. 1, 42:3-4). Compulife's system includes rate tables from over a hundred insurance
companies. (Vol. 2, 5:3). Compulife's software generates quotes mathematically using the rate
information and other inputs. (Vol. 3, 14:12-19).

7.      Insurance rates are public information. (Vol. 1, 42:10). However, for the
information to be useful it must be current; insurance companies provide Compulife with their
current rate tables before they are released to the public. (Vol. 1, 42:15-24). In exchange,
Compulife gives its compilation of rate information to insurers who provide that information to

---

[3] The Eleventh Circuit referred to Compulife's database of insurance rate information as the "Transformative
Database." *Compulife*, 959 F.3d at 1296.

Compulife in the form of a quoting tool[4] so that the insurers can review it in advance before Compulife releases its updated software to the public. (Vol. 1, 42:20-24, 48:9-15).

8.     When Compulife receives rate information from insurers, sometimes as frequently as every month, Bob Barney, the President of Compulife, enters the rate information into Compulife's system using Compulife's proprietary "back office" software and database that Compulife designed. (Vol. 1, 42:5, 44:16-18, 44:20-45:9; Vol. 2, 123:4-19). Compulife assigns its own internal four-letter company codes to the different insurance companies whose insurance policy information it inputs into in its database. (Vol. 2, 157:18-158:9, PX 109). Compulife updates its rate information in its software and provides those updates to its customers monthly. (Vol. 1, 48:17-19; Vol. 2, 123:20-23). Because the data files could be reverse engineered if not protected, Compulife designed an encryption system so that when the data was stored, if someone outside the company looked at the data files, "it just looks like a bunch of garbage." (Vol. 1, 45:12-20).

9.     Compulife does not sell insurance to avoid any perceived conflict of interest. According to Barney,  if he sold insurance "[c]ompanies and competing agents would cite the fact that I had an agency and therefore I was somehow prejudiced in the way I was preparing and producing software." (Vol. 1, 43:8-10). Compulife markets a PC version and an Internet quote engine version of its software. (Vol. 1, 49:9-16). The PC version was introduced in 1983, and the Internet engine version was introduced in 1997. (Vol. 1, 50:7-10). Both versions use the same encrypted data files. (Vol. 1, 50:25-51:2).

---

[4] Barney described this as "test software" that consists of a "segregated version of my program with just that company's products in it…so they can review what I have done." (Vol. 2, 7:7-12).

10.     Barney designed the software but is not a programmer. (Vol. 1, 43:16). Chris Bruner, a thirty-year Compulife employee, programmed the software. (Vol. 2, 119:6-7). Bruner wrote both the Compulife PC version and the Compulife internet engine version (written in C++) himself.[5] (Vol. 2, 120:2-13; Vol. 3, 22:19). Bruner also wrote the Compulife HTML Source Code that communicates with the Compulife internet engine. (Vol. 2, 128:13-17; Vol. 3, 22:17). Compulife's 2001 HTML Source Code was registered with the Copyright Office on May 29, 2015 and assigned Reg. No. TX-8-106-360. (PX 153, 541). Compulife's 2010 HTML Source Code, the updated version of its 2001 HTML Source Code, was registered with the Copyright Office on May 29, 2015 and assigned Reg. No. TX-8-106-364. (Vol. 2, 131:15-21, PX 153, 542).

11.     The Compulife internet engine and HTML work together: "If a person accesses a website that contains the HTML code and inputs the right information, the HTML code will then contact the C++ code, pass information to the C++ code, the C++ code does some computation and passes information back to the HTML code, which then displays it on the website." (Vol. 3, 27:18-23). The Compulife HTML gathers information from the end user like age, sex, smoking status, and details about the type of life insurance requested, and then the HTML calls the Compulife internet engine which calculates an insurance quote and produces the results back to the user. (Vol. 2, 120:18-19, 121:9-17). To accomplish the task of looking up insurance quotes for a user, the HTML code contains different blocks of code: each block of code relates to the different information needed from a user to produce an insurance quote: state selection code[6]

---

[5] The internet engine software was written by Bruner in C++ and the source code for it was registered with the Copyright Office. (Vol. 2, 121:7-8, 128:18-129:4; PX 153).

[6] The state selection code translates each state name into a number, rather than the typical abbreviation of states by two letter acronyms. (Vol. 2, 147:17-19, PX 567). On cross examination, Bruner admitted that the way he programmed the state selection code was a common way of doing it, but that there were many ways of program it differently. (Vol. 3, 6:21-25).

(Vol. 2, 139:10-20); birthdate and birth month selection code[7] (Vol. 2, 139:21-140:6); birth year code written in camel case (Vol. 2, 140:7-9); gender selection code[8] (Vol. 2, 140:11-17); smoker/tobacco code[9] (Vol. 2, 140:18-21); health class code[10] (Vol. 2, 140:22-141:7); insurance category code[11] (Vol. 2, 141:8-142:12); mode used code[12] (Vol. 2, 154:9-14); the code for sorting output information (Vol. 2, 155:1-11); and face amount code (Vol. 2, 142:19-143:8).

12.       In order for the Compulife HTML code to communicate with the Compulife internet engine, the HTML code must send the engine the correct parameters and variables defined in the HTML code so that the internet engine can look up the insurance rates in the Compulife software and produce an insurance quote; it must be a one-to-one match. (Vol. 3, 27:24-29:3). The parameters are also contained in the Compulife internet engine source code written in C++. (Vol. 3, 24:25-25:11, PX 542). The Compulife internet engine is expecting the parameters and variables to come to it in the particular way it is written in the Compulife HTML, and if it does not come to the engine in that way the software will spit out an error and not produce results. (Vol. 2, 121:18-122:3). The parameters, which correspond to the blocks of HTML code, are: "State", "BirthMonth", "Birthday", "BirthYear", "Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1", and "FaceAmount." (Vol. 2, 146:4-8, PX 542,

---

[7] The birth month selection code uses "camel case" where two words are combined without a space between them, here "BirthMonth." The second capitalized word forms a hump like that of a camel. (Vol. 2, 148:6-16, PX 567).

[8] Compulife's HTML only offers a choice between "male" and "female". (Vol. 2, 149:18, PX 567).

[9] The smoker/tobacco code, which uses camel case, defines a "radio button" to choose between smoker or non-smoker, but it could have been written to use a drop-down choice instead. (Vol. 2, 149:24-150:7, PX 567).

[10] This code defines health by different insurance classifications: PP for preferred plus, P for preferred, RP for regular plus, and R for regular. (Vol. 2, 150:8-17, PX 567).

[11] This code defines thirty-three different categories of term life insurance policies, each of which is assigned a different number, letter, or combination of numbers or letters, and permits comparison of different lengths or types of term policies. (Vol. 2, 151:13-154:8, PX 567).

[12] The mode used code gives the annual premium as well as the "modal" premium. The modal premium is monthly, quarterly, or semiannually. (Vol. 2, 154:9-14).

567). All the parameters must be present, spelled correctly and provided in the correct order in order for the software to produce quotes. (Vol. 2, 121:18-22).

13.     Compulife's software is provided to customers as an executable file. (Vol. 2, 124:4-9). An executable is a program a computer can run; written in machine code, executable files are made specifically for the computers they run on; humans cannot read executables. (Vol. 2, 124:16-21). The insurance data in the Transformational Database is included in Compulife's software as part of the same executable package. (Vol. 2, 125:4). The data is encrypted to protect it from being stolen. (Vol. 2, 125:18-20).

14.     The Term4Sale website works this way: visitors to Term4Sale.com enter their personal information to obtain a quote, including their zip code. (Vol. 1, 52:9-22, 132:3-19; Vol. 2, 37:20, 38:2). In response, the visitor receives an insurance quote and information for up to three Compulife insurance agents they can contact to apply for a policy. (Vol. 1, 52:9-22, 132:3-19; Vol. 2, 37:20, 38:2). Compulife uses the visitor's zip code to generate the list of up to three Compulife agents in their area to contact to purchase life insurance. (Vol. 1, 52:9-22). The visitor to Term4Sale who receives a quote can also send a message to the Compulife agents in their area through the Term4Sale website. (Vol. 1, 132:3-19). Not all insurance companies sell life insurance in all states, so the zip code information is also used to determine what insurance policies from what companies to quote to the consumer. (Vol. 1, 53:3-8).

15.     The only way to communicate with the Compulife Internet Engine is to use Compulife's HTML commands in Compulife's HTML code. (Vol. 1, 53:24-25). Compulife's HTML code creates the web page a website visitor sees when they use the life insurance quote engine function. (Vol. 2, 65:1-5).

16.    For Compulife customers who want to obtain Compulife's quote system on a single website, Compulife offers a "web quote" option which allows one user access to a copy of Compulife's Internet quote engine that Compulife runs on its servers. (Vol. 1, 54:3-7). To use the Compulife web quote option, a user must at least subscribe to "Compulife Basic" which costs $96 a year plus the web quote option for an additional $96 per year, or $192 total per year. (Vol. 1, 54:9-19, Vol. 2, 32:4-13; Vol. 3, 36:12).

17.    Alternatively, Compulife offers the Compulife Internet quote engine for more sophisticated customers who have "their own ideas about how they want to present their website to the consumer." (Vol. 1, 54:21-23). The Compulife internet quote engine costs $1,500 per year. (Vol. 1, 54:9-13). Internet quote engine customers can customize Compulife's software to their needs, run the software on their own server, and give third parties access. (Vol. 1, 54:21-55:13). The Compulife internet engine license agreement requires users who access the Compulife internet engine software to have valid Compulife PC licenses. (Vol. 1, 59:14-17, PX 537).

18.    Compulife's licensing agreements provide that Compulife's software constitutes Compulife's valuable trade secrets, contains confidential and trade secret material, and that the user will not duplicate Compulife's software except for back-up purposes. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535).  Compulife's licensing agreements prohibit the user from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting services to sub-users without Compulife's permission. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535). Compulife's licensing agreements provide that Compulife displays life insurance quotations on the internet through a proprietary system of template files originally created by Compulife, and that the user will not permit sub-users to re-format a quotation on another computer. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535). Compulife licensing agreements provide that Compulife's

software includes names of variables and lists of variables which are proprietary to Compulife and subject to Compulife's copyright. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535). Compulife's licensing agreements provide that the user's license for Compulife's software is not transferable without the written consent of Compulife. (Vol. 3, 37:10-40:9; PX 532, 533, 534, 535).

### 2.  Defendants

### a.  David Rutstein and Binyomin Rutstein

19.     David Rutstein was previously licensed by the Florida Department of Financial Services as an insurance agent.[13] (Vol. 4, 128:13-14, PX1). On April 19, 2012, David Rutstein agreed in a Consent Order that his insurance license was revoked and he was barred from working in the insurance industry for life[14] in *The State of Florida, Division of Financial Services, in the Matter of David Brian Rutstein*, Case No. 115256-11-AG. (Vol. 1, 129:2-10, Vol. 4, 128:13-14, 128:22-129:7, PX 1). David Rutstein was immediately and permanently removed and permanently barred from any and all direct or indirect participation in and/or affiliation with any entity which is licensed or regulated under the Florida Insurance Code, and any individual or entity which is otherwise involved in the business or transaction of insurance. (PX1).

---

[13] According to the file in in *The State of Florida, Division of Financial Services, in the Matter of David Brian Rutstein*, Case No. 115256-11-AG (PX 1), David Rutstein became licensed and began selling Medicare and health insurance after he graduated college in 1992. At one time David Rutstein had insurance licenses in 40 different states. Beginning in 2010 insurance regulators began to terminate and/or stop renewing David Rutstein's insurance licenses. David Rutstein's insurance license was revoked in North Carolina because he was receiving income from the sale of uncertified insurance policies through his website called GuaranteedIssueHealthInsurance.com, and because he misappropriated approximately $200,000 in consumer funds in the form of commissions received for the sale of nonexistent insurance products.

[14] According to Rutstein, his insurance license was revoked because he was involved in a scheme where Rutstein distributed leads for the sale of medical insurance policies. Rutstein obtained the leads from a website he owned that was number one in Google called "guaranteedissuehealthinsurance.com." Rutstein was paid an override commission on the sale of policies that resulted from the leads he distributed. Insurance certificates were sold to the individuals whose leads Rutstein distributed, but there was no insurance company or policies behind them. (Vol. 4, 173:2-176:7).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

20.     Despite being permanently barred from the insurance industry, the court determines that David Rutstein, through his activities on behalf of BeyondQuotes.com, NAAIP.org and American Web Designers, Ltd., remained involved in the insurance industry after his license was revoked. The court determines that David Rutstein's testimony at trial to the contrary, including Rutstein's insistence that he and "David Gordon" are not one and the same person, was not credible. Compulife demonstrated, to the court's satisfaction, that David Rutstein is David Gordon.[15]

---

[15] Compulife's Barney went to great lengths to uncover David Gordon's real identity. (Vol. 1, 121:18-122:3, PX 110). Barney found a LinkedIn profile from 2015 that was mostly fiction. (Vol. 1, 122:21-24, PX 110). In 2016, the fictional information was then transferred to a false LinkedIn profile for Benjamin Rutstein. (Vol. 1, 123:4-9, PX 110, 112). In 2017, the fictional information was transferred to a false LinkedIn profile for Moses Newman. (Vol. 1, 123:11-22, PX 112, 114).

Barney also examined the "about" page for NAAIP.org on May 18, 2015, but none of the names or photos on the NAAIP.org about page corresponded to real people.  (Vol. 1, 124:3-12, PX 159). On May 26, 2015, the photographs on the about page changed but the people listed there were still fictional. (Vol. 1, 124:15-25, PX 159, 160). The December 25, 2015 NAAIP.org about page again listed false information. (Vol. 1, 125:1-8, PX 162). The September 8, 2016 about page for NAAIP.org also listed false information but did reflect Benjamin Rutstein's involvement. (Vol. 1, 125:11-17, PX 4).

David Rutstein purchased the NAAIP.org domain name in 2009. (Vol. 1, 144:13-20, PX 165). When he did he listed the same 800 phone number used on the NAAIP.org website when Barney first visited the site, and the same email address listed for Binyomin Rutstein. (Vol. 1, 144:15-20, PX 165). By 2016, the ownership of the NAAIP.org website was transferred to Aaron Levy. (Vol. 1, 144:25-145:3, PX 165). The BeyondQuotes.com domain registration was originally in Binyomin Rutstein's name and then was transferred to Aaron Levy in 2016. (Vol. 1, 145:4-14, PX 166).

Barney was able to find a webpage at www.enrollment123.com that listed David Rutstein with a Boca Raton, Florida address and the same telephone number that Barney called on April 8, 2015 and spoke with David Gordon. (Vol. 1, 125:20-126:5, PX 262). On June 10, 2015 Barney found David Rutstein's Facebook page that contained a post that stated "David Rutstein naaip.org April 30 – Jerusalem, Israel – 4,746 free websites to date." (Vol. 1, 126:6-14, PX 286). On June 12, 2015, Barney found the record for Binyomin Rutstein's life insurance license with the State of Washington that used the Boca Raton, Florida address of Arlene Rutstein, the mother of David Rutstein, and the grandmother of Binyomin Rutstein. (Vol. 1, 126:16-21, 127:8-14, PX 169). The record also listed the same telephone number that Brian McSweeney had for David Rutstein and David Gordon. (Vol. 1, 127:16-21, PX 32, 169). Barney also found a web page for "Ben Rutstein" at www.hhcadmin.com that gave the email address david@naaip.org and the same telephone number McSweeney had for David Rutstein. (Vol. 128:3-16, PX 301). On June 12, 2015, Barney found state of Indiana insurance licensing information for Binyomin Rutstein that contained the same david@naaip.org email address and the same 800 telephone number listed on the NAAIP.org website. (Vol. 1, 128:18-24, PX 304). On October 8, 2016, Barney found two letters online at the medicareaide.com website with NAAIP logos purporting to be from David Rutstein that contained the same 800 telephone number listed on the NAAIP.org website. (Vol. 1, 129:22-130:14, PX 9, 10).

21.     The court was able to make credibility determinations throughout David Rutstein's testimony, and those credibility determinations inform these findings of fact. David Rutstein admitted he lied when he certified under penalty of perjury in the '08 case that he provided all responsive documents and that he had no information related to NAAIP software or websites. (Vol. 4, 146:22-147:10, PX 201). David Rutstein admitted he lied in his declaration submitted under penalty of perjury in opposition to summary judgment in the '08 case when he said he did not know the data feed for NAAIP and BeyondQuotes was coming from Compulife. (PX 497, Vol. 4, 148:5-152:9). Rutstein lied at his deposition when he denied involvement with NAAIP after his insurance license was revoked. (Vol. 4, 130:16, 150:4).

22.     David Rutstein was not credible when, for example, he testified that he had nothing to do with his son, Binyomin Rutstein's insurance agency, American Web Designers, Ltd. ("AWD") after David Rutstein's insurance license was revoked in 2012. (Vol. 4, 135:9-13). American Web Designers, Ltd. ("**AWD**") is an Ohio company licensed as an insurance agency in Florida. (Vol. 4, 134:21-22, 135:14-16, 177:14-23). To have a license for an insurance agency in Florida, there has to be an individual who stands as the principal for that agency; Binyomin Rutstein is the licensed insurance agent in Florida for American Web Designers. (Vol. 1, 146:11-18, PX 564). Binyomin Rutstein is an insurance agent licensed in 35 different states and appointed as agent by 70 different insurance companies to act as the producer on sales of insurance policies. (DE 296-1 at 33).  Yet, Binyomin Rutstein admitted at deposition that he has never sold a life insurance policy in his life. (PX 564 at 18:11-12).

23.     Binyomin's resident agent address and place of business is 11618 Briarwood Circle, #1, Boynton Beach, Florida, the home of David Rutstein's mother Arleen Rutstein. (Vol. 5, 21:8-10). Binyomin Rutstein is a legal resident of Jerusalem, Israel. (PX 564 at 10:2). David

Rutstein testified that his son Binyomin gave permission for David to use Binyomin's insurance license. (Vol. 4, 194:14).  David Rutstein acknowledged opening AWD's bank account with Bank of America by presenting his passport with his photograph as identification, signing the AWD corporate resolution as authorized signor to open that account, and being the only authorized signor on that account. (Vol. 4, 137:14-138:25, PX 106). In addition, in response to questions about the progress of the agreement between AWD and MBM Life Quotes (discussed below) before Barney's discovery on April 8, 2015 (also discussed below), David Rutstein, answering for himself concerning an agreement entered into by AWD, said "[e]verything was good, **we** had a contract." (Vol. 5, 15:6).

24.     David Rutstein was also not credible when he testified that the "David Gordon" identified as the sender and recipient of many of the emails admitted into evidence was not him, or that since his insurance license was revoked he never represented himself as "David Gordon." (Vol. 4, 133:5-10, PX 17). David Rutstein's denial that he was not the person who sent the email admitted as PX 48 from [david@naaip.org](mailto:david@naaip.org) to Melissa Irwin of ORG on April 18, 2014 was not credible.[16] (Vol. 4, 140:5-19). David Rutstein's attempt to disclaim personal use of the [david@naaip.org](mailto:david@naaip.org) email address by testifying that NAAIP uses the "david@NAAIP.org" email

---

[16] The email from [david@naaip.org](mailto:david@naaip.org) states: "I am the account of Binyomin Rutstein. Our legal name is Binyomin Rutstein. This should be managing account. David Gordon is the one that does talking to agents, but is not a licensed agent." (PX 48). David Rutstein testified that Aaron Levy sent the email "Most likely. He was the gentleman who handled most of this stuff." (Vol. 4, 140:21-22). Rutstein was then asked a series of questions calculated to get him to admit he was "David Gordon" at [david@naaip.org](mailto:david@naaip.org) who sent the email. (Vol. 4, 140:5-144:5). Rutstein was played a recording where he (Rutstein) is heard referring to himself as "David Gordon". (Vol. 4, 141:18-25, PX 325). Rutstein admitted the voice was his. (Vol. 4, 142:1-3). Yet Rutstein continued to maintain that he is "really, really careful not to ever use the word Gordon." (Vol. 4, 153:23-24).  The audio was played again, and in response David Rutstein admitted "I hear it, I hear it. No need to push forward." (Vol. 4, 154:12-13). Despite this Rutstein refused to admit unequivocally that he was "David Gordon," because "[w]ith you guys I could never be a hundred percent sure. Your desire is to put NAAIP out of business and destroy my life so I can never be a hundred percent sure." (Vol. 4, 154:22-24). So a different recording of David Rutstein referring to himself as "Gordon" was played. (Vol. 4, 155:6-24, PX 363 for identification only). Rutstein admitted he heard his voice refer to himself as David Gordon, responding "That is correct. That is what I heard." (Vol. 4, 155:24). Yet, despite this admission, David Rutstein continued to deny being David Gordon, saying "there is nothing you could present" that would convince him. (Vol. 4, 156:8-9).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

address as a sort of "catch-all" email, and that NAAIP.org used to use bob@NAAIP.org as the

catch-all, but does not anymore, was also not credible. (Vol. 4, 182:7-13). Rutstein's testimony

was contradicted by his admitted receipt of emails sent to david@naaip.org in April of 2015, the

period immediately after Barney's initial discovery of NAAIP's use of Compulife's HTML code

and Transformative Database. (Vol. 5, 12:7-16, PX 244).

25.      Audio recordings of David Rutstein's voice were played at the trial and in those

recordings Rutstein referred to himself as David Gordon numerous times. (PX 122 and 325).

David Rutstein's co-defendant Moses Newman, having heard the recordings, agreed that David

Rutstein and David Gordon are the same person. (Vol. 5, 65:15-17).

**b.  Moses Newman**

26.      Moses Newman is a contract computer programmer. (Vol. 5, 48:12-15). Newman

worked as a programmer for NAAIP.org starting in April of 2016. (Vol. 5, 24:8, 50:19).

However, Newman testified he participated in an earlier conference call involving Michael

Steinhardt of MSCC, but it was unclear if Newman did any programming work as a result. (Vol.

61:21-62:18).

**c.  Aaron Levy**

27.      Aaron Levy is an individual who resides at 111 Agripas, Apt. 20, Jerusalem,

Israel 9451311. (DE 296-1 at 50).  Aaron Levy testified he handles all the financial affairs of

NAAIP and BeyondQuotes.com. (Levy Transcript Page 47:20 to 48:18).

**3.  National Association of Accredited Insurance Professionals (NAAIP) and
BeyondQuotes.com**

28.      The "National Association of Accredited Insurance Professionals" or "**NAAIP**" is

a website on the internet located at the domain name www.naaip.org. (DE 296-1 at 45).  NAAIP

gives free websites to insurance agents using a website template. (DE 296-1 at 22).  The key

benefit offered by the "free" NAAIP websites is free quote engines, including a life insurance quote engine, that allows internet visitors to a free NAAIP website to enter certain basic information about their age, insurance rating and type of policy, as well as name telephone number and email address, and receive a list of quotes for term life insurance policies. (DE 296-1 at 23-24). NAAIP gives away its quote engine for free. (Vol. 2, 11:1-7). NAAIP is not a real entity, it is not a charity, not-for-profit, or trade association, and is not incorporated anywhere. (DE 296-1 at 28).

29.    **BeyondQuotes.com** is a lead generation website that David Rutstein purchased for $5,000 in 2008 from a third-party. (Vol. 4, 179:17-24). BeyondQuotes.com belongs to David Rutstein. (PX 569 at 171:20-23). David Rutstein used BeyondQuotes.com to generate insurance leads for insurance agents Brian McSweeney and Eric Savage. (PX 569 at 169:16-170:9; Vol. 4, 180:4-17; PX 28). For every lead McSweeney or Savage received that became a sale of an insurance policy, a "lead generation fee" was paid to AWD. (PX 569 at 170:7-9, Vol. 4, 180:4-181:8; PX 28). Both McSweeney and Savage were Compulife customers, and Rutstein put the Compulife "web quoter" on BeyondQuotes.com in August of 2010. (Vol. 4, 181:13-14).

30.    The naaip.org and beyondquotes.com domain names are registered with domain registrar GoDaddy.com, LLC. (DE 296-1 at 40). The NAAIP and BeyondQuotes websites were previously operated from servers in the United States. (DE 296-1 at 41). The NAAIP and BeyondQuotes websites were moved to Israel after Compulife complained to their US web host. (DE 296-1 at 42). The www.naaip.org domain name is currently registered in Aaron Levy's name and his address. (DE 296-1 at 52).

31.    NAAIP and BeyondQuotes both provide internet visitors the ability to obtain free quotes for term life insurance policies, the same service provided by the Compulife Software and

Compulife's www.term4sale.com website. David Rutstein testified that the accuracy of NAAIP's term life quote engine was not important, but this was contradicted by statements he posted on NAAIP's website shortly after the scraping attack indicating that quoter had just been updated and was now 90% accurate. (Vol. 5, 27:5-28:8, 29:12-17, PX 311).

#### 4. Other Third Parties

32.     **Michael Steinhardt** is the owner of **MSCC** Corporation**.** (PX 566 at 7:2). MSCC provides internet software for insurance agents called **VAM DB,** a customer relationship manager software program. (PX 566 at 7:6-17).  MSCC previously licensed Compulife's internet engine software as an authorized reseller. (PX 566 at 9:11-10:25). As an authorized reseller, MSCC made Compulife's software available to MSCC customers through the VAM DB service as well as on the MSCC customer's website. (PX 566 at 9:16-21). In order to use Compulife's software, the MSCC customer also had to be a Compulife PC software subscriber. (PX 566 at 10:7-17). Compulife's internet engine software was installed on MSCC's server. (PX 566 at 10:25).

33.     **Brian McSweeney** is a life insurance agent in Barrington, Illinois. (PX 569 at 168:19-24). McSweeney's company is MBM Life Quotes, LLC ("**MBM**"). (PX 569 at 168:16-24). Through MBM, McSweeney entered into an agreement dated August 15, 2011 with "American Web Designers, Ltd. Represented by David Rutstein" entitled "MBM AWD Agreement". (PX 28, PX 569 at 169:16-172:19). At the time, BeyondQuotes.com "was the number one site on Google." (PX 569 at 176:25). Pursuant to the MBM AWD Agreement, David Rutstein provided MBM and McSweeney with leads for the sale of life insurance policies; the leads were obtained by David Rutstein from the BeyondQuotes.com website. (PX 28). For every sale of an insurance policy MBM made from a lead received from the BeyondQuotes.com

website, MBM paid a lead generation fee to AWD of 32 ½ % of the sale proceeds. (PX 569 at 171:24-172:19, PX 28).

34.    **One Resource Group** ("**ORG**") is a life insurance wholesaler. (Vol. 1, 102:19-21; PX 565 at 43:7-24). Wholesalers like ORG accept life insurance applications from life insurance agents and submit those applications to life insurance companies. (Vol. 1, 102:19-21; PX 565 at 6:1-8:1). ORG receives overrides and bonuses from insurers on commissions the insurers pay to the insurance agents who submit applications through ORG. (Vol. 1, 102:23-103:7; PX 565 at 54:4-57:19). ORG then pays a portion of the overrides and bonuses it receives to the referral source. (PX 565 at 54:4-57:19).

35.    ORG was featured prominently in the "back office" portion of the NAAIP.org website. (Vol. 1, 107:8-24, PX 52). The referral source, in the case of NAAIP agents who placed insurance through ORG, was Binyomin Rutstein's company, American Web Designers. (PX 565 at 31:21-37:8). ORG entered into an Affiliation Agreement with AWD dated March 24, 2014. (PX 42). Pursuant to the Affiliation Agreement, ORG paid AWD $108,406.87 in override commissions from sales of insurance policies by NAAIP.org members during the period of time that NAAIP used Compulife's software and data. (Vol. 1, 148:1-12, PX 43). NAAIP's free websites and use of Compulife's software made those payments possible. (Vol. 2, 94:10-18; DX 59; PX 565 at 47:8-48:2).

**B.  '08 Case Facts**

36.    On April 8, 2015, Barney received a telephone call from a Compulife customer asking Barney if Compulife was able to provide a service for their agency that was the same as NAAIP was offering and pointed Barney to the website for the "National Association of Accredited Insurance Professionals" at www.NAAIP.org. (Vol. 1, 59:21-60:6, PX 556).  The NAAIP website advertises free internet websites with quote engines for insurance agents. (PX

556). At that time, in April of 2015, Barney identified 447 NAAIP agent websites at www.NAAIP.org. (Vol. 1, 65:18-22, 87:14-18). As of the trial of this case in November of 2020, the NAAIP.org website advertised that there were over 12,000 NAAIP agent websites at www.NAAIP.org. (Vol. 4,  144:17-21; PX 556).

37.     When he discovered the NAAIP website on April 8, 2015, Barney ran a quote on the NAAIP website, looked at the quote, and immediately recognized company names and product names from Compulife's software. (Vol. 1, 64:9-14). On April 10, 2015 Barney again ran a quote and produced a printout of what he saw at NAAIP.org using the page of the NAAIP.org website for an insurance agent named Thomas Mattison. (Vol. 1, 64:18-22, 65:4-17, PX 150). Barney recognized that the company names and product names on the NAAIP website came from Compulife's software because they matched certain naming conventions he follows when he inputs insurance company and product names into Compulife's software. (Vol. 1, 65:25-66:24).

38.     On April 8, 2015, after he discovered NAAIP, Barney called the telephone number on the NAAIP.org webpage, and a man by the name of David Gordon answered the phone and the two spoke for twenty minutes. (Vol. 1, 70:17-71:1). On April 9, 2015, and again on April 10, 2015, Barney sent emails to support@naaip.org advising David Gordon of NAAIP that he was using Compulife's software without permission or license and advising Gordon to stop. (PX 129). Since that first email, Barney communicated many times with David Rutstein, using the alias David Gordon, and repeatedly advised Rutstein to stop using Compulife's software. (Vol. 1, 75:5-6).

39.     On April 10, 2015, Barney looked at and printed out the source code for the Thomas Mattison page at www.NAAIP.org. (Vol. 1, 67:20-24, PX 149). Not all of the 25 pages

of code Barney saw was taken from Compulife, but beginning at line 503 Barney recognized Compulife's HTML code used to communicate information to Compulife's internet engine software. (Vol. 1, 68:15-69:7, compare PX 149 to PX 542). The state selection code and "State" parameter were identical. (Vol. 2, 148:3-5, PX 567 (Bruner Demonstrative 1 comparing PX 149 to PX 542) at 5-7). The birthday and birth month selection code and "Birthday" and "BirthMonth" parameters were identical. (Vol. 2, 148:8-22, PX 567 at 9-10). The birth year selection code and "BirthYear" parameter was identical. (Vol. 2, 148:24-25, PX 567 at 11). The gender selection code and "Sex" parameter were identical. (Vol. 2, 149:14-16 at 12). The smoker selection code and "Smoker" parameter were identical. (Vol. 2, 149:21-22, PX 567 at 13). The health class code was identical except NAAIP changed "Standard" to "Regular"; the "Health" parameter and values of "PP", "P", "RP", and "R" were identical. (Vol. 2, 150:8-151:9, PX 567 at 15). The new category code was identical for categories corresponding to term insurance policies for 5 years, 10 years, 15 years, 20 years, 25 years, 30 years, to age 70, to age 75; the "NewCategory" parameter and the category selection variables for the categories copied were identical. (Vol. 2, 152:20-24, PX 567 at 20-21). The mode used code and parameter for monthly premium was identical. (Vol. 2, 154:19, PX 567 at 22). The code for sorting output information was identical. (Vol. 2, 155:1, PX 567 at 23).

40.     On April 10, 2015, Barney's investigation led him to the website at www.BeyondQuotes.com which was also using Compulife's HTML code. Barney ran an insurance quote. (Vol. 1, 76:6-13, PX 448). Barney then used the contact form at the BeyondQuotes.com website to contact the owner, and in response Barney received an email from info@beyondquotes.com that indicated it came from "Agent Republic." (PX 33).  Barney looked

up "Agent Republic" in Compulife's customer records and found that "Agent Republic" was tied to Compulife customer Brian McSweeney. (Vol. 1, 77:6-22).

41.     Barney contacted McSweeney. (PX 569 at 180:6-8; Vol. 1, 77:19-22, PX 33, DX43). Brian McSweeney was a customer of MSCC's VAM DB service and a Compulife PC customer. (Vol. 1, 56:16-22; PX 569 at 175:17-176:22). MSCC was a licensed Compulife internet engine customer owned by Michael Steinhardt. (Vol. 1, 55:14-22, 59:4-11; Vol. 2, 45:2-3, 45:15-18; PX 537). MSCC operated VamDB, an insurance customer relationship database software service that insurance agents, like McSweeney, used to record information about their customers who buy life insurance. (Vol. 1, 56:10-15). As with all Compulife internet engine customers, MSCC was only permitted to allow licensed Compulife PC users access to the Compulife internet engine software. (Vol. 1, 59:14-17, PX 537).

42.     McSweeney believed that the insurance quotes on NAAIP and BeyondQuotes may be coming from VAM DB. (PX 569 at 180:10-25; Vol. 1, 79:22-23). Barney contacted Steinhardt of MSCC. (PX 566 at 18:12-19:2; Vol. 1, 79:20, PX 157). Steinhardt visited www.NAAIP.org and reviewed the underlying source code for pages on that website.[17] (PX 566 at 21:21-22:13; PX 157). Steinhardt recognized the HTML code as belonging to Compulife. (PX 566 at 21:21-22:13; PX 157). Steinhardt determined that the account being used to produce the quotes at NAAIP.org belonged to McSweeney. (PX 566 at 19:5-20:13).

43.     Steinhardt disabled McSweeney's account's access to the Compulife internet engine software running on MSCC's server. (PX 566 at 19:5-20:13; PX 157). The NAAIP.org websites and the www.BeyondQuotes.com website immediately stopped producing life

---

[17] Steinhardt observed that each agent page "was basically a template page, each one was the same just different agent information, but the information as far as writing a quote was the same." (PX 566 at 23:7-10).

insurance quotes. (PX 566 at 19:5-21:20; Vol. 1, 106:3-10, PX 157). Shortly thereafter, on Monday, April 13, 2015, McSweeney received a message from David Rutstein that said "the compulife guy disabled my quote engines…which may have been coming from you." (PX 569 at 184:10-185:1, PX 36, DX 38). That same day, Rutstein sent an email to Barney threatening to steal Compulife's Term4Sale customers. (Vol. 1, 105:3-13, PX 129). On April 25, 2015, Rutstein made similar threats to Compulife's business by email. (Vol. 1, 112:13-19, PX 253, 253, DX 99).

44.    Unbeknownst to Compulife, David Rutstein's access to Compulife's HTML code and database actually dated back to 2011 and occurred as follows: on August 17, 2011, David Rutstein, using the email address bob@naaip.org, sent an email to Brian McSweeney and service@compulife.com, subject "Dear Compulife – I have an account with you through Eric Savage." (DX 1). The email requested assistance from Compulife to put a quote engine on www.beyondquotes.com. The email said, "I also work with Brian McSweeney of www.BMlifequotes.com." (DX 1). The email requested assistance putting a quote engine on both websites. (DX 1). The email was signed "David Rutstein" with the phone number 561-948-6074. (DX 1).  Rutstein admitted to sending the email. (Vol. 4, 181:17-20).

45.    Compulife never gave consent for David Rutstein's use of Compulife's HTML or data. (Vol. 3, 109:21-110:9). Jeremiah Kuhn received the email, but he had never heard of David Rutstein at that time in 2011 and had no idea who he was. (Vol. 3, 75:1-4). Based upon the wording of the email, Kuhn believed that Rutstein was a website designer for Savage and McSweeney. (Vol. 3, 75:14-21, 76:13-16). Kuhn thought Savage was the Compulife subscriber. (Vol. 3, 75:24-25). Kuhn thought BeyondQuotes.com was owned by McSweeney or Savage, and Rutstein never mentioned NAAIP.org in his email. (Vol. 3, 79:7-13). Kuhn provided the

Compulife HTML quoter code to Rutstein but had no idea who he was or what organization he was a part of at that time. (Vol. 3, 81:7-11, 107:5-6, DX 4).

46.     David Rutstein admitted at trial that the "Compulife widget" on his BeyondQuotes.com website was communicating with Compulife's server; "It was completely through his system," Rutstein said. (Vol. 4, 183:183-914).  Rutstein testified that communication changed at some point from Compulife's server to MSCC's server, and that Rutstein was in charge of what needed to be done to effectuate this change. (Vol. 4, 184:3-185:9). Rutstein claimed that he was never asked by Steinhardt if he (Rutstein) had a license with Compulife. (Vol. 4, 186:10).

47.     Had Kuhn known the truth about Rutstein and that he intended to use the Compulife HTML quoter code on BeyondQuotes.com and NAAIP.org, Kuhn never would have provided the Compulife HTML code to Rutstein. (Vol. 3, 107:23-108:7). McSweeney told Compulife that McSweeney did not want Rutstein to have access to his quote engine, and it should be turned off. (PX 569 at 182:11-21). Compulife's licensing agreements only allow the use of Compulife's HTML on a website that is owned by a Compulife licensed user, so Rutstein, who was not a licensed Compulife user, was prohibited from using Compulife's HTML on BeyondQuotes.com and NAAIP.org, and his use violated all Compulife's licensing agreements. (Vol. 3, 76:17-20, 77:4-7, 108:10-109:20).

48.     Brian McSweeney paid the defendants over $75,819.00 in exchange for sales leads that defendants provided to McSweeney which were generated from the BeyondQuotes.com website while Compulife's software and data were used on the site to obtain leads from individuals who entered their information into the BeyondQuotes.com "Life Insurance Quote Engine."  (PX 569 at 218:6-10, PX 30).

49.     About two months after Barney discovered the use of Compulife's code and data on NAAIP and BeyondQuotes, David Rutstein "attacked" Compulife and its customers using Compulife's own www.Term4Sale.com website. (Vol. 1, 131:5-133:2, PX 272, 273). As noted above, the Term4Sale website, in addition to providing a free insurance quote, also provides visitors with information on three Compulife insurance agents they can contact to apply for a policy, and the visitor can send those agents a message through the Term4Sale website. (Vol. 1, 132:3-19). On June 5, 2015, Rutstein ran hundreds of quotes at Term4Sale, and after he was presented with each quote, he sent messages through the Term4Sale website to the Compulife insurance agent customers displayed to him based on the zip codes Rutstein entered. (Vol. 1, 132:20-133:2). The messages said "Compulife quote engine: Beware of security flaw. Your back office is not password protected," and provided a hyperlink to NAAIP followed by the statement "term life quote engines are free." (Vol. 1, 132:10-133:17, PX 272, 273). As a result, Barney was forced to do damage control with his customers who were frightened and concerned about what Rutstein had done. (Vol. 1, 133:18-137:1). Rutstein's actions injured Compulife's reputation and caused some of Compulife's customers to think that the contacts they normally would receive from the Term4Sale website were being diverted somewhere else. (Vol. 2, 42:1-11).

50.     During his investigation immediately after Barney discovered NAAIP in April of 2015, and in the period from April to May of 2015, Barney visited and reviewed hundreds of NAAIP free agent websites at www.NAAIP.org. (Vol. 1, 87:14-23, 89:8-14, 100:22-24). Barney made printouts of free agent website pages at www.NAAIP.org directly from the website and also using the "Wayback Machine" at www.archive.org that saves websites as they appeared on specific dates and times in the past. (Vol. 1, 89:6-91:14, 91:21-92:16, 93:23-94:17, 95:20-96:10, 97:14-98:9, 99:8-100:4, PX 551, 552, 553, 554, 555). Barney reviewed the source code for these

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

other agent websites at www.NAAIP.org and all of them featured a life insurance quote and contained Compulife's HTML source code. (Vol. 1, 93:5-16, 95:3-12, 96:12-16, 97:2-9, 98:18-99:5, 100:13-21, 101:3-10, PX 551, 552, 553, 554, 555).

51.     The NAAIP.org and BeyondQuotes.com life insurance quote engines remained non-functional after MSCC terminated access to the Compulife internet engine on MSSC's server on April 10, 2015 until sometime in May of 2015 when Barney noticed that source code on the NAAIP agent websites began to change, and Barney learned that NAAIP had reached out to one of Compulife's internet engine customers, IE Network, to purchase access. (Vol. 1, 106:12-16, 110:1-7, PX 97). Barney interceded and prevented IE Network from giving NAAIP access to Compulife's software. (Vol. 1, 111:1-112:5, PX 251).

52.     At some point in May of 2015, NAAIP began doing business with CompuOffice, a competitor of Compulife located in Canada, that offers a U.S. insurance comparison system called WinQuote. (Vol. 1, 109:21-23, 114:5-10). That continued for three weeks and then suddenly stopped. (Vol. 1, 114:12). Then, in the middle of June of 2015, Compulife's quotes began appearing on the NAAIP.org website again. (Vol. 1, 114:16-22, PX 291). Barney recognized the quotes as his information coming from Compulife's database in Compulife's software. (Vol. 1, 114:17-117:19, PX 291, 292, 309 and 1-S).  Comparison between what Barney found on the NAAIP.org website and quotes from Compulife's software showed the quotes matched on both. (Vol. 1, 114:17-117:19, 119:23-120:13, 121:1-5, compare PX 288 with PX 292, 309 and 1-S).

53.     In response, Compulife devised ways to modify and change its software to prevent and detect similar situations in the future. (Vol. 1, 119:4-16). One modification Compulife made was to force its internet engine software to check for valid software serial

numbers when information is requested from the internet engine. (Vol. 2, 120:20-121:6). Another modification was to add what Compulife calls a "watermark" to its quotes consisting of uppercase and lowercase letters generated based on a table Barney created. (Vol. 2, 126:24-127:8, PX 568 at 36). The letters are tagged onto the end of a product name in a quote and tell Compulife the serial number of its software used to provide the insurance quotes so the origin can be tracked back to the source. (Vol. 1, 140:9-25; Vol. 2, 172:25-173:15; PX 136, 137, 203, 568 at 40). The serial number is translated into two uppercase and lowercase letters – a "tuple" -- using a chart in a spreadsheet Barney created and gave to programmer Bruner. (Vol. 1, 141:19-24; Vol. 2, 172:25-173:15; PX 203). The letters are then added to the quotes that are displayed by Compulife's software. (Vol. 1, 141:25-142:11; Vol. 2, 172:25-173:15). If you know what letters correspond to what numbers you can determine the first two numbers of the serial number of the software used to produce the quotes. (Vol. 1, 142:11-17).

54.     Compulife's expert Nancy Miracle described this watermarking system as an effective way for Compulife to identify whether the data being displayed on a website in insurance quotes is Compulife's data and, if so, the source of that data, while at the same time being difficult to detect because the codes are small (just two letters) and "look like a data processing error of some sort." (Vol. 4, 6:19-7:16). Miracle opined that the watermark was implemented "fairly cleverly". (Vol. 4, 8:2-15). Miracle tested the watermark system and confirmed it worked as described by Compulife. (Vol. 4, 8:16-22).

## C.  '42 Case Facts

55.     From September 1-4, 2016, Compulife's Term4Sale.com website experienced a scraping attack. (Vol. 2, 133:22-134:4). Over 800,000 "get" requests were sent to the Term4Sale.com server in the United States in the attack; each request consisted of a single line of code, and multiple requests were sent each second over a four-day period. (PX 200). Each

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

request used certain "static" parameters that appear on the Term4Sale website in the Compulife HTML code. (Vol. 4, 15:8-11, PX 200). Bruner pulled the console log files for the Term4Sale website server[18] that recorded the attack, and it was introduced into evidence. (PX 200). Each entry in the log file was a request to the Compulife server at Term4Sale asking for information. (Vol. 2, 136:23-25).

56.     Newman testified that an Israeli woman named Matal of Ethiopian descent performed the scaping attack. (Vol. 4, 109:19-110:6). At a meeting in Tel-Aviv, Israel, Newman watched Matal use a computer to send automated requests in a way that was consistent with scraping. (Vol. 4, 110:3-6; Vol. 5, 67:22-68:3). The requests Matal sent were for two zip codes: 10458 for Bronx, New York, and 33433 for Boca Raton, Florida. (Vol. 4, 113:2-6). Matal took the information from the scraping attack and put it in a large CSV file[19] and then Newman integrated the information from the large CSV file into the database that provided quote information to NAAIP.org websites. (Vol. 4, 110:7-18). Newman acknowledged the information came from Compulife. (Vol. 4, 114:9). Newman was paid for his work. (Vol. 4, 112:20-24). The CSV files were never produced to Compulife because they were routinely deleted. (Vol. 4, 110:19-111:3).

57.     Both Bruner and Compulife's expert Nancy Miracle testified as to what occurred during the attack. (Vol. 2, 161:21-172:13, PX 568; Vol. 4, 10:20-27:18, PX 550). A single internet protocol (IP) address[20] sent over 800,000 requests to the Term4Sale server over and over many times per second for a four day period and each request used the parameters in

---

[18] Every request that came to the Term4Sale server was logged with the IP address it came from, the date and time the request was made, and the request itself. (Vol. 2, 134:15-17).

[19] Newman testified the file "ran into the gigabytes, I could not send it via email." (Vol. 4, 116:2).

[20] Bruner traced the IP address in the log file to a computer or server in Jerusalem, Israel. (Vol. 2, 135:10-24).

Compulife's HTML code while incrementing the corresponding variables one at a time scraping the Compulife Transformative Database contained in the Compulife internet engine software. (Vol. 2, 134:1-4; Vol. 3, 19:25-20:13; PX 200). The attack sent requests using the Term4Sale template file that called the Compulife internet engine's CGI program. (Vol. 2, 163:21-170:19, Vol. 4, 15:16-16:2). The requests only asked for information for two zip codes: 10458 for Bronx, New York, and 33433 for Boca Raton, Florida. (Vol. 2, 160:12-21). The attack on the Compulife internet engine server at Term4Sale.com used the same "BirthMonth", "Birthday", "BirthYear", "Sex", "Smoker", "Health", and "NewCategory" parameters from the Compulife HTML code spelled, formatted and organized identically to how they appear in Compulife's code registered with the Copyright Office. (Vol. 2, 121:18-22, 163:21-165:8; Vol. 4, 15:19-16:2). The requests passed parameters to the Compulife internet engine and produced multiple quotes for each request. (Vol. 2, 170:22).

58.    Bruner compared the quotes that NAAIP produced after the scraping attack and the quotes NAAIP produced matched the quote information obtainable at Compulife's Term4Sale website exactly except NAAIP rounded down to whole dollars. (Vol. 2, 172:7-12, PX 568 at 36-40). Miracle examined the quotes NAAIP produced in sample pages provided to her by Compulife and found Compulife's digital watermarks – the "tuple" of upper and lower case letters – in the quotes that the NAAIP.org website produced after the scraping attack. (Vol. 4, 8:23-10:14).

59.    Bruner also examined software code produced by the defendants. (PX 107). In the defendants' code Bruner found 111 of Compulife's internal company codes. (Vol. 2, 156:9-160:3). Miracle examined code the defendants produced as well. (Vol. 4, 25:20-23). Miracle discovered that the defendants have a database on the NAAIP server that contains quote

**SRIPLAW**

<span style="font-variant: small-caps">California ◆ Georgia ◆ Florida ◆ Tennessee ◆ New York</span>

information with specific fields that match Compulife's parameters and zip codes that correspond to the two zip codes scraped in the attack on the Term4Sale website. (Vol. 4, 25:25-26:23).

60.     Miracle estimated the scraping attack produced 43.5 million results. (Vol. 4, 9:12). Newman disputed that number; he testified that NAAIP.org's database only contained "three million or so" quotes or "three and a half million, roughly, permutations and combinations". (Vol. 4, 117:16-118:8). Newman agreed that three and a half million quotes was not an insignificant amount because, as he admitted candidly, "nobody wanted to be scraped, and nobody ever wants to be scraped." (Vol. 4, 120:10-11).

61.     In response to the scraping attack, Compulife modified the Compulife internet engine so that if more than five requests are quotes are made within one second the software starts slowing down and giving fewer results. (Vol. 2, 125:23-2). Compulife also added a terms of use agreement to the Term4Sale website. (Vol. 2, 41:11-14).

### D.  Damages and Continuing Harm to Compulife

62.     As noted above, One Resource Group is an insurance wholesaler that received overrides and bonuses from insurers on commissions the insurers paid to NAAIP insurance agents, and then ORG paid a portion of the overrides and bonuses it received to AWD as the referral source. ORG was featured prominently in the "back office" portion of the NAAIP.org website. (Vol. 1, 107:8-24, PX 52). One Resource Group paid $108,406.87 in override commissions from sales of insurance policies by NAAIP.org members to American Web Designers during the period of time that NAAIP used Compulife's software and data. (Vol. 1, 148:1-12, PX 43). Rutstein admitted NAAIP.org received that approximate amount from ORG over a two to three-year period. (Vol. 4, 191:3-12). David Rutstein testified that most NAAIP.org users' websites had Compulife's software which made those payments possible. (Vol. 2, 94:10-

**SRIPLAW**

Cᴀʟɪꜰᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Tᴇɴɴᴇꜱꜱᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ

18, DX 59).  In addition to payments from ORG, MBM paid Defendants $75,819 in split

commissions earned from the sale of insurance leads to who originated from BeyondQuotes.com.

63.     Barney performed further research on whether NAAIP continued to use

Compulife's software, and he found quotes on the NAAIP website that came from the Compulife

software, as recently as the Spring of 2019. (Vol. 2, 108:4-109:4).

64.     Compulife incurred costs and expenses of 1000 hours of its programmer Chris

Bruner's time to add increased security measures and protections for its software, and to

investigate the incidents alleged in the '08 and '42 cases. (Vol. 3, 63:15-65:2). As a result of

having to spend time addressing security issues created by the defendants' activities, Bruner was

diverted from spending time moving Compulife's product forward, modernize it, and add to the

software to make it more valuable to Compulife's customers. (Vol. 2, 110:8-23, 173:24-11; Vol.

3, 63:15-64:5). Compulife added a degrade system to its website. (Vol. 2, 181:6-11). Compulife

can slow down how quickly its server responds to get requests but it cannot eliminate the

possibility of scraping attacks because it cannot do away with get requests completely. (Vol. 2,

177:22-25). Bruner's effective rate as a computer programmer is $44 per hour. (Vol. 2, 173:16-

20).  Bruner spent 1,000 hours addressing those issues costing Compulife $110,000. (Vol. 3,

64:11-65:2).

65.     There is no reason why Compulife could not support the thousands of NAAIP

members if they became paying Compulife customers. (Vol. 2, 110:24-111:5).

66.     Defendants had no authority to use Compulife's software. (Vol. 2, 111:6-8).

Defendants never had authority to use Compulife's data or generate life quotes. (Vol. 2, 112:2-

4). Compulife never intended to provide such authorization. (Vol. 2, 114:13-17). Defendants

never explained what they were doing to Compulife, and if they had Compulife would not have allowed it. (Vol. 2, 114:18-115:4)

67.     Compulife lost business it otherwise expected to receive without the interference of NAAIP during the period of time that NAAIP operated. During the period from 2012 through 2019, the number of free trials Compulife gave out to potential customers, and the number of those trials that converted to four-month free subscriptions, both declined. (Vol. 3, 43:20-51:17, PX 151, 546). During that same period the number of four-month subscribers who converted to paying annual subscription customers also declined. (Vol. 3, 51:25-54:2, PX 547). Compulife would have charged each agent an annual licensing fee for their use of Compulife's software and data.

68.     The NAAIP website has a running total of the number of insurance agents who have free websites at NAAIP.org. As of the trial of this case, the number of registered members of the National Association of Accredited Insurance Professionals was 12,498. (Vol. 3, 55:12-56:21; PX 548). The free agent websites NAAIP gives away to NAAIP members either used the Compulife 2010 HTML Source Code on them, or used the Compulife database compilation of insurance information to produce insurance quotes, and therefore each of the free NAAIP.org websites should have licensed Compulife's software or database of information, and Compulife has lost licensing fees as a result. (Vol. 3, 43:12-19, 57:3-58:8; PX 548). Compulife confirmed that sixty-six (66) of its customers canceled their subscriptions and were registered NAAIP users causing Compulife $16,394.00 in damages for lost subscriptions. (Vol. 3, 58:9-61:24; PX 447, 548, 549).  Compulife's experience based upon its many years in the market is that no other company can beat Compulife's competitive pricing, so when agents stop using Compulife's

product it is typically because they have gotten out of the life insurance business. (Vol. 3, 111:7-112:2).

69.     Compulife lost sales worth $43,462.00 to individuals who did not purchase Compulife subscriptions and instead became NAAIP members.

70.      The Court takes judicial notice that the current exchange rate is $.80 USD to CAD, and therefore the amount Compulife incurred for Bruner's time in U.S. Dollars is $37,920.44.

71.     Defendants engaged in willful and malicious misappropriation.

72.     Defendants were notified on numerous occasions that Compulife objected to their use of Compulife's software.

73.     Defendants contacted customers of Compulife in an attempt to get them to cancel their Compulife subscriptions and join NAAIP.

74.     The harm caused to Compulife cannot be remedied by money damages alone.

### III.     CONCLUSIONS OF LAW

#### A.  Compulife's Claims

In the '08 Case, Compulife alleges claims against David Rutstein and Binyomin Rutstein for direct copyright infringement (17 U.S.C. § 501); contributory copyright infringement (17 U.S.C. § 501); federal theft of trade secrets (18 U.S.C. § 1836(b)); and Florida theft of trade secrets (Chapter 688, Florida Statutes). ('42 ECF 296).

In the '42 Case, Compulife alleges claims against David Rutstein, Binyomin Rutstein, Aaron Levy, and Moses Newman for direct copyright infringement (17 U.S.C. § 501); contributory copyright infringement (17 U.S.C. § 501); federal theft of trade secrets (18 U.S.C. § 1836(b)); and Florida theft of trade secrets (Chapter 688, Florida Statutes). ('42 ECF 296).

**B. Jurisdiction and Venue**

The '08 Case and the '42 Case were consolidated for trial. The parties stipulated that the Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338(a), and 1367. ('42 ECF 296).  Based upon the proof at trial the Court agrees that it has subject matter jurisdiction over these consolidated cases.

The parties stipulated that this Court has personal jurisdiction over the parties, and that venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and (c) and 1400(a). ('42 ECF 296).   Based upon the proof at trial the Court agrees that it has personal jurisdiction over the defendants and that venue is proper in these consolidated cases.

**C. Eleventh Circuit Appeal and the Application of the Law of the Case Doctrine on Retrial**

The Fifth Circuit explained the "law of the case" doctrine over fifty years ago as follows:

> The 'law of the case' rule is based on the salutary and sound public policy that litigation should come to an end. It is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members,' and that it would be impossible for an appellate court 'to perform its duties satisfactorily and efficiently' and expeditiously 'if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal' thereof.

> While the 'law of the case' doctrine is not an inexorable command, a decision of a legal issue or issues by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

*White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.) (footnotes omitted).

The law of the case doctrine bars relitigation of issues that were decided, either explicitly or by necessary implication, in an earlier appeal of the same case. See *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) ("The [law of the case] doctrine operates to

preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal."); *A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 582 (11th Cir. 2001) ("Generally, the law of the case doctrine requires a court to follow what has been explicitly or by necessary implication decided by a prior appellate decision."); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 n. 3 (11th Cir. 1990) ("While the law of the case does not bar litigation of issues which might have been decided but were not, it does require a court to follow what has been decided explicitly, as well as by necessary implication, in an earlier proceeding.") (internal marks and citation omitted).

### D.  Copyright Infringement

#### 1.  Legal Standards

##### a.  Direct Copyright Infringement

In order to prevail on a claim of direct copyright infringement, two elements must be established: ownership of a valid copyright, and violation of one or more of the plaintiff's exclusive rights under 17 U.S.C. § 106, usually by copying.  *Feist Publ'ns. Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-33 (11th Cir. 2011). The Supreme Court determined in *Feist* that to qualify for copyright protection, a work must be original to the author, must be created independently (not copied), and must possess "at least some minimum degree of creativity." *Feist*, 499 U.S. at 345.

The second element, copying, "comprises two subparts, 'factual and legal copying.'" *Compulife*, 959 F.3d at 1301 citing *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1148 n.40 (11th Cir. 2007). "Factual copying—the question 'whether the defendant actually used the plaintiff's material,'—may be shown 'either by direct evidence, or, in the absence of direct evidence, it may be inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

work and the copyrighted work.'" *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301–02 (11th Cir. 2020) quoting *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1554 (11th Cir. 1996).

"'Legal'—or 'actionable'—copying occurs when 'those elements of the [copyrighted work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.'" *Compulife*, 959 F.3d at 1302 quoting *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1300 (11th Cir. 2008). Substantial similarity "must be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole." *Peter Letterese*, 533 F.3d at 1307. "Quantitatively insubstantial copying may still be actionable if it is qualitatively substantial." *Compulife*, 959 F.3d at 1302 citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565 (1985).

The trier of fact must first filter out the unprotectible elements of the copied material because "copyright protection extends only to a work's expressive elements, not to any underlying 'idea, procedure, process, system, method of operation, concept, principle, or discovery' expressed therein." *Compulife*, 959 F.3d at 1304 quoting 17 U.S.C. § 102. The process of "filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scènes à faire* material, and other unprotectable elements." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1545 (11th Cir. 1996).

After filtering out the unprotectible elements comes the comparison step to determine substantial similarity. Substantial similarity "exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir. 1982). "Even in the

rare case of a plaintiff with direct evidence that a defendant attempted to appropriate his original expression, there is no infringement unless the defendant succeeded to a meaningful degree." *Leigh*, 212 F.3d at 1214 citing *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 122–23 (2d Cir. 1994).

"[A]fter an infringement plaintiff has demonstrated that he holds a valid copyright and that the defendant engaged in factual copying, the defendant bears the burden of proving—as part of the filtration analysis—that the elements he copied from a copyrighted work are unprotectable." *Compulife*, 959 F.3d at 1305-6. Plaintiff is not required to prove a negative, i.e. that the portion of what defendant appropriated from plaintiff's work is not unprotectible. *Id.* Rather, the burden to prove unprotectability rests with the defendant. *Id.*

### b.  Joint and Several Liability

Copyright infringement is a tort and all who participate in the infringement are jointly and severally liable for the infringement.  *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1278 (11th Cir. 2008).  Where two or more persons act together and cause wrong to another, they incur joint liability for the acts of each other. *Id.*  "A party named individually who has used a corporation which he controls and dominates totally is liable jointly and individually for all acts of copyright infringement, unfair competition and trade secret appropriation." *SmokEnders, Inc. v. Smoke No More, Inc.*, 1974 U.S. Dist. LEXIS 6183 *26, 184 U.S.P.Q. (BNA) 309 (S.D. Fla. 1974).

### c.  Contributory Copyright Infringement

One commits contributory infringement when "with knowledge of the infringing activity, [she] induces, causes or materially contributes to the infringing conduct of another." *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987). "One infringes contributorily by intentionally

inducing or encouraging direct infringement…" *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 914 (2005).

### 2.  Conclusions of Law in the '08 Case

### a.  Ownership of a Valid Copyright

Compulife's 2010 HTML code was registered with the Copyright Office on May 29, 2015, assigned Reg. No. TX 8-106-364. "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. § 410(c). As the district court noted following the first trial, Compulife's registration was made slightly more than five years after its 2010 publication date. *Compulife Software, Inc. v. Rutstein*, No. 9:16-CV-80808-JMH, 2018 WL 11033483, at *13 (S.D. Fla. Mar. 12, 2018). The court also noted that it is within the court's discretion to accord later filings presumptive validity. 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.11[A][1] (Matthew Bender, rev. ed., 2017). Following the first trial, the district court exercised its discretion to accord Compulife's certificate the presumption of validity. *Compulife,* 2018 WL 11033483 at *13. On appeal, the Eleventh Circuit noted that "[t]he existence and validity of Compulife's copyright are undisputed." *Compulife*, 959 F.3d at 1301.

Even were the validity of Compulife's copyright disputed by defendants, Compulife demonstrated that its 2010 HTML code is original creative authorship entitled to copyright protection.[21] Bruner, Compulife's programmer, wrote the 2010 HTML code himself and did not

---

[21] The second amended joint pretrial stipulation identifies "unprotectable elements" as an affirmative defense in both the '08 case and the '42 case. ('42 ECF 296). This is not an affirmative defense because it simply provides a basis to negate Plaintiff's *prima facie* case. See *Royal Palm Sav. Ass'n v. Pine Trace Corp.,* 716 F. Supp. 1416, 1420 (M.D. Fla. 1989) ("An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification or other negating matter."). Furthermore, as discussed below, defendants failed to meet their burden to show that the code they copied was unprotectable.

copy it from anyone else. Compulife's expert, Miracle, opined that the 2010 HTML code contained numerous creative elements including a creative way to identify and organize variables related to requests for insurance quotation information.  Defendants offered no evidence demonstrating Compulife's 2010 HTML code "does not satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl. 8," *Bateman,* 79 F.3d at 1542, a requirement that "variously has been characterized as 'modest,' 'minimal,' and 'a low threshold.'" *Original Appalachian Artworks*, 684 F.2d at 824. Therefore, based on either the presumption Compulife's registration certificate, the doctrine of law of the case, or the evidence at trial, Compulife owns a valid copyright in its 2010 HTML code.

### b.  Factual Copying

Compulife proved defendants copied Compulife's 2010 HTML code as a matter of fact. Factual copying was not disputed by defendants in the '08 case on appeal and is law of the case. *Compulife*, 959 F.3d at 1302 (determining that factual copying "isn't really disputed here, and we think it has been established…").

Furthermore, even if Compulife was required to prove factual copying, the evidence showed that the defendants accessed Compulife's 2010 HTML code when Rutstein was sent an email containing it by Kuhn in 2011 (DX 4), and it was in defendants' possession on the NAAIP.org and BeyondQuotes.com websites when Barney discovered them in April of 2015. (PX 149, 551, 552, 553, 54, 555). Furthermore, the 2010 HTML code was in use by defendants because when their access to MSCC's server with the Compulife internet engine was cut-off by Steinhardt, NAAIP.org and BeyondQuotes.com websites stopped producing quotes. Compulife proved factual copying of Compulife's HTML code by defendants to operate their NAAIP websites and the BeyondQuotes website and generate insurance quotes at both sites.

### c.  Legal Copying

Compulife also proved both the qualitative and quantitative significance of the HTML code copied by the defendants. The Compulife 2010 HTML code totals 347 lines. (Vol. 3, 147:4). Thirteen of those lines are mandatory and have to be in the code for it to function. (Vol. 4, 4:15-5:5). Of the remaining code, defendants copied 282 lines of Compulife's HTML code, or 84%[22] of the total lines of code. (Vol. 3, 144:7-146:22). The 282 lines of code defendants copied perform the key functions needed to produce an insurance quote from user input: the state selection code, the birthdate and birth month selection code, the birth year code written in camel case, the gender selection code, the smoker/tobacco code, the health class code, the insurance category code, the mode used code, the code for sorting output information, and the face amount code. In reaching this conclusion I credit the opinion of Compulife's expert Nancy Miracle that defendants copying of Compulife's HTML code was qualitatively and quantitatively significant. (Vol. 4, 27:3-8).

Defendants failed to meet their burden to show that the elements they copied from Compulife's HTML code were unprotectible. Defendants offered no evidence on this point, only speculation. Defendants presented no expert testimony either. Compulife proved legal copying of its 2010 HTML code in the '08 case.

### d.  Joint and Several Liability of Defendants David Rutstein and Binyomin Rutstein

The court determines that David Rutstein and Binyomin Rutstein, the defendants in the '08 case, are jointly and severally liable for copyright infringement.

---

[22] At trial, Ms. Miracle initially testified that the defendants copied 81% of the code based on defendants' copying of 282 lines out of 347 lines total. (Vol. 3, 146:22). The court then asked Ms. Miracle to recalculate the percentage used after determining the non-discretionary portion of the total lines of HTML. (Vol. 3, 146:25-147:21). Thereafter, Ms. Miracle determined that thirteen lines of HTML code were non-discretionary. (Vol. 4, 4:15-5:5). While Ms. Miracle did not report the new percentage, the calculation based on 334 total non-discretionary lines to 282 lines copied yields 84%.

David Rutstein founded NAAIP in 2010. David Rutstein purchased the BeyondQuotes.com website. David Rutstein operated BeyondQuotes.com and NAAIP.org from the time of its founding through the present. David Rutstein claimed that he stopped working on NAAIP except for hosting a daily conference call, but the court finds Mr. Rutstein's testimony not to be credible on this point. The evidence showed that NAAIP and BeyondQuotes have at all relevant times been operated by David Rutstein.

Binyomin Rutstein participated in the infringement.  Binyomin Rutstein is David Rutstein's son. Binyomin Rutstein obtained his insurance license in 2010 at the age of 18. Binyomin Rutstein has never sold an insurance policy in his life. David Rutstein testified that he used Binyomin Rutstein's insurance license to operate AWD and conduct the business of NAAIP.org and BeyondQuotes.com. Binyomin knew that his insurance licenses were being used to operate NAAIP and BeyondQuotes. Binyomin Rutstein profited from the operation of NAAIP and BeyondQuotes.

### 3.   Conclusions of Law in the '42 Case

#### a.   Ownership of a Valid Copyright

The same Compulife 2010 HTML code is at issue in the '42 Case as in the '08 Case. For the same reasons as in the '08 case, Compulife's copyright is valid in the '42 case.

#### b.   Factual Copying

In the '42 case, Compulife demonstrated that its 2010 HTML Source Code was copied and used in "get" commands that were sent to "scrape" Compulife's www.Term4Sale.com website for insurance quotes. Each "get" command copied key parameters and associated variables from Compulife's 2010 HTML Source Code. Factual copying occurred in the '42 Case when the defendants launched the scraping attack. The attack sent parameters copied from the Compulife 2010 HTML as 800,000 "get" requests to the Compulife internet engine server

running the Term4Sale.com website. The parameters were copied exactly as they appear in the

Compulife HTML. The parameters sent were: "State", "BirthMonth", "Birthday", "BirthYear",

"Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1", and

"FaceAmount." The parameters were formatted and ordered the way they were written in the

Compulife HTML code, for had they been spelled or ordered differently, the server running

Term4Sale.com would not have produced the millions of quotes the defendants scraped from

Compulife's website.

### c.  Legal Copying

Compulife proved the qualitative and quantitative significance of the HTML code copied

and used by the defendants for the scraping attack. While the amount of code used consisted of

only eleven (11) parameters and the variables defined in the code that correspond to those

parameters, qualitatively those eleven parameters and the variables were essential to the success

of the defendants' scraping attack as they appear in the get requests used in the attack. Had the

defendants not copied the eleven parameters and used the correct variables defined in the

Compulife HTML code, their attack would have failed. Since the parameters are also contained

in the Compulife internet engine source code written in C++, they are by definition qualitatively

significant for the functioning of Compulife's internet engine.

As the Eleventh Circuit noted on appeal of this case:

> Quantitatively insubstantial copying may still be actionable if it is qualitatively
> substantial. See *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S.
> 539, 565, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). For instance, because "a small
> portion of the structure or code of a [computer] program may nonetheless give it
> distinctive features or may make the program especially creative or desirable,"
> copying of that portion is actionable. 4 Nimmer on Copyright § 13.03[F][5]
> (2019).

*Compulife*, 959 F.3d 1302. Here, the eleven parameters and their associated variables copied by

defendants were especially desirable because they held the keys to millions of quotes the

defendants needed in order to update their quote engines and keep them functioning on thousands of NAAIP.org agent websites. Therefore, while the amount of code copied to commit the scraping attack was small, qualitatively the code was essential and demonstrates legal copying. In reaching this conclusion I credit the opinion of Compulife's expert Nancy Miracle that the Compulife parameters and values used in the get requests were copied to scrape Compulife's Transformative Database. (Vol. 4, 27:3-18).

Once again, defendants failed to meet their burden to show that the elements they copied from Compulife's HTML code were unprotectible. Defendants offered no evidence on this point, only speculation. Defendants presented no expert testimony either. Compulife proved legal copying of its 2010 HTML code in the '42 case.

### d.  Joint and Several Liability of Defendants

The court determines that all the defendants in the '42 case are jointly and severally liable for copyright infringement. For the same reasons why David and Binyomin Rutstein are liable in the '08 case, so too are they liable in the '42 case.

Aaron Levy is also liable in the '42 case. Levy participated in the infringement.  The domain names www.naaip.org and www.beyondquotes.com are registered to Aaron Levy. Aaron Levy also handles all the financial affairs of NAAIP and BeyondQuotes.com. Aaron Levy paid an Israeli woman of Ethiopian descent named Matal for the data that was scraped from Compulife's www.Term4Sale.com website.

Moses Newman is also liable in the '42 case. Moses Newman participated in the infringement.  Moses Newman was the chief programmer for NAAIP.org since April of 2016. Moses Newman wrote the NAAIP and BeyondQuotes quote engine that copied the Compulife 2010 HTML Code. Moses Newman loaded the data scraped by Matal from Compulife's www.Term4Sale.com website into a database used by NAAIP and BeyondQuotes.

### E. Contributory Infringement

### 1. Court's Conclusions

Compulife demonstrated defendants committed direct infringement of Compulife's 2010 HTML code which was copied and distributed on NAAIP.org websites and used to generate insurance quotes. Each NAAIP website was given free to a different life insurance agent.  The free NAAIP websites copied Compulife's copyrighted 2010 HTML code. There are thousands of such websites.

The Court finds that defendants David Rutstein and Binyomin Rutstein induced, caused and materially contributed to and participated in the infringement of Compulife's HTML code on the NAAIP.org websites. David Rutstein has been involved in the operations of NAAIP.org and BeyondQuotes.com from April 19, 2012 to the present. David Rutstein has promoted free NAAIP member websites to insurance agents. David Rutstein knowingly induced NAAIP members to get free NAAIP websites with Compulife's copyrighted HTML code on them. In both the '08 case and the '42 case, David Rutstein induced, caused and materially contributed to the infringement.

The Court finds that defendant Binyomin Rutstein materially contributed to the infringement by permitting the use of his insurance licenses to operate NAAIP. Binyomin Rutstein knew that the other defendants were using his insurance licenses to operate NAAIP and he allowed it. In both the '08 case and the '42 case that defendant Binyomin Rutstein materially contributed to infringement.

The Court finds that defendant Aaron Levy materially contributed to the infringement. The domain names www.naaip.org and www.beyondquotes.com are registered to Aaron Levy. Aaron Levy also handles all the financial affairs of NAAIP and BeyondQuotes.com.  Aaron Levy paid an Israeli woman of Ethiopian descent named Matal for the data that was scraped from

42

Compulife's www.Term4Sale.com website. The Court determines in the '42 case that defendant Aaron Levy materially contributed to infringement.

The Court finds that defendant Moses Newman materially contributed to the infringement. Moses Newman has been the chief programmer for NAAIP.org since April of 2016.  Moses Newman wrote the NAAIP quote engine that included code copied from the Compulife 2010 HTML Code. Moses Newman loaded the data scraped from Compulife's www.Term4Sale.com into a database used by NAAIP.   Moses Newman knew the data was scraped. The Court determines in the '42 case that defendant Moses Newman materially contributed to infringement.

**F.  Compulife's Misappropriation of Trade Secrets Claims Under the DTSA and FUTSA**

**1.  Legal Standards**

To prove a claim under the Florida Uniform Trade Secrets Act (FUTSA), Fla. Stat. § 688.001, et seq., Compulife "must demonstrate that (1) it possessed a trade secret and (2) the secret was misappropriated." *Compulife*, 959 F.3d at 1310-11 quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018). The Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, et seq., "creates a federal cause of action that largely mirrors FUTSA." *Compulife*, 959 F.3d at 1311, fn. 13.

Florida law defines a trade secret as

information ... that: (a) [d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.' " *Yellowfin Yachts*, 898 F.3d

at 1298–99 (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978)).

Compulife alleges misappropriation both by acquisition and by use. A person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means." Fla. Stat., § 688.002(2)(a). A person misappropriates a secret by use if he uses it "without express or implied consent" and either:

> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
>> a. Derived from or through a person who had utilized improper means to acquire it;
>>
>> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat., § 688.002(2)(b). As used in FUTSA, "[i]mproper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id*. § 688.002(1).

## 2.   Conclusions of Law in the '08 Case

Compulife's Transformative Database of insurance information in Compulife's software is a protectible trade secret of Compulife.[23] The court in the first trial determined that

---

[23] The Eleventh Circuit observed:

Compulife's Transformative Database[24] was a trade secret, and defendants failed to contest

that finding on appeal, which is law of the case.[25] *Compulife*, 959 F.3d at 1311.

The evidence showed that defendant David Rutstein obtained access to Compulife's

Transformative Database in the Compulife internet engine software running on MSCC's server

---

The Transformative Database is valuable because it contains up-to-date information on many life insurers' premium-rate tables and thus allows for simultaneous comparison of rates from dozens of providers. Most of Compulife's customers are insurance agents who buy access to the database so that they can more easily provide reliable cost estimates to prospective policy purchasers. Although the Transformative Database is based on publicly available information—namely, individual insurers' rate tables—it can't be replicated without a specialized method and formula known only within Compulife.

*Compulife*, 959 F.3d at 1296.

[24] Defendants asserted "failure to maintain level of secrecy and confidentiality of trade secret, and permissive use" as affirmative defenses in the second amended joint pretrial stipulation. ('42 ECF 296). However, neither are true affirmative defenses but rather simply provide a basis to negate Plaintiff's *prima facie* case of trade secret misappropriation. *Premier Baths, Inc. v. Safe Step Walk-In Tub Co*., No. 612CV708ORL22DAB, 2012 WL 13102325, at *5 (M.D. Fla. Oct. 19, 2012)("An essential element of a misappropriation of trade secrets claim is that the alleged confidential information actually constitutes a trade secret.") citing Fla. Stat. § 688.002(2), (4) (defining "misappropriation" and "trade secret").

[25] Even without application of law of the case, the evidence showed that Compulife's database of insurance information in Compulife's software derived economic value from not being known to others, and was the subject of reasonable efforts to maintain its secrecy.

Compulife kept its database confidential, encrypted it, secured it, encoded it, licensed it under restrictive terms and confidentiality, and limited access to it to maintain its secrecy. Compulife wrote its software containing its database in C++ code and only provided licensees with compiled versions of the software. Compulife only permitted authorized users to access the Compulife data files. The program used by Compulife for creating and maintaining its trade secrets was written in C++ compiled code and is not provided externally to anyone. The Compulife trade secrets are intentionally encrypted in such a way as to ensure that the data files cannot be easily reverse engineered. The only permissible way to access the Compulife data files in order to obtain a quote is by using the compiled program which is licensed to Compulife customers or by visiting www.Term4sale.com.

Furthermore, all Compulife software is licensed to users pursuant to licensing agreements. Compulife's licensing agreements prohibit the user from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting service to sub-users without Compulife's permission. That same agreement notifies the user that Compulife's software includes names of variables and lists of variables which are proprietary to Compulife.

The data in Compulife's software is encrypted so that it is only usable by Compulife's licensed subscribers. Compulife includes serial numbers in each version of its software that are cross referenced with Compulife's database of licensed users, and Compulife automatically disables software that is not properly licensed. Compulife also includes watermarks in its software to detect unauthorized users.

Under these facts, Compulife was entitled to trade secret protection for its database. See *All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, at *10-11 (S.D. Fla. Nov. 27, 2012)("Trade secrets are broadly defined under the Florida Uniform Trade Secrets Act and include information that derives an economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy"); See also *Del Monte Fresh Produce Co. v. Dole Food Co., Inc*., 136 F. Supp. 2d 1272, 1291 (S.D. Fla. 2001).

using an account belonging to Brian McSweeney. The evidence showed that David Rutstein used Compulife's software to produce insurance quotes on BeyondQuotes.com and NAAIP.org.

In response, defendants argued that they did not misappropriate Compulife's trade secrets in its Transformative Database because their access to Compulife's software was authorized by Jeremiah Kuhn who sent David Rutstein Compulife's HTML code needed to access the Compulife internet engine and authorized by Steinhardt and McSweeney who permitted defendants to connect BeyondQuotes.com and NAAIP.org to the Compulife internet engine software running on MSCC's server.[26]

Defendants misunderstand the concept of authorized access. Access obtained voluntarily but without knowledge of the true facts is not, in fact, authorized. "When, for instance, a defendant knows that his knowledge of a trade secret was acquired using 'improper means,' or that he has acquired knowledge of a trade secret 'by accident or mistake' and still uses it, such use is actionable misappropriation." *Compulife,* 959 F.3d at 1313 citing Fla. Stat. § 688.002(2)(b) 1., 2.a., 3. That is the case here. Steinhardt, McSweeney, Barney, and Kuhn all testified that had they known that the defendants were going to connect BeyondQuotes and NAAIP websites to the Compulife internet engine containing the Transformative Database, they never would have allowed the defendants to do what they ultimately did. Defendants' access was unauthorized and improper.

Defendants also used Compulife's Transformative Database without authorization. As the Eleventh Circuit noted, "the bar for what counts as 'use' of a trade secret is generally low." *Compulife,* 959 F.3d at 1313, citing *Penalty Kick Mgmt. v. Coca Cola Co*., 318 F.3d 1284, 1292

---

[26] Rutstein testified he told Kuhn in a telephone call that BeyondQuotes.com was his website, but Rutstein could not recall the details of the call. (Vol. 4, 199:12-200:8). The defendants offered no testimony claiming that NAAIP.org's access was authorized.

(11th Cir. 2003) ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995))). The evidence demonstrated defendants used Compulife's Transformative Database in violation of the statute.

### 3.  Conclusions of Law in the '42 Case

The evidence showed that from September 1, 2016 through September 4, 2016, over 800,000 "get" requests were sent to the Compulife internet engine software running on the www.Term4Sale.com websites. The "get" requests were sent from IP address 5.29.63.18 located in Israel by a woman named "Matal" at the request of the defendants. The "get" requests asked for quotes by specifying two zip codes: 10458 for Bronx, New York, and 33433 for Boca Raton, Florida.  In response to each get request, the Transformative Database contained in the Compulife software produced insurance quotes for those zip codes. The total number of quotes produced was in the millions. Matal collected the millions of insurance quotes the Term4Sale server produced into a file. Matal gave the file to defendant Moses Newman. Newman knew how Matal obtained the quotes in the file because he watched her execute her scraping attack.

Newman took the file of quotes he received from Matal and put them in the database on the www.NAAIP.org website. After the scraping attack, the insurance quotes produced by the free agent websites on NAAIP.org contained Compulife's security watermark indicating that the quotes came from the Term4Sale.com website. In addition, after the scraping attack, the quotes produced by the quote engine on the NAAIP.org website were limited to quotes for 10458 for Bronx, New York, and 33433 for Boca Raton, Florida.

While the Transformative Database does not contain the insurance quotes themselves, it contains the insurance rates necessary to produce the quotes. Based upon the evidence presented, the block of data that the defendants took was significant: over 870,000 "get" requests were sent

and produced over 43,500,000 insurance quotes. Newman described the files of quotes he received from Matal as large, apparently large enough to create a database large enough to provide sufficient data to operate the term life quote engine at the NAAIP.org agent websites. Defendants attempted to minimize the significance of what they took, by eliciting testimony that the combinations of different requests to the database could have been in the trillions, Miracle opined that the number of unique responses would not be that high. (Vol. 4, 32:8-9).  The amount of data was large enough to constitute appropriation of the Transformative Database.

The means defendants employed to obtain the data through a scraping attack were improper. There was nothing proper about the scraping attack according to either Compulife's witnesses or even defendant Newman who admitted that "nobody wants to be scraped." Compulife spent considerable time and resources before the attack to build protections into its software and Transformative Database to thwart and trace such attacks, and built further protections into its software after to avoid such attacks in the future. The scraping attack meets any reasonable definition of "improper means" imaginable.

In response, defendants argued that they did not misappropriate Compulife's trade secrets because they only took insurance quotes that the Term4Sale.com server produced on the public internet that were freely available to the public. However, this argument ignores that fact that defendants scraped millions of quotes. Even assuming, arguendo, that "the scraped quotes were not individually protectable trade secrets because each is readily available to the public," the defendants scraped "so much of the Transformative Database []—in a bit-by-bit fashion—that a protected portion of the trade secret was acquired." *Compulife,* 959 F.3d at 1314–15 ("Even if quotes aren't trade secrets, taking enough of them must amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret

protections for 'compilations,' which the law clearly provides."), citing Fla. Stat. § 688.002(4) ("

'Trade secret' means information, including a ... compilation."), and *Unistar Corp. v. Child*, 415

So. 2d 733, 734 (Fla. 3rd DCA 1982) (holding that a "distillation of" publicly available

information was a protectable trade secret). Defendants' scraping attack appropriated a

"substantial portion" of the Compulife Transformative Database, and the portion appropriated

was sufficiently large to give rise to liability for misappropriation.

      Defendants also argued that taking quotes from a publicly accessible site automatically

means that the taking was authorized or otherwise proper. However, as the Eleventh Circuit held,

while Compulife authorized manual human access to Term4Sale.com, it did not authorize robot

access, and as the defendants demonstrated by scraping Compulife's database "a robot can

collect more quotes than any human practicably could." *Compulife,* 959 F.3d at 1314–15 ("So,

while manually accessing quotes from Compulife's database is unlikely ever to constitute

improper means, using a bot to collect an otherwise infeasible amount of data may well be—in

the same way that using aerial photography may be improper when a secret is exposed to view

from above."), citing *Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-1193-A, 2003 WL

23018270, at *8 (E.D. Va. Dec. 5, 2003) ("There can be no doubt that the use of a computer

software robot to hack into a computer system and to take or copy proprietary information is an

improper means to obtain a trade secret, and thus is misappropriation under the VUTSA."). Nor

does the lack of terms of use on the Term4Sale.com website render the defendants' hacking

proper. *Id*.

      Defendants also used the quotes that were scraped. The quotes had value to the

defendants, otherwise they would not have used them. That use, independent of access, is

sufficient to demonstrate misappropriation occurred.

Finally, defendants argue Compulife did not take reasonable efforts to protect its database because terms of use for the Term4Sale website were only posted after the scraping attack, and therefore this confirms that Compulife's trade secrets were not reasonably protected.  The Court disagrees. The fact that the Term4Sale website allows access to the Compulife database to operate does not mean that Compulife did not take reasonable steps to protect its trade secrets from an extraordinary event like the scraping attack. The mere fact that Term4Sale was vulnerable to such an attack does not mean that Compulife did not take reasonable steps to protect its database, especially in light of the many other security measures Compulife undertook to secure its trade secrets such as its use of encryption, its automated licensing check, its watermarks, and its licensing agreements.

The Court also disagrees that the absence of a terms of use on the Term4Sale website prior to the attack diminishes Compulife's trade secret claim. The evidence showed that the Compulife software is licensed to users pursuant to a license agreement that prohibits licensed users from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting service to sub-users without Compulife's permission. (Doc. 177, ¶ 10; PX 532-537). The evidence also showed that the Compulife software includes functionality that checks whether the person accessing the software has a valid license.  These and other precautions testified to by the witnesses for Compulife were sufficient to entitle Compulife to trade secret protection for its database.

"The individual who misappropriates a trade secret and the corporation who profits from use of the misappropriated trade secret are joint tortfeasors and hence jointly and severally liable for damage sustained by the trade secret owner." *SmokEnders,* 1974 U.S. Dist. LEXIS 6183 at *26. The evidence showed that defendants either misappropriated Compulife's trade secrets,

profited from the misappropriation, or both. The evidence supports the finding that David

Rutstein, Aaron Levy, and Moses Newman misappropriated Compulife's trade secrets.  The

evidence also showed that all the defendants, including Binyomin Rutstein, profited from the

misappropriation.  Therefore, all defendants are jointly and severally liable for misappropriation.

### G.  Defendants' Affirmative Defenses

#### 1.  Independent Creation

The defendants' second amended joint pretrial stipulation identifies independent creation

as an affirmative defense in both cases. ('42 ECF 296).  Independent creation requires a

defendant to negate the claim of copying with evidence. *Arthur Rutenberg Homes v. Drew

Homes, Inc*. 829 F.Supp. 1314, 1318 (M.D. Fla. 1993)(*citing* 3 M. Nimmer & D. Nimmer,

*Nimmer on Copyright*, § 12.11[D] (1992)).

Defendants failed to demonstrate the affirmative defense of independent creation. No

evidence that defendants created Compulife's software on their own was offered. Rather, the

evidence showed that Compulife created its software. The affirmative defense of independent

creation fails.

#### 2.  Innocent Infringement

The defendants' second amended joint pretrial stipulation identifies innocent

infringement as an affirmative defense in both cases. ('42 ECF 296). Innocent infringement is

not a true affirmative defense, but rather a limitation on damages and is only applicable if the

infringer proves that he was unaware that the works had been copyrighted. *Malibu Media, LLC v.

Fitzpatrick*, 2013 U.S. Dist. LEXIS 149495 (S.D. Fla. Oct. 17, 2013).

The Court finds that the innocent infringement defense is not applicable to the

defendants. Innocent infringement only applies to statutory damages determinations, but

Compulife seeks actual damages.

### 3. Unclean Hands

Unclean hands requires a defendant to show (1) that the plaintiff's wrongdoing is directly related to the claim against which it is asserted and (2) that it was personally injured by the plaintiff's conduct. *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993).

Defendants failed to demonstrate any evidence to support their affirmative defense of unclean hands.  Compulife did not engage in any wrongdoing directly related to the claims against which the defense is asserted. Defendants suffered no injuries from Compulife's conduct. The affirmative defense of unclean hands fails.

## IV.   DAMAGES AND INJUNCTIVE RELIEF

### A. Copyright Infringement

#### 1. Legal Standards

By statute, the "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement." 17 U.S.C. 504(b). The damages suffered are to compensate of the copyright for any injury to the market value of the copyrighted work, and it "often is measured by the revenue that the plaintiff lost as a result of the infringement." *Montgomery v. Noga*, 168 F.3d 1282, 1294, 1295 n.19 (11th Cir. 1999). To collect actual damages, a copy right claimant must demonstrate a causal connection between the infringing party's activity and any injury to the market value of the copyrighted work at the time of infringement. *Id*. at 1294.

In addition to actual damages, Compulife is entitled to defendants' profits from the infringement but only to the extent they are not already taken into account in calculating Compulife's actual damages. 17 U.S.C. 504(b).  A claim for lost profits may include a retroactive license fee measured by what the plaintiff would have earned by licensing the

infringing use to the defendant. See e.g., *Montgomery*, 168 F.3d at 1295–96 (affirming jury award of actual damages based on a retroactive license fee); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001).

In order to demonstrate entitlement to a reasonable license fee, Plaintiff "must show that the thing taken had a fair market value." *On Davis*, 246 F.3d at 166. Courts have found adequate evidence supporting a finding of fair market value when: (1) the plaintiff demonstrates that he previously received compensation for use of the infringed work; or (2) the plaintiff produces evidence of benchmark licenses, that is, what licensors have paid for use of similar work. See e.g., *On Davis*, 246 F.3d at 166 (plaintiff testified he had previously been given a $50 royalty for the use of a photograph which included his sunglasses); *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 359 (S.D.N.Y.2003) (plaintiff produced evidence of previous license fees of $15 to $88 paid for the publication of his photographs).

Any claim of damages may not be based on pure speculation. See e.g. *Telecom Tech. Servs. Inc. v. Rolm Co.,* 388 F.3d 820, 830 (11th Cir. 2004) (addressing claim that damages were too speculative). "[S]ome difficulty in quantifying the damages attributable to the infringement should not bar recovery." *On Davis,* 246 F.3d at 167. "[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and the loss of revenue, the burden shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper & Row Publishers v. National Enterprises*, 471 U.S. 539, 567 (1985).

Such a claim for actual damages may include a retroactive license fee measured by what the Plaintiff would have earned by licensing the infringing use to the Defendant. See e.g.,

*Montgomery,* 168 F.3d at 1295-96 (affirming jury award of actual damages based on retroactive license fee).

### 2. Court's Conclusions

Compulife is entitled to recover actual damages for infringement based on the licensing revenue that it lost as a result of the infringement. Compulife presented evidence that the members of NAAIP are life insurance agents and that each member is a potential customer for Compulife's software. Compelling evidence of this is found in the fact that Compulife learned about the defendants' infringement from an insurance agent who inquired whether Compulife was able to provide a service for their agency that was the same as NAAIP was offering, and pointed Barney to the website for the "National Association of Accredited Insurance Professionals" at www.NAAIP.org. (Vol. 1, 59:21-60:6, PX 556). Because the defendants provided Compulife's software for free on NAAIP.org, Compulife is entitled to recover from the defendants what Compulife would have earned by licensing the infringing use to them on a per agent basis.

Compulife presented the testimony of Jeremiah Kuhn, who acts as Compulife's financial officer, to prove its damages. Mr. Kuhn testified to Compulife's licensing fee over the years since 2013 when the infringement began. Mr. Kuhn also presented evidence as to the number of NAAIP members since 2013 based upon his observations of the website since 2015, and his estimate of the numbers of agent members prior to 2015 based upon other information he found in his investigation of the defendants. The court is satisfied that Mr. Kuhn's estimates of the number of agents in 2013 and 2014 are reasonable and not speculative. The Court also credits Kuhn's testimony that potential Compulife customers who found out they could obtain the same or similar service from NAAIP for free would not have paid Compulife for that service, and therefore Compulife lost customers. (Vol. 3, 86:15:4-25).

Based upon the testimony, the Court finds that Compulife is entitled to actual damages from the defendants for direct copyright infringement and contributory copyright infringement as follows:

| Year | # NAAIP Users | Annual Licensing Fee Per User | Year Total |
|------|---------------|-------------------------------|------------|
| 2013 | 528 | $298.00 | $157,344.00 |
| 2014 | 1582 | $298.00 | $471,436.00 |
| 2015 | 4746 | $288.00 | $1,366,848.00 |
| 2016 | 6586 | $234.00 | $1,541,124.00 |
| 2017 | 7805 | $192.00 | $1,498,560.00 |
| 2018 | 7805 | $192.00 | $1,498,560.00 |
| 2019 | 7805 | $192.00 | $1,498,560.00 |
| 2020 | 12,482 | $192.00 | $2,396,544.00 |
| | | Total: | **$10,428,976.00** |

Compulife is also entitled to recover the defendants' profits from the infringement. The evidence showed that One Resource Group paid the defendants through American Web Designers, Inc., Binyomin Rutstein's insurance agency, override commissions as a result of sales of insurance policies by NAAIP members. The amount of override commissions paid the defendants was $108,406.87. This amount is the defendants' gross revenues, and these amounts are not already taken into account in computing Compulife's actual damages.  Therefore, Compulife is entitled to recover the amounts paid defendants in override commissions as part of their damages.  Defendants presented no evidence of their expenses to reduce these amounts of damage.

Brian McSweeney testified that his company, MBM Life Quotes, paid the defendants through American Web Designers, Inc., Binyomin Rutstein's insurance agency, $75,819.00 for "leads" that resulted in sales of insurance policies. The leads resulted from BeyondQuotes.com and each lead was a potential customer who used the quote engine at BeyondQuotes which infringed on Compulife's copyright. The amount paid by McSweeney's company to defendants are their gross revenues, and these amounts are not already taken into account in computing Compulife's actual damages.  Defendants presented no evidence of their expenses to reduce these amounts of damage.

The damages Compulife suffered for contributory infringement is the same as for direct infringement so the Court does not award any additional amount for contributory infringement to avoid a double recovery.

### B.  Trade Secret Misappropriation

#### 1.  Legal Standards

To the extent that it is not duplicative of its damages for copyright infringement, Compulife is entitled to recover (i) the actual damages suffered as a result of defendants' misappropriation of Compulife's compilation of information concerning the term life insurance market, terms life products, and term life rates; and (ii) any Defendant's unjust enrichment that is a result of their misappropriation, even if that amount is more than the actual damages suffered by Compulife. *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268 (S.D. Fla. 2003).  If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any compensatory award. Fla. Stat. § 688.004.

### 2.  Court's Conclusions

The Court determines that Compulife's actual damages for trade secret misappropriation are the same as for copyright infringement except that in addition to the actual damages Compulife suffered, Compulife is also entitled to recover its economic damages related to the costs and expenses of its programmer Chris Bruner's time expended to add increased security measures and protections for its software after the first misappropriation and infringement was discovered in April of 2015, and then after the scraping attack was discovered in September of 2016.

As to actual damages, as with its copyright infringement claims, Compulife presented evidence that the members of NAAIP are life insurance agents and that each member is a potential customer for Compulife's software.  Because the defendants provided access to Compulife's database of insurance information for free on NAAIP.org, Compulife is entitled to recover from the defendants what Compulife would have earned by licensing the database and its software to them on a per agent basis.  The Court will consider the same testimony provided by Jeremiah Kuhn to determine Compulife's damages for trade secret misappropriation.  The same estimates provided by Mr. Kuhn as to the number of NAAIP agents from 2013 through 2020 apply here, are reasonable and not speculative.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Compulife also presented evidence through Jeremiah Kuhn that Compulife potential customers who agreed to four-month trials did not subscribe as expected. This led to Compulife being unable to convert free four-month trial customers into paying customers during a time when the only alternative to Compulife was the defendants' free NAAIP.org service. While the defendants claimed that the failure of these potential customers to become paying customer was speculative, the court determines that the inference raised by Kuhn was reasonable, not speculative, and justified under the facts.

| Year | # New Users Lost | Annual Licensing Fee Per User | Year Total | Running Total |
|------|------------------|-------------------------------|------------|---------------|
| 2013 | 37 | $298.00 | $11,026.00 | $11,026.00 |
| 2014 | 24 | $298.00 | $7,152.00 | $18,178.00 |
| 2015 | 28 | $288.00 | $8,064.00 | $26,242.00 |
| 2016 | 26 | $234.00 | $6,084.00 | $32,326.00 |
| 2017 | 22 | $192.00 | $4,224.00 | $36,550.00 |
| 2018 | 12 | $192.00 | $2,304.00 | $38,854.00 |
| 2019 | 12 | $192.00 | $2,304.00 | $41,158.00 |
| 2020 | 12 | $192.00 | $2,304.00 | **$43,462.00** |

Compulife is also entitled to recover the defendants' unjust enrichment that is a result of their misappropriation.  Again, as with Compulife's copyright infringement claims, the evidence showed that One Resource Group paid the defendants $108,406.87 in override commissions to American Web Designers, Inc., Binyomin Rutstein's insurance agency, as a result of sales of insurance policies by NAAIP members. Brian McSweeney testified that his company, MBM Life Quotes, also paid the defendants through American Web Designers, Inc., Binyomin Rutstein's insurance agency, $75,819.00 for "leads" that resulted in sales of insurance policies. These

amounts are the defendants' unjust enrichment.  Again, defendants presented no evidence of their expenses to reduce these amounts of damage.

Regarding Compulife's economic damages, Chris Bruner testified that he spent 80 hours investigating the scraping attack.  Bruner also testified that he spent 1,000 hours adding additional security measures and protections to the software after the April 2015 infringement and misappropriation was discovered.   Bruner's effective hourly rate is $44 Canadian dollars per hour.  The Court finds that Compulife is entitled to recover 1,080 hours of Mr. Bruner's time at the equivalent rate in U.S. dollars as economic damages.  At the current exchange rate of $.80 USD to CAD, the amount Compulife is entitled to recover for Chris Bruner's time is $38,297.60.

The Court also determines that Compulife has demonstrated that the defendants engaged in willful and malicious misappropriation, and therefore Compulife is entitled to exemplary damages. The evidence of willful and malicious misappropriation presented was overwhelming. The Defendants repeatedly lied, denied involvement, attempted to prolong litigation, avoided settlement, and engaged in violations of Compulife's rights in its copyrights and trade secrets with repeated notice that Compulife objected. The statute provides for an exemplary damages award in an amount up to two times the actual damages awarded.  Based upon this evidence, the Court determines that exemplary damages in the amount of two times Compulife's actual damages is appropriate.

### C.  Pre-Judgment Interest

Consistent with the law, Compulife is entitled to pre-judgment interest on the amounts awarded as damages herein. *Leonard v. Stemtech Int'l, Inc*., 834 F.3d 376 (3rd Cir. 2016)(copyright owners are entitled to award of prejudgment interest on actual damages to make the plaintiff whole because a copyright owners has an "equitable claim to the time-value of income derived from his creation.")

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

### D. Permanent Injunction

The remedies provided by the Copyright Act include injunctive relief to prevent or restrain further infringement of the copyright. 17 U.S.C. § 502(a). Compulife has the burden under *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), to show "(1) that it suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391. To obtain a permanent injunction based on trade secret misappropriation., a party "must demonstrate a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." *Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008) quoting *Eastern Fed. Corp. v. State Office Supply Co.*, 646 So.2d 737, 741 (Fla. 1st DCA 1994).

The evidence at trial showed that despite the filing of a first lawsuit (the '08 Case) against defendants, they infringed by copying Compulife's HTML code to perform the scraping attack that scraped Compulife's Transformative Database. Where, as here, liability has been determined adversely to the infringer, there has been a history of continuing infringement and a significant threat of future infringement remains, a permanent injunction is appropriate. *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1161 (9th Cir. 2011).

Irreparable harm was shown by defendants' continued infringement and the appearance of Compulife's quotes on NAAIP.org after the '08 lawsuit was filed. Irreparable harm was also shown by defendants' continued use of Compulife's data even after the '42 case was filed.

Defendants' inferior quotation service built using information from only two zip codes made to appear as if it is accurate (and represented as accurate by Rutstein to NAAIP.org

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

agents), undermines the value of Compulife's software and Transformative Database, Compulife's goodwill and ability to attract new customers and retain existing licensees, all of which caused Compulife to suffer irreparable harm. See *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017)(The loss of the value of works to the copyright owner, the loss of the copyright owner's goodwill, and the loss of negotiating leverage are all the types of irreparable harm that cannot readily be remedied with damages.).

Irreparable harm is also shown by defendants continued thefts and refusal to abandon its business model that involves stealing from others like Compulife, requiring Compulife to engage in a constant battle with defendants to stop future infringement and trade secrets theft. "A legal remedy is inadequate if it would require a 'multiplicity of suits.'" *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007). A permanent injunction will ensure that a multiplicity of suits is avoided and defendants' future infringement, which threatens to destroy Compulife if it continues, is prevented.

Any hardship to defendants is not valid. Defendants are thieves and pirates and the hardship attendant to lawful behavior is not hardship at all. Where, as here, the infringement and misappropriation stems from an unwillingness to obtain proper permissions, licensing or consent, and the plaintiff stands to lose business and the ability to protect its works and secrets, the balance of hardships must favor the plaintiff.

There is greater public interest in protecting the rights of copyright and trade secret owners than in allowing an infringer and misappropriator to continue using Compulife's copyrighted source code and trade secret protected compilation. The public interest will be served by granting a permanent injunction against defendants. Defendants should not be permitted to operate its website that traffics in infringing code and stolen information. The

insurance agent public has no idea that when it joins NAAIP.org and obtains a free website it is simultaneously aiding and abetting trade secrets theft and copyright infringement.

As long as NAAIP.org remains online Compulife is harmed. Only an injunction can stop defendants from infringing and stealing. Defendants should be enjoined from operating NAAIP.org in addition to engaging in any further infringing or misappropriation.

Compulife is entitled to entry of a permanent injunction against defendants.  The Court will issue its permanent injunction separately.

### E.  Judgment for Money Damages

The Court will issue a separate judgment for monetary damages consistent with these findings of fact and conclusions of law.

**SO ORDERED**

THIS _____ DAY OF _____, 2021

_____
HONORABLE BRUCE E. REINHART
United States Magistrate Judge

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Dated:  January 19, 2021                    Respectfully submitted,

                                            */s/ Joel B. Rothman*
                                            JOEL B. ROTHMAN
                                            Florida Bar Number:  98220
                                            joel.rothman@sriplaw.com

                                            **SRIPLAW**
                                            21301 Powerline Road
                                            Suite 100
                                            Boca Raton, FL  33433
                                            561.404.4350 – Telephone
                                            561.404.4353 – Facsimile

                                            *Counsel for Plaintiff Compulife Software Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on January 19, 2021, a true and correct copy of the foregoing document was sent by electronic mail by the Court's CM/ECF System to all parties listed below on the Service List.

*/s/Joel B. Rothman*
JOEL B. ROTHMAN

### <u>SERVICE LIST</u>

Allison L. Friedman, Esq.
**ALLISON L. FRIEDMAN, PA**
20533 Biscayne Boulevard
Suite 4-435
Aventura, FL  33180
305.905.2679 – Telephone
888.691.1248 – Telephone
305.692.9387 – Facsimile
ralfriedman@hotmail.com

*Counsel for Defendants*